FILED

MAY 2 1 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**George M. Lewis, M.D.**
George M. Lewis, M.D., Pro Se
7095 Hollywood Blvd.
# 1245
Hollywood, Ca. 90028
323-512-0198

*Plaintiff*

Case: 1:07-cv-00939
Assigned To : Urbina, Ricardo M.
Assign. Date : 5/21/2007
Description: Civil Rights-Non Employ.

JURY ACTION

**CIVIL COMPLAINT FOR**
**DAMAGES PURSUANT TO**
**42 U.S.C. 1983, 1985, and 1986**

**vs.**

**Senator Evan Bayh, United States**
**Senator from Indiana**
*Defendant*

_____/

**COMES NOW** George M. Lewis, M.D., appearing Pro Se, who asks

this honorable court to her this complaint (Haines v. Kener 1972 401US 519,

30L Ed. 2d 652 92 S.Ct. 594), who states the following:

### JURISDICTION

This civil complaint for damages arises from alleged violations of 42 U.S.C.

1983, 42 U.S.C. 1985, AND 42 U.S.C. 1986; this District Court has subject

1

matter jurisdiction pursuant to 28 U.S.C. 1331 because it presents several federal questions arising under the Constitution and the laws of the United States. With respect to Plaintiff's claims based on 42 U.S.C. 1985 (3) and 1986, the Court also has jurisdiction pursuant to 28 U.S.C. 1343(a)(3). Supplemental jurisdiction over the Plaintiff's pendent state-law claims is conferred by 28 U.S.C. 1367(a).

### VENUE

Plaintiff filed a civil complaint in the Central District of California, Los Angeles Division as Case No. CV-04-2950 AHS against Senator Bayh and other defendants who were alleged to have violated Plaintiff's constitutional rights. Senator Evan Bayh was named Respondete Superior in the complaint. The District Court's dismissed the claims against all other defendants save Senator Evan Bayh, whose claim had been raised in the wrong venue. The court gave Plaintiff leave to refile the complaint in the proper venue. The venue in which Senator Evan Bayh lives, or where the violation of rights was alleged to have taken place.

This matter was reviewed and upheld by the Ninth Circuit Court of Appeals on April 7, 2007. In the matter now filed before this District Court, venue is appropriate in this judicial district under 28 U.S.C. 1332 because the case involves diversity of citizenship and a part or substantial part of the

events or omissions giving rise to Plaintiff's complaints occurred in this or other districts.

**Fourth, Fifth, Sixth, and Fourteenth Amendment Violations, Civil Rights Conspiracy, Unintentional Infliction of Emotional Harm, Theft, Obstruction of Justice, Civil Conspiracy**

### Preliminary Statement

1.      The fundamental ground upon which this tort action arises is based on the misconduct of Senator Evan Bayh who, acting in a personal capacity, requested and reviewed several investigative reports that pertained to complaints Plaintiff had filed between November 1998 and January 2001. These reports contained information from the Department of Treasury's investigations into allegations that private citizens, members of the Indiana Bar, law enforcement officials, a household moving and storage-company, an IRS employee, as well as public officials in Indiana were guilty of criminal wrongdoing. These reports also included findings about the alleged illegal conduct of high-ranking public officials in Indiana whom Plaintiff alleged had violated his civil and constitutional rights.

2.      Through the partial disclosure of documents made possible by the requests made under F.O.I.A., Plaintiff determined that two third party congressional requests had been for these investigative

3

reports in June 2001. Plaintiff alleges that Senator Bayh was the third party congressional entity that requested and reviewed these two investigative reports. **(Exhibit A)**

3. Plaintiff alleges the two investigative reports were reviewed by Defendant Senator Evan Bayh and constituted conduct that went beyond the speech and debate protections for which legislators would normally be accorded immunity.

4. In January 2001, Plaintiff went to Senator Charles Grassley and reported official misconduct by officials in Indiana and California that began in 1998. Plaintiff had not received a response to his many inquiries about official misconduct. Senator Grassley requested a congressional inquiry into the allegations of official misconduct in April 2001.

5. In July 2001, Plaintiff was informed by the Department of Treasury that seven investigative reports existed that pertained to the numerous complaints Plaintiff had filed between 1998 and 2001.

6. Plaintiff entered the F.O.I.A. administrative process. When it concluded in January 2002, only 509 of 714 pages were released by the Department of Treasury and the remaining 205 pages were

4

withheld for privacy and law enforcement exemptions. Plaintiff had reviewed the F.O.I.A. documents he received. Contained in these pages, it revealed that a *third party congressional request,* other that the congressional inquiry made by Senator Grassley, to review these investigative reports. However, the documents indicated the requests were limited to **only** *two of the seven investigative reports*. These two third party congressional requests were quite specific.

7.      The first congressional request was made on June 19, 2001 for the Marion County, Indiana reports and attachments. And, the second congressional request was made two days later, on June 21, 2001 for the Hamilton County reports and attachments. Plaintiff alleges that these two reports, which Plaintiff had been denied access to, pertained to the alleged official misconduct of the public officials, private citizens, and other entities that were Senator Bayh's Indiana constituents.

8.      Plaintiff alleges that after reviewing these investigative reports on June 19, 2001 and on June 21, 2001 Senator Bayh had full knowledge of their contents and that he took deliberate steps to

block the release of the documents to Plaintiff during the F.O.I.A.
administrative process that Plaintiff initiated in July 2001.

9.    In addition, after Plaintiff had been instructed to file the F.O.I.A.
(52 U.S.C. 552) complaint in federal district court on April 19,
2002, Plaintiff alleges Senator Bayh acted in both direct and
indirect ways to limit his access to as much of the material as
possible **(Exhibit B)**.

10.    Plaintiff alleges that Senator Bayh's review of these documents
was conducted on behalf of himself and his co-conspirators and
thereby constitutes conduct that fall outside of the protections for
speech and debate. Senator Bayh's participation in this civil
conspiracy [1] to deprive Plaintiff of his civil and constitutional
rights caused severe hardship to Plaintiff, as well as emotional,
physical, and mental distress, family separation and dissolution, for
which Plaintiff is entitled to damages.

11.    Senator Bayh's misconduct is at the center of this controversy.
However, Plaintiff presents a controversy that has gone on since
1998, nearly ten years. Over this long period of time, the elements

---

[1] A tort of civil conspiracy contains three elements: (1.) a combination of two or more persons; (2.) for the purpose of injuring the plaintiff; (3.) causing plaintiff special damage, Kuznik v. Bees Ferry Associates, 342 S.C. 579, 538 S.E. 2d. 15 (Ct. App. 2000), cert. Granted, (July 3, 2001).

of this conspiracy required the help of others who actively tried to thwart Plaintiff's efforts to exercise his constitutional rights in pursuit of civil or criminal actions. *And*, create situation that were intended to result in his arrest, incarceration, silencing, and discrediting.

12. The damages caused by the well-coordinated conspiracy that these parties were involved in can be divided into **two distinct and separate** groups of actions. The first involved illegal actions that took place in Indiana in 1998, 1999, and 2000 which included the initial violations of law and constitutional rights of Plaintiff; and, second arose from the coordinated actions taken by a wide variety of people (both inside and outside of Indiana) **and** agencies, which were themselves participants in the illegal cover-up the illegal acts.

13. **First,** there were specific acts of criminal misconduct perpetrated by citizens, agencies, officials, and a commercial moving company in Indiana. The initial acts of criminal misconduct were in violation of 42 USC 1983, 42 USC 1985, and the Fourteenth Amendment of the U.S. Constitution. They occurred in Marion County and Hamilton County, Indiana and were investigated by F.B.I. and T.I.G.T.A, as well as other agencies, and Plaintiff's

request. The two specific Treasury reports are among the documents Plaintiff sought through F.O.I.A. Plaintiff alleges Senator Bayh conducted a third party congressional review of selected reports on June 19 and 21 2001 and then took steps to block their release in order to protect himself and his Indiana constitutients.

14.    **Second,** After Plaintiff submitted allegations about the eleven individuals, three state agencies, a commercial moving company, the Clerk, Indiana Supreme Court, and the Hamilton County Sheriff's Department stating they had violated his rights there was an intense and widespread effort to prevent Plaintiff from vindicating his allegations and pursuing these matters in civil and/or criminal court.

15.    Plaintiff alleges this conspiracy carried a heavy and distinct racial animus, expressed by Steven Siedel, when, as he had convinced the Deputy Sheriff to for Plaintiff to leave before the packing was done, said, "This is where we separate the men from the boys, George".

16.    Plaintiff understood this racial taunt as Siedel's attempt to make a racial comparison that was once popular whites with low self-

esteem, during slavery and for a period of time afterwards. Siedel's hubris conveyed to Plaintiff, who is African American that white males were the men, and African American males were the boys by virtue of the prevailing social order. At that moment, he wanted to emphasize the power he had to do as he pleased, with the help and protection of the Sheriff's Department, Kenneth Kern, Atlantic Relocations, the Clerk, Indiana Supreme Court, and Defendant Senator Evan Bayh.

17.    Siedel was telling Plaintiff that the white men who were going to steal Plaintiff's belongings, commit fraud, be guilty of conversion, and obstruction of justice were superior to African American Plaintiff; they were a cut above Plaintiff by virtue of their racial superiority. The above mentioned co-conspirators were all involved in this conspiracy and violated 42 USC 1983, 42 USC 1985, 42 USC 1986, as well as the Fourth and Fourteenth Amendments of the constitution.

18.    Their conduct was the direct cause of injuries to Plaintiff, injuries that were the basis for the claim of intentional infliction of emotional harm, abuse of process, defamation of character, obstruction of justice, the conversion of stolen property, and

unintentional infliction of emotional harm upon Plaintiff, for which

Plaintiff is entitled to damages.

## CAUSE OF ACTION # 1

**Plaintiff Alleges Constitutional and Civil Rights violations; Basis of Claims that Defendant Caused Intentional Infliction of Emotional Harm, Conversion, Abuse of Process and Obstruction of Justice**

**19.**    Plaintiff restates as if fully set forth here each and every claim,

assertion, and allegation set forth in the foregoing Paragraphs 1-18

of this complaint:

Between November 1998 and September 2006, Plaintiff's

complaints were submitted to the Federal Bureau of Investigations

**(Exhibit C)**, F.D.I.C., the Attorney General, U.S. Department of

Justice, U.S. Attorney for the Southern District of Indiana, U.S.

Attorney for the Northern District of California, the U.S. Attorney

for the Central District of California, Department of Homeland

Security **(Exhibit D)**, the Indiana Judicial Commission, Taxpayer

Advocates Office, IRS **(Exhibit E)**, Director of Practice,

T.I.G.T.A, Inspector General, Department of Justice, Office of

Professional Responsibility, Department of Justice, and the U.S.

Senate Ethics Committee.

10

20. Upon information and belief, Plaintiff alleges the attempt that was made to take his life was part of a <u>long</u> and <u>voluminous</u> history of abuses and civil rights violations that began in September 1997 and has continued until the present. The Defendant Senator Evan Bayh was responsible for the egregious acts of misconduct in a complex conspiracy-a conspiracy driven from the beginning by the desire to punish Plaintiff for making public allegations about the wrongdoing of citizens in Indiana that deprived him of rights guaranteed under the constitution.

21. Plaintiff alleges that present from the beginning of this civil conspiracy against his civil and constitutional rights was a more far-reaching objective, that of protecting the constituents of Senator Bayh from culpability for their criminal wrongdoing.

22. Upon information and belief, Plaintiff alleges that race played an important role in the continuation of this conspiracy. One person, Jay Pewthers, named as a defendant (CV-04-2950-AHS) openly acknowledged that race was a factor in his work with Plaintiff. His race was used pejoratively as a means to discredit Plaintiff's claims by employing readily accepted stereotypes and rationalizations against him that compromised his rights as a citizen. Plaintiff

alleges that this made it easier for those involved to distance themselves from their illegal and immoral conduct towards Plaintiff. Plaintiff alleges Defendant Evan Bayh and those he protected were motivated by racial animus.

23.    Upon information and belief, Plaintiff alleges this conspiracy continued and grew out of control because of Defendant Senator Evan Bayh's disregard for the law, the racial animus he shared with his co-conspirators, and the belief that none of them would ever be held accountable for their actions. This Defendant and those whom he protected as well as those who helped him throughout this controversy, all entered into a civil conspiracy against Plaintiff.

24.    Plaintiff alleges the various agencies he contacted repeatedly ignored the credible information and evidence that supported the allegations of abuse Plaintiff made between 1998 and 2006. *And,* this conspiracy against Plaintiff rights continued because many of these people and government agencies named herein suppressed the truth and acted intentionally to protect Defendant Evan Bayh and those who had violated the law in Indiana.

25.    Upon information and belief, Plaintiff alleges these are the basis for the actions described in more detail later, occurring between 1997 and 2006, all documented below, were in violation of federal statutes 42 U.S.C. 1983, 42 U.S.C. 1985, and 42 U.S.C. 1986, as well as the Fourth, Fifth, and Fourteenth Amendments of the United States Constitution. These violations of rights took place in multiple jurisdictions and involved many different individuals, for different lengths of time since 1998, when Plaintiff filed the first complaint. Plaintiff references, with specificity, all such alleged violations of law and violations of constitutional rights herein.

26.    Plaintiff    submits    evidence    that    Defendant    Senator    Bayh participated in a civil conspiracy against Plaintiff's rights. [2] It reveals the illegal conduct of Senator Bayh was tied to the alleged criminal behavior of his Indiana constitutients in 1998. It reveals that a congressional party, other than the one requested by Plaintiff had sought and secured the review of two investigative reports. Those two reports concerned alleged criminal conduct in Marion County, Indiana, and Hamilton, County, Indiana.

---

[2]    The elements of a civil conspiracy are: (1) an agreement, (2) a wrongful act by any of the conspirators pursuant to that agreement, and (3) damages. <u>Stone v. Regents of University of California,</u> 77 Cal. App. 4th 736, 92 Cal. Rptr. 2d 94, 140 Ed. Law Rep. 1012 (4th Dist. 1999).

27.   Upon information and belief, Plaintiff alleges Defendant Senator Evan Bayh misused both the offices and the authority the public entrusted to him, as a United States Senator from Indiana and through his appointment as a member of the Select Committee on Intelligence, to exploit his position and power, and the resources of the United States government to destroy Plaintiff's life for the purpose of protecting the alleged illegal conduct of his Indiana constitutients, and then Senator Bayh participated in efforts to cover-up of his complicity in this conspiracy, after the fact.

28.   The conduct and actions taken by Defendant Senator Evan Bayh caused injuries to Plaintiff. Plaintiff's injuries caused him emotional and physical hardship, and exacerbated a chronic medical condition. The causes of action for these injuries support Plaintiff's claims of abuse of process, intentional infliction of emotional harm, defamation of character, and unintentional infliction of emotional harm for which Plaintiff is entitled to damages.

## CAUSE OF ACTION # 2

**Plaintiff Alleges Constitutional and Civil Rights violations; Basis of Claims that Defendant Caused Unintentional Infliction of Emotional Harm, Abuse of Process and Obstruction of Justice**

29. Plaintiff restates as if fully set forth here each and every claim, assertion, and allegation set forth in the foregoing Paragraphs 1-18, and Paragraphs 19-28 of this Complaint:

30. Upon information and belief, Plaintiff alleges Defendant Senator Evan Bayh had knowledge of but did not act to protect the rights of Plaintiff *after* he learned about a controversy that began in September 1997. At that time, Plaintiff was called to testify in a child support hearing in a Title IV-D Court hearing. Commissioner Barbara Collins ordered the Court Reporter to turn off the tape machine and she allowed the Deputy Prosecutor Lorraine Bradley to attempt to extort money from Plaintiff as his attorney, Kenneth Kern, stood by and did nothing.

31. Upon information and belief, Plaintiff alleges Defendant Senator Evan Bayh knew about but did not act to protect Plaintiff's rights when he had knowledge that the court had forced Plaintiff to give Kern his power of attorney with IRS to insure that he would work with Revenue Officer Keith Clayton, under the threat of losing his

15

Indiana medical license. Plaintiff was advised by a former IRS agent to ask IRS if he was the target of a criminal investigation. He was told in 1998, 1999, and 2000 that he was not the subject of a criminal investigation.

32.     In his numerous contacts with IRS, he made it clear that he was not a tax protester, and had no desire to avoid paying taxes, but the difficulties in resolving the tax matters persisted. Plaintiff reported the misconduct of Collins, Kern, Bradley, and the court to the Indiana Judicial Commission, which later found unprofessional conduct had "not" occurred. Defendant Senator Evan Bayh knew about but did not act on the knowledge he had about the conduct of these parties to protect the abrogation of Plaintiff's rights. This resulted in injuries to Plaintiff and led to claims whose causes were the abuse of process, intentional infliction of emotional harm, and defamation of character.

33.     Upon information and belief, Plaintiff alleges Defendant Senator Evan Bayh knew about but did not act on the knowledge to protect the rights of Plaintiff *after* IRS Revenue Officer Keith Clayton conspired with Steven Siedel to steal Plaintiff's automobile, a

16

Corvette, using the offices of James Kingsolver, vice president of a Noblesville bank to disguise their intent and effect the transaction.

34. Mr. Siedel ended up keeping the car while Kern promised to file a suit for conversion in the Marion County Court, which he failed to do. Plaintiff reported these actions to the Tax Advocates Office, the Director of Practice, the Regional Director of IRS, the F.B.I., the F.D.I.C., and the U.S. Attorney for the Southern District of Indiana. Plaintiff alleges Defendant Senator Evan Bayh knew about but intervened with the F.D.I.C. to thwart Plaintiff's effort to have the matter investigated and reviewed.

35. Therefore, upon information and belief, Plaintiff alleges that Defendant Senator Evan Bayh had knowledge about these two specific alleged violations of Plaintiff's rights. Plaintiff further alleges that Defendant did not act on the knowledge to protect Plaintiff's rights in the first instance; and that Defendant took steps to intentionally block government agency oversight, in the second instance.

36. Defendant Senator Evan Bayh's actions resulted in injuries to Plaintiff and his family. Plaintiff is entitled to damages from the cause of his claim is fraud, theft, conversion, abuse of process,

17

obstruction of justice, and intentional infliction of emotional harm,

for which Plaintiff was entitled to damages.

## CAUSE OF ACTION # 3

**Plaintiff Alleges Constitutional and Civil Rights violations; Basis of Claims that Defendant Caused Intentional Infliction of Emotional Harm, Abuse of Process and Obstruction of Justice**

37.    Plaintiff restates as if fully set forth here each and every claim,

assertion, and allegation set forth in the foregoing Paragraphs 1-18,

Paragraphs 19-28, and Paragraphs 29-36 of this Complaint:

Upon information and belief, Plaintiff alleges Defendant Senator

Evan Bayh knew about but did not act on the knowledge to protect

Plaintiff's rights *after* he became aware that on July 3, 1998,

Plaintiff was served an eviction notice on the day before the long

July 4th weekend, with the date of eviction set for "**no later than**

**9:00 am Wednesday July 8, 1998**". This order gave Plaintiff no

opportunity to respond, appeal, arrange for moving the contents of

a 5000 sq. ft. household, or challenge the decision in any way

(**Exhibit F**). However, Plaintiff's attorney Kenneth Kern, who had

represented him in the Noblesville courtroom where Judge

Sturdyvant issued the order, came up with a possible solution for

Plaintiff.

18

38.     Kern suggested that he submit, on behalf of Plaintiff, a Writ of
        Habeas Mandamus to Randal Sheppard, Chief Justice, Indiana
        Supreme Court, asking for a stay of the eviction order. Because the
        fourth of July fell on a Saturday, it was a long holiday weekend.
        Monday, July 6th was a legal holiday. That left only one business
        day, Tuesday July 7th for Kern to submit the Writ of Habeas
        Mandamus to the Supreme Court of Indiana. Kern said it could be
        done on Tuesday, July 7, 1998, the day before the eviction was
        scheduled to take place.

39.     Kern was certain this last-minute appeal to the Chief Justice would
        set aside the eviction order temporarily. Plaintiff and Kern arrived
        at the Clerk of the Supreme Court's office around 4:00 pm on the
        afternoon of July 7. However, because they arrived one half hour
        before closing and did not have a signed copy of the Noblesville
        Superior Court transcript, the Clerk turned them away. However,
        the filing fees were paid. The docket number (which was entered
        on a sequentially numbered roster of cases that had been docketed
        for that day) was scratched out, but Kern promised to return first
        thing the following morning, July 8, 1998, presumably before the

19

eviction was to have taken place at 0900, with the missing signed transcript and file the petition in the Clerk's Office.

40.    The eviction took place promptly on the following morning at 0900, on July 9th, 1998. Kern ignored all of Plaintiff's calls that day until around 1400 to 1500 when the packing was nearly completed. Kern stated that he had heard nothing from Chief Justice Sheppard on the appeal he had filed earlier that morning in the Indiana Supreme Court. Later, when Plaintiff would make an official request for the document, the Clerk issued one that had no time stamp and had an ambiguous date.

41.    Plaintiff alleged the document that purported to represent Kern's filing of the Writ of Mandamus as timely and honorably filed. It was intended to create the verisimilitude of judicially propriety, of procedural correctness, when in fact the Court Clerk and Kern both knew there was no chance whatsoever of delaying the eviction. Plaintiff alleges the document was never filed in the Supreme Court of Indiana. Kern and the Clerk of the Court were guilty of abuse of process, obstruction of justice, and fraud.

42.    Kern could not have protected his acts of misconduct or those of the other co-conspirators, by himself. The Supreme Court Clerk

was also a voluntary co-conspirator by issuing a forged document, trying to represent the filing as having been honorably and timely submitted, when it was neither. Attorney Kenneth Kern participated in this civil conspiracy to defraud Plaintiff out of household goods, property, money, and time. The Clerk sought to cover-up this criminal misconduct, and was, in fact, a co-conspirator, herself.

43.     Upon information and belief, Plaintiff alleges Defendant Senator Evan Bayh knew about the criminal misconduct of the Indiana constituients named herein and did not act on that knowledge to protect Plaintiff's rights, or to *prevent* the continued abuse of Plaintiff's rights, thereafter.

44.     Plaintiff experienced depression, symptoms of PTSD, loss of community standing, the disruption and eventual separation of his family, alienation of love, and reactivation of a chronic medical condition. Defendant Evan Bayh's actions are the basis for Plaintiff's claims of abuse of process, intentional infliction of emotional harm, and obstruction of justice, for which Plaintiff is entitled to damages.

## CAUSE OF ACTION # 4

**Plaintiff Alleges Constitutional and Civil Rights violations; Basis of Claims that Defendant Caused Intentional Infliction of Emotional Harm, Conversion, Theft, Abuse of Process and Obstruction of Justice**

45.    Plaintiff restates as if fully set forth here each and every claim, assertion, and allegation set forth in the foregoing Paragraphs 1-18, Paragraphs 19-28, Paragraphs 29-36, and Paragraphs 37-44 of this Complaint:

Upon information and belief, Plaintiff alleges that Defendant Senator Evan Bayh knew about the abuse of Plaintiff's rights and disregarded that knowledge in favor of acting to protect the Hamilton County Sheriff's Department for its criminal neglect in overseeing Plaintiff's eviction and Mr. Steve Siedel's theft of personal property after Siedel had contracted with Atlantic Relocations to pack and store Plaintiff's household goods.

46.    On the day of the eviction, Kern spoke with Siedel, then assured Plaintiff that his household goods would be protected. However, the sheriff's department ordered Plaintiff off the premises **before** the packing was completed, threatening him with arrest, if he did not comply. The Deputy Sheriff attempted to assuage Plaintiff's

22

doubts by again falsely restating that Plaintiff's his property would be safe.

47.    During the following year, Plaintiff paid monthly storage fees to Atlantic Relocations in Indianapolis, Indiana based on the estimated weight AR assessed in charges for storing the contents of a 5000 square foot home which included a seven foot slate topped pool table, Bicycles, Golfing, Camping, and other types of recreational equipment, outdoor furniture, an outdoor gas grill and rotisserie, a free standing de-humidifier, lawn furniture, gardening tools, including a mower, and snow removal tools, etc. However, *none* of these household goods was delivered to Plaintiff, although they all should have been removed from the premises.

48.    Upon information and belief, Plaintiff alleges Defendant Senator Evan Bayh had knowledge of these criminal acts and took steps to protect his Indiana constitutients from culpability and to prevent Plaintiff from obtaining honorable responses from government agencies, and prosecuting his case in the courts. Defendant Senator Evan Bayh acted to protect Kenneth Kern, Steve Siedel, and the Clerk of the Supreme Court of Indiana, Atlantic Relocations, and the Hamilton County Sheriff's Department.

49.    Plaintiff suffered mental and physical distress, resulting from the abuse perpetrated by these co-conspirators. The injuries to Plaintiff and his family resulted in damages caused by abuse of process, obstruction of justice, conversion, theft, intentional infliction of emotional distress, and violation of Plaintiff's Fourteenth Amendment rights guaranteed by the Constitution.

## CAUSE OF ACTION # 5

**Plaintiff Alleges Constitutional and Civil Rights violations; Basis of Claims that Defendant Caused Unintentional Infliction of Emotional Harm, Abuse of Process and Obstruction of Justice**

50.    Plaintiff restates as if fully set forth here each and every claim, assertion, and allegation set forth in the foregoing Paragraphs 1-18, Paragraphs 19-28, Paragraphs 29-36, Paragraphs 37-44, and Paragraphs 45-49 of this Complaint:

In November 1998, Plaintiff wrote a detailed account of everything that had happened in Indianapolis and personally presented it to the F.B.I. office in Indianapolis, Indiana. The investigation was done and when Plaintiff called to ask for the results or findings in February or March 1999, he was told that nothing was found that constituted any violations of any law. All of Plaintiff's subsequent attempts to have those investigative reports released through

24

F.O.I.A. have resulted in denials of access and no investigative documents have been released by F.B.I.

51.   In March 1999, Plaintiff filed a complaint with the Taxpayer Advocates Office in Oakland, California. In it, he alleged that Kern and IRS agent Keith Clayton had stolen money that should have been applied toward his tax lien. Plaintiff alleges they were intending to use this money to invest in penny stocks for their personal gain and would not have been detected had Plaintiff remained in Indiana and not gone to California. Plaintiff learned F.B.I. and IRS had concluded their investigations into his allegations simultaneously and reached conclusions around this time.

52.   However, Plaintiff would not be made aware that "any investigations" had actually taken place until July 2001, *after his request for a Congressional inquiry.* And, although Plaintiff lawfully petitioned for those investigative reports through F.O.I.A., Plaintiff alleges Defendant Senator Evan Bayh reviewed the reports relating to Marion County and Hamilton County, Indiana and took steps to block their release to Plaintiff.

25

53.    In May 1999, Atlantic Relocations of Hamilton County, Indiana, unilaterally decided to transfer Plaintiff's household goods, without Plaintiff's prior knowledge or his consent, to Fairfield, California where Plaintiff had moved in September 1998. A moving van from Atlantic Relocations arrived in Fairfield with no warning and with no inventory, which AR claimed to have lost or not to have completed at the time of the eviction.

54.    In May 1999, AR called Plaintiff with an ultimatum. Either accept the delivery or pay transportation costs to have it returned to Indiana. Plaintiff demanded an accounting of the truck's contents before he would accept delivery of the shipment. The driver arrived with a shipment that was 3000 pounds less than the weight Plaintiff had been paying for during the previous ten months of storage.

55.    Plaintiff refused to accept the Indiana shipment. Facing a stalemate with Plaintiff, AR in Indiana called for the assistance of an outsider. Plaintiff spoke with Atlanta, Georgia based vice President John Schroeder. Plaintiff negotiated and settled on an adjusted fee for the cost of transporting the goods with AR vice president John Schroeder. Plaintiff made Schroeder aware that property that was

supposed to have been stored was missing. He described the circumstances around the move of his household goods to AR for storage. Plaintiff pointed out the ten months of fraudulent billing, the fact that the shipment arrived without an inventory, and the collusion between Steve Siedel and Ken Kern to cover up their wrongdoing.

56.    Plaintiff also informed the U.S. Attorney for the Southern District of Indiana, and the Hamilton County Prosecutor's Office. Schroeder instructed Plaintiff to submit the insurance claim to settle his differences with, first, the Evansville Office, then, second, with the nationwide insurer in New Hampshire.

57.    Upon information and belief, Plaintiff alleges that Defendant Senator Evan Bayh knew about these attacks on Plaintiff rights and did not act on that knowledge to protect Plaintiff *after* he was made aware of it. Plaintiff further alleges Defendant Senator Evan Bayh took steps to *prevent* Plaintiff from receiving fair treatment from the agencies designated to address such complaints.

58.    Furthermore, upon information and belief, Plaintiff alleges that Atlantic Relocations intentionally manipulated Plaintiff into believing that all of his household goods were in storage between

27

July 1998 and May 1999. AR presented a monthly bill for the storage of Plaintiff's household goods that was based on calculations of overall weight and the size and number of containers used in storage.

59.  Atlantic Relocations submitted fraudulent billing each month through the United States Postal Service to conceal the fact that it had colluded with Kern and Siedel to steal Plaintiff's household property. A monthly bill should have reflected charges for what was *actually* in storage and the contents in storage should have included *everything* that had been removed from the premises on July 9, 1998.

60.  Upon information and belief, Plaintiff alleges this was not the case. Plaintiff alleges that AR knew that all of Plaintiff's household goods had not been placed in storage. In order to conceal the theft of property, AR began issuing fraudulent billing for the purpose of disguising the commission of a crime, acting in furtherance of a civil conspiracy, and to defraud Plaintiff. These action clearly constituted a violation of the United States Criminal Code 18 U.S.C. 63, 18 U.S.C. 1346, and 18 U.S.C. 1349 for Mail Fraud which is punishable by fine and imprisonment **(Exhibit G)**.

61.   In May 1999, after a long series of delays and confusion about who was the responsible for authorizing payment for damage claims at AR, the burden was shifted from Hamilton County, Indiana, to Atlanta, Ga., to Evansville, Indiana. AR finally decided that Evansville, Indiana would receive the claim for damages, and Plaintiff submitted a claim for $15,000.00 in lost or damaged goods to Atlantic Relocations in July 1999.

62.   In addition to the loss of property, Plaintiff also suffered economic losses from additional expenses, lost time from work, losses of professional opportunities, and losses in salary, sleep disturbance, anxiety, depression, further disruptions in his family, and an exacerbation of a chronic medical condition.

63.   For more than a year afterwards, Atlantic Relocations, through vice president Schroeder strung Plaintiff along for more than a year, with one excuse after another for the delay in obtaining an insurance settlement, until November 2000.

64.   During this year, Schroeder promised an investigation that should have been consistent with that of the F.B.I. and T.I.G.T.A. Plaintiff alleges that AR and Schroeder never intended to honor Plaintiff's claim. The promises Schroeder made to Plaintiff about insurance

reimbursements for his losses were all bogus. Schroeder was a co-conspirator in that he assisted in furthering this conspiracy against Plaintiff's rights. He helped to cover-up the wrongdoing of the AR facility in Hamilton County, Indiana and helped protect the other members of this conspiracy from culpability for their wrongdoing.

65.    Upon information and belief, Plaintiff alleges Defendant Senator Evan Bayh knew about the criminal conduct of this Hamilton County, Indiana business and took actions to protect these people from culpability for their criminal misconduct. Plaintiff alleges that the timing of Mr. Schroeder's rejection was targeted to occur around the same time a separate scheme to entrap Plaintiff in Sacramento, California in October 2000.

66.    Mr. Schroeder called just days after Plaintiff had returned from Sacramento, California where other members of this civil conspiracy had acted with stealth, deceit, and malice, to defraud Plaintiff by manipulating him into opening an illegal banking account. Plaintiff had traveled to Sacramento from Los Angeles for assistance with and IRS offer-in-compromise.

67.    Plaintiff alleges there was collusion here between these parties at a much higher level than had previously been employed in this

conspiracy against Plaintiff's rights. When the Hamilton County co-conspirators reached out and brought in Schroeder from Atlanta, Georgia to attack Plaintiff from a different front, the collusion between the parties in this conspiracy grew in its complexity. Schroeder's introduction and participation for more than one year presented and entirely separate set of circumstances from what had gone on in 1998 and 1999.

68.    Plaintiff alleges that since his household goods had already been stolen, Schroeder's role had been to mollify Plaintiff, persuading him not to file any more official complaints, while he waited for the "promised" reimbursements Schroeder and all but guaranteed Plaintiff was entitled to. This tactics of the conspiracy had shifted, while the motive remained the same. The conspiracy still protected the Indiana white-collar criminals alleged to have been protected by Senator Bayh.

69.    Plaintiff alleges there was a connection between the co-conspirators in Indiana [3] and those people who became the

---

[3]  In general, to constitute a civil conspiracy there must be two or more persons, an object to be accomplished, a meeting of the minds on the object or course of action, one or more unlawful overt acts, and damages proximately resulting there from. See Corpus Juris Secundum, 15A.p. 355.

individual links in another, completely separate, chain of events used to manipulate Plaintiff into opening an illegal joint checking account with Jay Pewthers at Wells Fargo Bank in Sacramento, California.

70.    This separate chain of events leading up to the failed entrapment scheme in Sacramento, California represented the shift in the goals of the co-conspirators in this conspiracy away from protecting the Indiana participants to executing schemes that would have had Plaintiff jailed, silenced, and discredited.

71.    Plaintiff wrote numerous complaints about these events to Indiana authorities, federal agencies, the U.S. Attorney for the Southern District of Indiana, and other agencies. In these complaints, Plaintiff stated that he had the eyewitness account of a very credible witness who stated that several months after the move was supposed to have been completed, that Plaintiff's pool table was seen still situated on the lower level of the Giest Road house, exactly where it had been standing on the day of the eviction. This massive slate-topped pool table could not have been in storage.

72.    Along with the other missing items, (at the time of delivery in California) the pool table could not have been calculated in the

32

total weight in storage. It could not have been included in the move. Therefore, Plaintiff alleges AR colluded with Steven Siedel, Kenneth Kern, and the Hamilton County Sheriff's Office to deprive Plaintiff of his Fourteenth Amendment rights to property.

73. Upon information and belief, Plaintiff alleges that Defendant Senator Evan Bayh was, at the very least, knowledgeable about the conduct of Atlantic Relocations' and its participation in the unlawful conspiracy against Plaintiff, and then he took steps to protect their illegal conduct.

**74.** Upon information and belief, Plaintiff also alleges that Defendant Senator Evan Bayh knew about the co-conspiracy involved in the alleged entrapment scheme at Wells Fargo Bank in Sacramento. This was willful misconduct. It may have resulted in Plaintiffs' being jailed, silenced, and discredited. It resulted in financial losses and emotional suffering to Plaintiff. The actions of these co-conspirators, acting in concert with Defendant Senator Evan Bayh was the cause for Plaintiff's claim of theft, fraud, conversion, intentional infliction of emotional harm, and defamation of character, for which Plaintiff is entitled to damages.

## CAUSE OF ACTION # 6

**Plaintiff Alleges Constitutional and Civil Rights violations; Basis of Claims that
Defendant Caused Intentional Infliction of Emotional Harm, Conversion, Abuse
of Process and Obstruction of Justice**

75.   Plaintiff restates as if fully set forth here each and every claim,
      assertion, and allegation set forth in the foregoing Paragraphs 1-18,
      Paragraphs    19-28,    Paragraphs    29-36,    Paragraphs    37-44,
      Paragraphs 45-49 and Paragraphs 50-74 of this Complaint:

      In June 1999, Plaintiff's son was away for a planned summer visit
      with his mother in Kentucky and Plaintiff was home alone.
      Plaintiff alleges that the conspiracy to protect the Indiana officials,
      citizens, agencies, and commercial business from culpability for
      their criminal acts and their participation in a civil conspiracy
      extended to include others.

76.   Plaintiff alleges these "others" who joined in this conspiracy
      operated apart from the Indiana co-conspirators but they were in
      concert with the *modified* goal to have Plaintiff arrested and/or
      discredited, and/or silenced in order to protect the Indiana
      constitutients Plaintiff alleged to have broken the law.

77.   Upon information and belief, Plaintiff alleges that Defendant
      Senator Evan Bayh had knowledge of the conspiratorial acts

targeting Plaintiff to jail and silence his protests about civil rights violations in Indiana. The first such attempt to entrap Plaintiff in the possible commission of a crime occurred when Plaintiff came home from work one Friday evening and encountered an inebriated, attractive young woman in his driveway who asked if she could come into the house to use his telephone.

78. He invited her into his home where she established immediate rapport by revealing the unusual coincidence that the names of her two children were identical to the first name of his ex-girlfriend's son and the middle name of her oldest niece.

79. Very shortly thereafter, this young woman sat on his lap and partially disrobed, becoming intensely amorous. Within fifteen minutes of her arrival, she had determined Plaintiff was alone and suggested the she could spend the night. Plaintiff felt this was all wrong.

80. He had *never* before in his life arrived home from work and found an attractive young woman waiting in his driveway wanting to have sex with him. Plaintiff declined her offer and, instead, drove her to her house.

81.    After thinking about this encounter, Plaintiff alleged this was pre-arranged and designed to entrap him in a sexually compromising situation for which he could be charged with some crime and imprisoned. He alleged that possibly the government had orchestrated the encounter for the purpose of entrapping him in what could have been alleged was a sexual assault.

82.    This violated Plaintiff's Fourth Amendment rights to privacy and constituted an unwarranted invasion of privacy. This behavior on the part or parts of the people involved in this conspiracy caused the intentional infliction of emotional harm, fraud, and concealment for which Plaintiff is entitled to damages.

83.    In July 1999, after resettling in California, Plaintiff was involved in ongoing negotiations with IRS for an Offer-in-Compromise to settle a tax debt. He noticed a discrepancy of about $10,000.00 between the funds actually collected by IRS from liens on his accounts and the amount shown credited to his account. He made inquiries to his accountant who had no explanation.

84.    However, he would later discover that an amount equal to that had been added to his account that he had not paid, or been responsible for paying himself. Plaintiff alleges this was a readjustment for the

36

monies he claimed had been stolen through the alleged misconduct of IRS Agent Keith Clayton and Attorney Kenneth Kern.

85. However, this was not done in accordance with IRS regulations that required the taxpayer should be informed and that the proceedings receive public notification, documentation of the amounts secured from the sale of property, etc. None of this was done in Plaintiff's situation.

86. Rather than receiving an explanation for this unexpected correction in his IRS account, when Plaintiff raised the issue later, he was threatened by with the removal of the amount that had been credited, if Plaintiff was stating that the credit was a mistake. Plaintiff alleges this money was connected to the alleged misconduct of the two Indiana conspirators and their motives for depriving Plaintiff's rights.

87. Upon information and belief, Plaintiff alleges that Defendant Senator Evan Bayh had knowledge of the two Indiana conspirators' misconduct and the actions taken to protect them, including returning a portion of the money alleged to have been stolen to Plaintiff.

37

88.  Plaintiff alleges that Defendant Senator Evan Bayh not only knew that these Indiana Defendants had broken the law, and that he had not only attempted to protect them from culpability for the crimes they committed, but that he was also aware of the knew about schemes to incarcerate, discredit, and silence Plaintiff for making the malfeasance of Defendant's Indiana constitutients a matter of the public record.

89.  Plaintiff alleged they had stolen funds, or diverted tax monies for private use in the buying penny stocks, where Kern was involved as an inside trader on behalf of himself and other professionals in the Indianapolis community. Plaintiff alleges the misconduct of Clayton and Kern had been protected by the actions of Defendant Evan Bayh and resulted in substantial injury to Plaintiff.

90.  The violation of rights damaged Plaintiff's mental and physical health and was the cause for his claims of the unintentional infliction of emotional harm, fraud, obstruction of justice, abuse of process, and violated Plaintiff's Fourteenth amendment rights, for which he is entitled to damages.

## CAUSE OF ACTION # 7

**Plaintiff Alleges Constitutional and Civil Rights violations; Basis of Claims that
Defendant Caused Unintentional Infliction of Emotional Harm, Abuse of
Process and Obstruction of Justice**

91.    Plaintiff restates as if fully set forth here each and every claim,
assertion, and allegation set forth in the foregoing Paragraphs 1-18,
Paragraphs 19-28, Paragraphs 29-36, Paragraphs 37-44,
Paragraphs 45-49, Paragraphs 50-74, and Paragraphs 75-90 of this
Complaint:

Upon information and belief, Plaintiff alleges that beginning in
May or June 1999, the goal of the conspiracy turned to efforts to
have Plaintiff jailed, discredited, or silenced for publicly exposing
the malfeasance of the Indiana constituents Defendant Senator
Evan Bayh had been protecting. In July 1999, Dan Weaver, an
Indianapolis attorney contacted Plaintiff. They had talked in 1996
about this case and neither of them thought it would go very far
because it lacked any substantive basis for which a claim of
damages could be made.

92.    This time Weaver stated that Plaintiff's former psychiatric patient
had an attorney who filed her "intention" to file a malpractice
claim against Plaintiff and two Indianapolis hospitals. This was the

39

same psychiatric patient (name withheld) that submitted the 1996 claim on her own behalf.

93.  This patient suffered from a severe Bipolar Disorder and Plaintiff had treated her at the request of her parents, after she had been discharged from the Post Office for threatening to kill her supervisor, and had claimed, among other things, that a male psychiatric technician surreptitiously entered her room at night and stuffed dollar bills into her vagina.

94.  In addition, she alleged that Plaintiff had hospitalized her against her will and had failed to appropriately supervise the male attendants on the hospital staff.

95.  In July 1999, Plaintiff was informed that Marilyn Moores a respected, politically well-connected, highly competent attorney from the prestigious Indianapolis law firm of Cohen and Malad had decided to represent the same indigent bipolar patient (on contingency) who had filed her Intention to File a Claim as a Pro Se litigant.

96.  Plaintiff alleges that it was not a coincidence that Cohen and Malad had close ties to Defendant Senator Evan Bayh. Cohen and Malad is one of a handful of high-powered Indianapolis' legal

establishments that had been a large contributor to the 1998 Indiana Senate race of then Governor Evan Bayh's campaign for the U.S. Senate. The addition of Ms Moore to the case proved to be a key turning point. It would require Plaintiff to respond to long and technical interrogatories and the necessity of his pouring of attention, time, and precious resources into his own defense for the next five years.

97. The malpractice case went on until 2003, when pursuant to Indiana's statutory requirement a panel of three physicians heard all the evidence for the Indiana Department of Insurance. After what had turned out to be a seven-year ordeal, the panel voted unanimously in Plaintiff's favor for the case to be dropped because it had no merit.

98. Upon information and belief, Plaintiff alleges that Defendant Senator Evan Bayh, as the titular head of the Democratic Party in Indiana, had the power, authority, and opportunity to reward Ms Moores for furthering the conspiracy to protect these Indiana constitutients, and by this point in the controversy, himself, as well.

99.    Plaintiff alleges that Defendant Senator Evan Bayh rewarded Ms.
Moores, a democrat, for the years she spent pursuing a case that
had little hope of succeeding. Yet, it consumed Plaintiff's time,
energy, and resources. Ms Moores' participation in this conspiracy
was intended to discredit Plaintiff. Plaintiff alleges that during year
after the medical panel decided in Plaintiff's favor, Ms. Moores
was rewarded by an appointment to an important Judgeship where
she took administrative control of the Juvenile Justice system of
Marion County, Indiana.

### CAUSE OF ACTION # 9

**Plaintiff Alleges Constitutional and Civil Rights violations; Basis of Claims that
Defendant Caused Unintentional Infliction of Emotional Harm, Abuse of
Process and Obstruction of Justice**

100.    Plaintiff restates as if fully set forth here each and every claim,
assertion, and allegation set forth in the foregoing Paragraphs 1-18,
Paragraphs 19-28, Paragraphs 29-36, Paragraphs 37-44,
Paragraphs 45-49, Paragraphs 50-74, Paragraphs 75-90, and
Paragraphs 91-99 of this Complaint:

In August 1999, an Indianapolis attorney named Gregory Poore
called Plaintiff and told him that he was recommending that
someone else take over the Guardianship of Plaintiff's father,

George M. Lewis, Sr. who resided in an Indianapolis nursing home. Poore said that because Plaintiff lived in California, the Probate Court had asked him to find someone else to assume Guardianship of George M. Lewis, Sr., Plaintiff's father.

101.    Plaintiff had countered with the alternative plan to move his father to California when he found accommodations, but Poore told him the only way Plaintiff could influence the court's decision about the guardianship of his father was by returning to Indianapolis and making an appearance before the Probate judge.

102.    Although it had been an extremely difficult and painful decision for Plaintiff, he refused to return to Indiana. Plaintiff alleges that Poore, another Marion County democrat, acted to further the conspiracy to protect those Indiana constitutients of Defendant Senator Evan Bayh whom Plaintiff alleged had broken the law. Plaintiff alleges Poore attempted to further the conspiracy by luring Plaintiff back to Indiana to have him jailed, silenced, and discredited. Plaintiff alleges that Poore was a co-conspirator with Defendant Senator Evan Bayh to protect those who had violated Plaintiff's civil and constitutional rights.

43

103.   Upon information and belief, Plaintiff alleges Defendant Senator
       Evan Bayh and these Indiana co-conspirators had enormous
       resources at their disposal to have Plaintiff jailed, silenced, and
       discredited. Plaintiff alleges they were willing to go to any means
       to bring Plaintiff back to Indiana, where he alleged they intended
       to put him in jail and silence him for his outspoken allegations
       about those who had violated his civil and constitutional rights.

104.   Plaintiff alleges these acts of intimidation and harassment caused
       severe personal and professional damage to his life and career.
       Plaintiff alleges the actions taken by these co-conspirators caused
       mental suffering, disruption of his family, depression, and
       exacerbation of a chronic medical condition. The cause of these
       injuries are the basis for his claims of abuse of process, obstruction
       of justice, and intentional infliction of emotional harm, for which
       he is entitled to damages.

## CAUSE OF ACTION # 8

**Plaintiff Alleges Constitutional and Civil Rights violations; Basis of Claims that Defendant Caused Unintentional Infliction of Emotional Harm, Abuse of Process and Obstruction of Justice**

105. Plaintiff restates as if fully set forth here each and every claim, assertion, and allegation set forth in the foregoing Paragraphs 1-18, Paragraphs 19-28, Paragraphs 29-36, Paragraphs 37-44, Paragraphs 45-49, Paragraphs 50-74, Paragraphs 75-90, Paragraphs 91-99, and Paragraphs 100-104 of this Complaint:

On September 21,1999 Plaintiff had made the difficult decision to remain in California, as the conspirators attempted to tightened the noose around his neck. Plaintiff alleges that his rebuff of Mr. Poore led to another group of conspirators coming on stage with the same goal. Plaintiff alleges another group of conspirators were trying to achieve the same goal of having Plaintiff jailed, silenced, and discredited for the purpose of protecting the Indiana constituitients of Defendant Senator Evan Bayh.

Plaintiff alleges that about a week after Poore failed to achieve the conspiracy's, on September 29, 1999, just days after the Indiana Probate court took the guardianship of George M. Lewis, Sr. from Plaintiff, the California Medial Board of Quality Assurance

45

informed Plaintiff that his California medical license to practice in California had been suspended.

106.   The order for suspension was pursuant to a request from the Indianapolis, Indiana Title IV-D Court. That court issued an order for suspension to the Indiana Medical Board. The Indiana Medical Board contacted the California Medical Board and requested the suspension of Plaintiff's California medical license, based on the suspension in Indiana license for child support arrearages.

107.   As a result of a reciprocal agreement between state medical boards designed to protect the public from practitioners who had clearly demonstrated incompetence or malfeasance, the California board chose to honor the Indiana suspension order. It suspended Plaintiff's medical license in an order dated September 29, 1999.

108.   However, at the time of the suspension, on 09/29/99, Plaintiff did not have an Indiana medical license. Plaintiff had held an Indiana license at one time, but allowed it to expire on June 30, 1999, because of his permanent change of residence to California, and his intention to forego any further medical activity in Indiana.

109.   However, the Indiana Medical Board *pre-dated* a suspension order to March 30, 1999 to make it appear that it had been issued over

100 days before Plaintiff was officially notified in California. This was such an obvious violation of professional ethics and the law that if grieves Plaintiff to allege that Defendant Senator Evan Bayh and his co-conspirators must have been disparate to attempt to incarcerate, silence, and discredit Plaintiff in this manner.

110. Plaintiff had not been charged with professional misconduct, negligence, malpractice, incompetence, or malfeasance, which was the statutory basis used by the California medical board for its suspension order.

111. Yet, Plaintiff was required by California law to inform all of his patients that he was no longer able to provide services for them and had to disband his practice. He referred all of his patients to other psychiatrists who assumed responsibility for their prescriptions and day to day care.

112. On October 3, 1999, Plaintiff wrote a letter to the Indiana Judicial Commission in which he offered proof of his allegations about the official misconduct of Commissioner Barbara Collins, Deputy Prosecutor Lorraine Bradley, and Kenneth Kern. The letter was mailed only to the Indiana Judicial Commission, but the result of this letter was almost immediate.

113. Plaintiff's medical license was reinstated on October 5, 1999, but the Indiana Judicial Commission would eventually determine, several months later, that none of these parties were guilty of any unprofessional conduct **(Exhibit H)**.

114. Plaintiff had pointed out to Supervising Deputy Attorney General Gail Heppell that the suspension was contrary to California Section 2310 that stated, "suspension of a practitioner's medical license for any reasons other than unfitness, incompetence, or being a danger to the community were barred". Ms Heppell and the Director, California Medical Board knew the *only* justification offered by the Indiana Title IV-D Court for suspending Plaintiff's medical license was alleged child support arrearages, yet they had ordered the suspension based on the Indiana request anyway.

115. On October 4, 1999, the Deputy Attorney General for California called Plaintiff to deliver the news about the reinstatement of his license. He alleged the conduct of the medical board violated his Fourteenth amendment property rights and resulted in personal and professional injury to Plaintiff. Plaintiff never received an apology from any of these parties. Instead, the California Medical Board

48

responded with a punitive official sanction of Plaintiff for failure to inform them about his change of personal residence.

116. Although Plaintiff had maintained the same professional address since his arrival in California, the medical board posted an unmeritorious sanction and fine against Plaintiff on its Internet website. Plaintiff alleges this was an act of revenge for the pressure he exerted on the board to reverse the damaging error it had made.

117. Upon information and belief, Plaintiff alleges this egregious abuse of power by all the parties was a desperate attempt to have Plaintiff returned to Indiana where he would be incarcerated, silenced, and discredited. Plaintiff alleges the California Medical Board entered into the conspiracy against Plaintiff's rights when it unlawfully suspended Plaintiff's medical license at the request of authorities in Indiana.

118. The medical board's cavalier conduct damaged Plaintiff's community and professional reputation and caused him financial, emotional, and mental harm, for which he is entitled to damages.

119. Upon information and belief, Plaintiff alleges Defendant Senator Evan Bayh knew about the attempts to deprive Plaintiff of his constitutional rights and did not act upon that knowledge to repair

remedy or protect those rights. Plaintiff alleges Defendant Senator Evan Bayh reviewed the two investigative reports from Marion and Hamilton County to determine if any others had been named for violating the law in addition to those whom he had been protecting.

120. Plaintiff alleges the Indiana Judicial Commission failed to discharge its duty in an impartial manner. Plaintiff alleges that this agency became part of the conspiracy to deprive Plaintiff of his rights when it exonerated Collins, Bradley, and Kern. Plaintiff alleges Defendant Senator Evan Bayh had knowledge of the IJC action and failed to act on it to protect Plaintiff's rights.

121. As a direct consequence of these acts of abuse, Plaintiff was forced to endure mental anguish, psychological trauma, pain and suffering, and claims damages for the causes of abuse of process, intentional infliction of emotional harm, defamation of character.

### CAUSE OF ACTION # 10

122. Plaintiff restates as if fully set forth here each and every claim, assertion, and allegation set forth in the foregoing Paragraphs 1-18, Paragraphs 19-28, Paragraphs 29-36, Paragraphs 37-44, Paragraphs 45-49, Paragraphs 50-74, Paragraphs 75-90,

Paragraphs 91-99, Paragraphs 100-104, and Paragraphs 105-121 of this Complaint:

123.   During the summer of 2003, Plaintiff alleged that Senator Bayh used the power and authority of his office and his position on the Select Committee on Intelligence in an effort to deprive Plaintiff of rights that were guaranteed by statute and by the United States Constitution. Plaintiff mailed this letter to the United States Senate Ethics Committee and never received an acknowledgement or a response. Until that time, it had been inconceivable to him that the Defendant Senator Evan Bayh would have been involved in criminal conduct. In April 2004, Plaintiff filed a complaint, alleging a civil conspiracy, naming Defendant Evan Bayh as the Respondete Superior.

124.   Plaintiff alleges the conspiracy went well beyond the events and identities of agencies and persons cited herein.[4] Plaintiff alleges that his phones were wiretapped, his life was threatened, his health was severely damaged, he was harassed, intimidated, and subjected to other abuses, all as a result of exercising his constitutional rights

---

[4] See CV-04-2950 AHS cites incidents and includes evidence of a conspiracy reaching beyond the events raised in this complaint.

51

to report the illegal conduct of the people in Indiana who broke the law and seek documents through F.O.I.A.

125.  Plaintiff alleges the other participants in this conspiracy have direct or indirect ties to Defendant Senator Evan Bayh and they should be accounted for in this legacy of lawless, unethical abuse. These other activities [5] and co-conspirators were representative of what happens in conspiracies.

## Argument

126.  Plaintiff alleges that Senator Evan Bayh was at the heart of this civil conspiracy from the very beginning and that this conspiracy deprived Plaintiff of rights guaranteed by the Constitution of the United States. From the earliest stages of this tragic controversy, Plaintiff had only asked for fair treatment. In 1998, his life was burdened with several financial matters. The people he turned to for assistance were people he thought he knew and could trust. Instead of helping, they acted out of greed, envy, jealousy, and malice to financially exploit Plaintiff's weaknesses for their own personal gain.

---

[5] Illegal wiretapping is banned in the United States, except for the actions of the F.I.S.A. Court. As are attacks on personal computers.

Commissioner Barbara Collins, Kenneth Kern, Lorraine Bradley, Steven Siedel, the Clerk, Indiana Supreme Court, IRS Agent Keith Clayton, the Hamilton County Sheriff's Department, Atlantic Relocations, showed an egregious disregard for the law. Plaintiff sent numerous complaints about their violations of statutes and constitutional rights to news media outlets, as well as to various government agencies. However, the indifference of these agencies and the news media to, or suppression of the evidence I sent, suggests they overlooked the misconduct of these co-conspirators.

Or, Plaintiff alleges these agencies and media outlets' total lack of response to his plight may have been due to external pressures from sources that exercised enough power to prevent the system from working in the appropriate manner. There were two levels of abuse that took place. On one level was the initial assault on his rights by people Plaintiff had trusted, or had thought could be trusted. They broke the law, causing damage to Plaintiff and his family. On the next level was a pattern that condoned this abuse and protected the people alleged to have perpetrated it. It meant Plaintiff didn't matter. His complaints were not taken seriously.

This type of abuse came from the very agencies that were suppose to protect the rights of all citizens, but they simply wouldn't do it for him. He was repeatedly rebuffed, even scorned for making allegations about the misconduct of public officials.

As Plaintiff asked questions and pressed for believable answers from state and federal government agencies, the responses included efforts to explain, justify, or attempts to rationalize the most recent egregious violation of the law. The effort to cover-up the misconduct was shared by all of these co-conspirators. Honesty would have dispelled many of Plaintiff's concerns rather quickly. However, instead of having these issues addressed with honesty, Plaintiff encountered patent prevarications, double standards, or attitudes that were dismissive or communicated a lack of respect for his concerns. The attempt to cover-up the alleged misconduct of the Indiana residents grew and grew and grew out of control.

Plaintiff alleges this cover-up grew out of control because 1.) It remained concealed for a long period of time, although many people were aware that it existed; 2.) The cover-up of the criminal conduct of the white-collar criminals in Indiana required bringing new people into a conspiracy; 3.) Over a long period of time, the

focused moved away from Indiana co-conspirators to people who didn't know Plaintiff.

Many of these new people were less likely to have a personal animus towards Plaintiff. What began with a few people, lying for themselves, or on behalf of their friends, may have been a personal matter, involving misguided loyalty. But asking others to lie, making it necessary to keep one's job, or when it is an integral part of the workplace culture, it undermines the basis of personal integrity and contradicts the relevance of a shared moral compass.

There is no justification for the misconduct of the Defendant Senator Evan Bayh and these co-conspirators. Plaintiff alleges that what began with a small group of white-collar criminals in Indiana eventually led to United States Senator Evan Bayh's poor judgment and criminal complicity as a co-conspirator in these acts which deprived Plaintiff of rights guaranteed by statute and by the constitution.

Plaintiff alleges that Senator Bay was the third party congressional entity that reviewed the U. S. Treasury investigative reports pertaining to the alleged misconduct of his Indiana constituitents.

55

## The Plaintiff's Injuries

127. Plaintiff restates as if fully set forth here each and every claim, assertion, and allegation set forth in the foregoing Paragraphs 1-18, Paragraphs 19-28, Paragraphs 29-36, Paragraphs 37-44, Paragraphs 45-49, Paragraphs 50-74, Paragraphs 75-90, Paragraphs 91-99, Paragraphs 100-104, Paragraphs 105-121, and Paragraphs 122-1126 of this Complaint:

128. Plaintiff restates as if fully set forth here each and every claim, assertion, and allegation set forth in the foregoing Paragraphs 1-6, Paragraphs 7-12, Paragraphs 13-46, Paragraphs 47-60, Paragraphs 61-67, and Paragraphs 68-70 of this Complaint:

129. This is a conspiracy to abuse, harass, intimidate, incarcerate, illegally monitor, and expose Plaintiff to dangers that threatened his life. This has caused significant injury to Plaintiff and his family.

130. Plaintiff suffered anxiety and depression because of gross invasions of privacy as a result of Defendants' conduct.

131. Plaintiff fears for his own safety and the safety of his children and grandchildren as a result of Defendants' conduct.

132. Plaintiff has lost a promising career, personal and professional community standing and has been impaired in pursuing professional opportunities as a result of Defendants' actions.

133. Plaintiff lost proprietary control over programs he developed for use in prisons in Indiana and Ohio, Taking Charge, Tough Assignments, True Security, and Total Choice, which were stolen and used illegally by institutions without Plaintiff's consent.

134. Plaintiff has frequent exacerbations of a chronic medical problem; and he has recently been diagnosed with congestive heart failure as a result of Defendants' actions.

135. Plaintiff has been deprived of his Constitutional rights under the Fourth and Fourteenth Amendment as a result of the Defendants' actions. As a result of this abuse, Plaintiff lost personal and professional belongings. Many of items are irreplaceable. Plaintiff's family suffered from the displacement, fears for their safety, harassment, abuse, and invasions of privacy.

### Demand

136. Plaintiff holds and claims the above to be true and the conduct and actions, taken in a personal capacity, by Defendant Senator Evan Bayh did cause injury to Plaintiff and his family. Therefore, he

states a claim for negligent infliction of emotional distress, abuse

of process, obstruction of justice, invasion of privacy, theft, and

conversion. Therefore, under 28 U.S.C. 1346, 28 U.S.C. 2671, and

28 U.S.C. 2680 he demands a jury trial and unspecified damages,

including compensatory, punitive, consequential and discretionary

damages.


Respectfully Submitted,

George M. Lewis, M.D.                    05/18/2007
7095 Hollywood Blvd. # 1245
Los Angeles, California 90028
323-512-0198

58

# EXHIBIT LIST SHEET

| Exhibit Number | Description | Pages |
|---|---|---|
| 1 | Letter from Senator CHARLES GRASSLEY, dated April 9, 2001, with attached copy of complaint from GEORGE LEWIS. | 6-17 |
| 2 | Form 2028M, Memorandum of Interview, dated May 24, 2001, regarding an interview of DR. GEORGE LEWIS with attachments. | 18-69 |
| 3 | | 70-71 |
| 4 | | 72 |
| 5 | | 73 |
| 6 | | 74-75 |
| 7 | Form 2028M, Memorandum of Activity, dated June 19, 2001, regarding a record review of Hamilton County, Indiana records with attachments. | 76-91 |
| 8 | | 92-93 |
| 9 | Form 2028M, Memorandum of Interview, dated June 20, 2001, regarding an interview of ANGELA SMITH-JONES, Director, Indiana Medical Certification Board with attachments. | 94-104 |
| 10 | Form 2028M, Memorandum of Activity, dated June 21, 2001, regarding a record review of Marion County, Indiana records with attachments. | 105-108 |
| 11 | | 109-112 |
| 12 | | 113-169 |
| 13 | Form 2028M, Memorandum of Interview, dated August 20, 2001, regarding an interview of DAVID THORTON, Chief Enforcement, Medical Board of California, with attachments. | 170-172 |
| 14 | | 173-176 |

b7c

| Case Number:<br>62-0105-0027-I | Case Title:<br>BENNETT, JEFFREY |
|---|---|

TIGTA Form OI 2028A (Rev. 03/2001)

Treasury Inspector General for Tax Administration

07-0939

FILED

MAY 2 ...

MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

OFFICIAL USE ONLY

THIS DOCUMENT IS PROVIDED FOR OFFICIAL USE ONLY. ANY REQUEST FOR DISCLOSURE OR FURTHER DISSEMINATION OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO HEADQUARTERS, TREASURY INSPECTOR GENERAL FOR TAX ADMINISTRATION.

5



**U.S. Department of Justice**

*United States Attorney*
*Southern District of Indiana*

---

*10 West Market Street*
*Suite 2100*
*Indianapolis, IN 46204-3048*

*(317)226-6333*
*TDD (317)226-5438*

*FAX NUMBERS:*
*Main (317)226-6125*
*Administration (317)226-5176*
*Civil (317)226-5027*
*FLU (317) 226-6133*
*OCDETF (317)226-5953*

June 1, 2001

George M. Lewis, M.D.
3328 Stevens Avenue
Rosemead, California 91770

Dear Mr. Lewis:

    Although I read your May 12 letter and attached 23-page "Chronology of IRS Abuse," I found nothing to support the allegations of criminal activity you made against seventeen persons and institutions (Yes, I counted them). Although it is difficult to discern from your "chronology," it appears these conflicts arose when various state and federal agencies attempted to collect child support, student loans and back income taxes you purportedly owed.

    My office evaluates the information gathered by investigative agencies, including the FBI and IRS, to determine whether sufficient evidence exists to sustain proof of a crime beyond a reasonable doubt. Since you reject the impartiality and fairness of these agencies, you will reject any decisions by my office based upon their investigative product. We are not staffed with investigators.

Sincerely,

Timothy M. Morrison
United States Attorney

07 0939

**FILED**

MAY 2 1 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

**George M. Lewis. M.D.**
**636 No. Spaulding Ave.**
**Los Angeles, California 90036**
**323-651-1262**

November 20, 2004

Federal Bureau of Investigation
575 No. Pennsylvania Ave.
Indianapolis, Indiana 46204

Re: George M. Lewis, M.D.
SSN: 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

Dear Sir or Madam:

In November of 1998, I delivered a detailed complaint to the Indianapolis Federal Bureau of Investigation, outlining numerous instances of abuse involving my constitutional and civil rights. That document outlined the actions of attorney Kenneth Kern, Steven Siedel, Atlantic Relocations, and the Hamilton County Sheriff's Department, who, together, conspired to steal my personal and household property. Their conduct violated the criminal code 18 U.S.C. 241, which states that "if two or more persons conspire to injure, oppress, threaten, or intimidate any person in any State, Territory, Commonwealth, Possession, or District in the free exercise or enjoyment of any right or privilege secured by the Constitution of the United States..." they are guilty of a crime that is punishable by imprisonment.

That document also provided facts and information about the way Kenneth Kern and the Indiana Supreme Court Clerk violated 42 U.S.C. 1983 and 42 U.S.C. 1985.

*07 0939*

FILED

MAY 2 1 2007     FN 12

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

To reacquaint you with the issues presented in 1998: In June 1998, Judge Wayne Sturdyvant heard the matter of Siedel vs. Lewis, deciding the eviction case in favor of Mr. Siedel. Judge Sturdyvant issued his final decision and the eviction order of the court at the same time, late in the afternoon of Friday, July 2, 1998, the day before the long three-day July 4th holiday weekend. Judge Sturdyvant's order stipulated that the eviction take place no sooner than 9:00 A.M., Wednesday morning, July 7, 1998, leaving me **one day**, July 6, 1998, in which to appeal the court's decision.

On July 6, 1998, late in the afternoon, attorney Kern met me at the Indiana Supreme Court where he planned to file a Writ of Habeaus Mandamus, asking Chief Justice Randal Sheppard to stay the eviction scheduled for the following day, July 7, 1998. Mr. Kern failed to produce a signed copy of the transcript from the Noblesville, Indiana hearing, or any other form of certification from the Noblesville Superior Court, but nonetheless urged me to pay the $ 375.00 filing fee to obtain a filing number. Beyond the questions about Judge Sturdyvant's issuing a decision that allowed only one day to file an appeal and whether the Indiana Supreme Court is the appropriate venue to file such an appeal, Mr. Kern was turned away at 4:30 P.M. on July 6, 1998, although he promised to return with the necessary documentation before 9:00 A.M. the following morning.

The eviction took place as scheduled at 9:00 A.M., July 7, 1998 when the Hamilton County Sheriff's Department arrived with more than a dozen movers from Atlantic Relocations and methodically executed a plan to pack, load and store the household belongings from my 5,000 square foot home. The household

FN 12

goods were initially stored in the name of Mr. Siedel, leading Plaintiff to believe that the move had been planned and coordinated well in advance of the decision handed down by Judge Sturdyvant on the afternoon of July 2, 1998.

Mr. Kern did not call me until late in the afternoon of July 7, 1998 to say that the appeal had been filed and that he had heard nothing from Chief Justice Sheppard. I doubted that my appeal rights had been upheld by Mr. Kern and questioned if my rights could have been upheld at all, since Mr. Kern failed to file the Writ of Habeus Mandamus on July 6, 1998, the day before the eviction was to have taken place, as he had planned. The Hamilton County Sheriff's Department Deputy ordered me off the premises before the packing of my household goods had been completed. Thereafter, I paid monthly storage fees based on the overall weight of the furnishings that <u>Atlantic Relocations </u>had calculated was being held in storage.

I alleged that the Hamilton County Sheriff's Department, Atlantic Relocations, Kenneth Kern, and Steve Siedel used the eviction and the legal authority upholding the enforcement of the eviction, acting under the color of law, to steal my household goods, violating 42 U.S.C. 1983 and my fourteenth Amendment rights, protecting property as guaranteed by the United States Constitution.

I moved from Indiana to northern California in September 1998, leaving my household goods in storage until ay 1999, when, without my prior knowledge or authorization, Atlantic Relocations shipped my household goods to Fairfield, California (this time frame happened to coincide with the end of the first investigation conducted into my allegations, CV-02-3249 FMC, although I was not in-

FN 12

formed of the findings then, nor have I been informed about the contents of <u>any</u> investigation into the matters I have meticulously detailed in my complaints to the U.S. Attorney for the Southern District of Indiana and the Indianapolis FBI. Atlantic Relocations sent the shipment without advanced notice, demanding payment in full, without an inventory, asserting that the original inventory was never completed or had been lost.

I refused to accept delivery and demanded Atlantic Relocations complete another inventory, under my supervision, before I would accept delivery and pay the invoice. There was a difference of more than three thousand pounds between what Atlantic Relocations purported to have stored and shipped, according to its own estimates, and what actually arrived and was inventoried in Fairfield, California. There was more than a twenty thousand dollars in damaged, missing or stolen furnishings, violating 42 U.S.C. 1983 where my missing property resulted from the deprivation of my rights guaranteed under the Fourteenth Amendment of the Constitution.

Under the provisions of the Freedom of Information Act (5 U.C.S. 552), I am now requesting all the investigative reports produced from the FBI's investigation of those 1998 complaints. In addition, because of communications I had with the FBI in early 1999 I have strong reasons to believe that attempts were made to thwart the investigation. Specifically, I believe U.S. Attorney Tim Morrison and/or Senator Evan Bayh may have interceded on behalf of the accused to derail the investigation I requested, which would be a violation of 42 U.S.C. 1985.

FN 12

This also violates 18 U.S.C. 242 that states "whoever, under the color of any law, statute, ordinance, regulation, or custom, willfully subjects any person in any deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States..." is guilty of a crime that is punishable by imprisonment.

However, my understanding is that some sort of investigation was completed and I am requesting the documents connected with this matter and a full disclosure of the findings of your completed your inquiry. Thank you in advance for your help and cooperation.

Sincerely,

George M. Lewis, M.D.

FN 12

Kenneth Kern
Attorney-at-Law
5407 E. Pleasant Run Pkwy. S. Dr.
Indianapolis, Indiana 46219

Atlantic Relocations
9967 Westpoint Drive
Indianapolis, Indiana 46256-3334

Hamilton County Sheriff Department
18100 Cumberland Road
Nobelsville, Indiana 46060

Steve Siedel
11639 W. Georgetown Rd.
Columbus, Indiana 47201

Indiana Supreme Court
Clerk
Room 217
200 W. Washington St.
Indianapolis, Indiana 46204

FN 12

Gmh



=037=  U.S. POSTAGE
PB METER 7136410

=0.12=  U.S. POSTAGE
PB METER 7136410

WASHINGTON
JUL 2 '0 3
D.C.

WASHINGTON
JUL 2 '0 3
D.C.

FIRST CLASS

Mr. George M. Lewis, M.D.
18430 Brookhurst Street, Suite 201 H
Fountain Valley, CA 92708

Department of Homeland Security
Office of the Inspector General
Office of Investigations
245 Murray Drive
Building 410
Washington, D.C. 20528

07 0939
**FILED**

MAY 2 1 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

FN 12

**George M. Lewis, M.D.**
**18430 Brookhurst Street  Suite 201 H**
**Fountain Valley, California 92708**
**714-593-770   Ph.   714-593-0710  Fax**

June 22, 2003

Department of Homeland Security
Office of the Inspector General
Washington, D.C. 20528

I am writing about concerns that I asked your office to investigate last November 2002 regarding harassment and abuse by Justice Department employees after my arrest for violating child support statutes. At that time I expressed concerns about the illegal electronic monitoring of my cellular telephone, the limiting of my ability to earn a living through sabotaging, manipulating and delaying of my credit card collection capacity. After making that complaint the Los Angeles U.S. Attorney's Office tried to withdraw my signed plea agreement, which I also reported in a separate November complaint.

Beginning sometime after filing my last complaint to the Justice Department in November 2002, I believe that an attempt was made on my life by exposing me to a toxic substance that was placed in a liquid soap I used, producing the nearly fatal constellation of symptoms found in Congestive Heart Failure. I barely survived and have been recovering through my participation in a University of Southern California / Los Angeles County Hospital Cardiology study.

After I was discharged from the USC Cardiology Unit in January 2003, I honestly felt that a significant change had taken place. For example, I felt that the illegal monitoring of my cellular telephone had stopped. However, I was aware of other disturbing events. My computer was being continually hacked. Needless to say, I did not consent to this type of invasion of privacy. However, my computer files were destroyed or stolen, my access to familiar web sites denied, my email disrupted and destroyed (all violations of the Computer Fraud and Abuse Act). During the week of April 29, 2003, as I prepared for the FOIA hearing on the government's motion for summary judgment, I believe my close friend, Dianne Curran's cellular telephone was illegally wire tapped (425-681-8511) and our conversations monitored (another violation of the federal electronic monitoring laws).

In November, I reported to the Justice Department that my ability to collect payments from credit card sales resulted in excessive bank charges. This occurred at a Wells Fargo Bank, the same bank that Mr. Jay Pewthers used to induce me to open an illegal checking account in a Sacramento, California in October 2000.

FN 12

At that time Mr. Pewthers told me that he was part of the Phoenix Group, a consulting organization based in Huntsville, Alabama, that I believe has extensive federal contracts. This organization's expertise is in the field of conducting counterintelligence operations for business and government agencies. However, I think Phoenix, or an organization like it, has been participating in an ongoing pattern of harassment and abuse, directed towards me, well before the time USC discharged me from the Cardiac Intensive Care Unit.

I have maintained membership in an online dating service named Match.com for several months. Until recently, I had free access until a hacker blocked my ability to launch that web page. Beginning in March 2003, three women (Stacy Frick, Sunny Foor, and Teri Schriber), whose telephone numbers I have upon request, contacted me to initiate some form of social interaction. I believe these women were directed by law enforcement to obtain information from me and/or set me up to be accused of committing a crime (see previous complaints). Ms Foor told me that she worked for the Orange County District Attorney's Office as a rape counselor. She was openly seductive, inviting my sexual response. Ms Foor even agreed to let me work in her office to satisfy any community restitution requirements the court might impose. The other two were less predatory. Even if these women were only gathering intelligence about me, it was without my knowledge or permission and their actions do not, in my opinion, constitute actions consistent with the voluntary consent doctrine. They invaded my privacy, without probable cause, for reasons that are still unclear to me.

When I suggested that Ms Foor talk with my attorney, Mr. Leothis Matthews, she stopped our interaction dead in its tracks. I do not know if these women's actions were initiated by Justice Department personnel or by a private organization like the Phoenix Consulting Group. I know that when I went to Sacramento thinking I was resolving my conflicts with IRS (see previous complaints), Mr. Pewthers told me that the Phoenix Group's philosophy was honed during the Viet Nam war. He said that they were trained to do anything necessary, to control the citizenry, influence the outcomes of political elections, using torture, entrapment, misinformation, psychological manipulation, and assassinations to achieve their goals. Their mission at that time was to control the population and change the government. I believe that is happening here, today, in America.

Sincerely,


George M. Lewis, M.D.

FN  12



# DEPARTMENT OF HOMELAND SECURITY
### Office of Inspector General
### Washington, DC 20528

JUL 1 7 2003

George M. Lewis, M.D.
18430 Brookhurst Street, Suite 201 H
Fountain Valley, CA 92708

OIG Complaint Number: C03-04341

Dear Mr. Lewis:

The purpose of this letter is to acknowledge receipt of your correspondence on July 9, 2003.
It will be reviewed by the staff of the Investigations Division, Office of Inspector General. If
additional information is required for this review, you will be notified.

Thank you for your interest in the elimination of fraud, waste and abuse in the programs and
operations of the Department of Homeland Security.

Sincerely,

Elizabeth M. Redman
Assistant Inspector General
  for Investigations

FN IL

**George M. Lewis**
**3328 Stevens Avenue**
**Rosemead, California 97101**
**626-572-8941**
**(FAX) 626-572-9288**

Ms. Paula Mills
Internal Revenue Service
Los Angeles Appeals Office
300 N Los Angeles Street
Room 3054, MS LA-8000
Los Angeles, California 90012

Dear Ms Mills;

Please find the first page of the document you requested. I initially submitted an Administrative Claim to Ms. Terry Franklin and Mr. Leo Alvarado in mid-July 2001. After going through three months of confusion about the identity of the person to whom this petition should have been sent, I re-submitted the entire packet to Mr. Leo Alvarado, Director of Special Procedure Function, as directed by IRS collections policy analyst Ms. Mel Hadley. I finally received a letter acknowledging its receipt by the District Office on October 1, 2001.

Submitting an Administrative Claim was consistent directions in IRC 41,7433-1. **Civil cause of action for certain unauthorized collections actions**, which states, if, in connection with the collection of a federal tax with respect to a taxpayer, an officer or an employee of the Internal Revenue Service recklessly or intentionally disregards any provision of the Internal Revenue Code or any regulation promulgated under the Internal Revenue Code, such taxpayer may bring a civil action for damages against the United States in federal district court. The taxpayer has a duty to mitigate damages.

In addition, 41,7433-1(d) **No civil action in federal district court prior to filing an administrative claim—**

(1)      Except as provided in paragraph (d)(2) of this section, no action under paragraph (a) of this section shall be maintained in any federal district court before the earlier of the following dates:

(i)      The date the decision is rendered on an administrative claim filed in accordance with paragraph (f) of this section; or

(ii)     The date six months after the date an administrative claim is filed in accordance with paragraph (f) of this section.

07 0939
**FILED**

MAY 2 1 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

(2)    If an administrative claim is filed in accordance with paragraph (e) of this section during the last six months of the period of limitations described in paragraph (g) of this section, the taxpayer may file an action in federal district court any time after the administrative claim is filed and before the expiration of the period of limitations.

Regulation 41,7433-1(f) stipulates that an administrative claim for damages shall be sent in writing to the district director (marked for the attention of the Chief, Special Procedures Function) of the district in which the taxpayer resides. Thus, I have, as outlined above, complied with the applicable IRC provisions twice.

In making the request for a due process hearing, I took one additional step because a reference in the CCH 41,7433 discussion of the Conference Committee Agreement opinion about P.L 100-647. It states that Collections has the authority to participate in non-suit settlements under 41,7122. Specifically.......(ninth), the conference agreement deletes the specific authority granted the IRS to settle administrative claims under this provision. However, it is the intent of the conferees that the general settlement authority of the IRS provided under IRC 7122 be utilized, where appropriate, to settle actions brought under this provision.

It is my position that IRC 7122 gives Collections the authority to hear my 7433 unauthorized collections complaints and can provide for me a context in which the settlement process may be initiated, satisfying the requirement to exhaust all administrative remedies. Thus, I have timely filed Form 12153 requesting a Due Process Hearing to address unauthorized collections actions by IRS employees, with respect to the collection of taxes, under IRC 7433.

It is my expectation, with the timely filing of this appeals request, under section 7122, that I will be entitled to present the evidence supporting my allegations of unauthorized collections actions in a forum that 1.) Satisfies the administrative process recommended by the Conference Agreement, e.g. 41,7433-1. And 2.) Provides a hearing process that gives me the opportunity to arrive at a fair settlement on the abuse issues before going to federal district court.

My original administrative claim included twenty-five individual instances of abuse by IRS representatives and employees. Arguably, this really represents twenty-five separate claims, although some of them are beyond the two-year statute of limitations. However, taken together, this shows a clear pattern of coordinated, institutionalized and officially sanctioned abuse directed towards a taxpayer by IRS, while using the Title IV-D Court, the bar, the state medical board, private corporations, my employer, my family, private attorney's, other government agencies, as well as a U.S. Treasury agent who suppressed evidence I provided about IRS abuse.

Meeting all the requirements outlined in IRC 7433 insures that I will have the government's financial support pursuing these claims in federal district court. This is important because I have documented many violations of the IRS Code and my constitutional rights. Nonetheless, I am concerned because the lawsuits of many taxpayers, with similar

complaints, have been dismissed because they failed to exhaust all administrative reme-
dies prior to filing in federal court. *Nunez, Jose Alberto, vs. U.S.* 1998 D.C., Fl, 82 AFTR
2d 98-6189 and *Grace, James vs. Thomas, Rath,* C2000, D.C., MI, 85 AFTR 20 2000-
796, 2000-1 USTC 1150196.

If this request for a Due Process Hearing does not fulfill the requirements for exhausting
my administrative remedies, please inform me in writing, immediately and tell me how to
achieve this goal. If this is the appropriate forum to address my section 7433 complaints
and discuss the possibility of entering into a settlement agreement, please inform me in
writing prior to the November 29, 2001 meeting. Although wiretapping is a separate is-
sue, the Supreme Court has spoken on entrapment in *Sorrells v United States* and
*Sherman v United States.* It is my view that the government should accept the precarious-
ness of its position with respect to this allegation of government wrongdoing. Further-
more, in cases such as mine, in which there is uncertainty about the outcome of any fu-
ture litigation, the government's interest would be served best, through resolving the
complaints before they reached federal district court.

If I petitioned the Federal Court with *only* two allegations: 1.) That IRS, under the guise
of helping me resolve an O.I.C appeal, working alone or in concert with other govern-
ment agencies, attempted to entrap me in a scheme that involved opening an illegal bank
account in Sacramento and then stole the evidence I had gathered about other instances of
IRS abuses *United States v. Thickstun,* 110 F.3d 1394 (9th Cir.), cert. Denied, 118 S. Ct.
305 (1997), and 2.) That IRS (in concert with other agencies) conducted illegal wiretap-
ping of my cellular telephone, which I discovered and reported to the appropriate
authorities. The official response was to deny that wiretap existed, followed by efforts to
cover up the fact by altering all the telephone records in which the number appeared.
Furthermore, I believe the violations of the law perpetrated by IRS and other agencies
(Title IV-D Court, California State Medical Board, Marion County Prosecutor's Office)
and government personnel were disguised through the illegal use of a "hand-off" tech-
nique *People v. Gaxiola,* BA132597. These actions deprived me of my constitutional
rights to privacy and due process.

I allege that Donna Siebel, Jeff Bennett, Robert Hedlund, IRS employees in the Sacra-
mento IRS office, working with Jay Pewthers and/or others from different government
agencies, violated section IRC 301. 7433 by taking part in and orchestrating a scheme to
have me entrapped in the commission of a crime after I refused to sign the offer-in-
compromise and collateral agreement that was on the table in January 2000. And, during
the time I was in the offer-in-compromise appeal process, while awaiting their final de-
termination, these IRS employees attempted, in the pursuit of collecting the back taxes I
owed, to have me jailed for opening an illegal account.

Entrapment is defined in Black's Law Dictionary as "the act of officers or agents of the
government inducing a person to commit a crime not contemplated by him, for the pur-
pose of instituting a criminal prosecution against him." The idea of entrapment has been
around a long time. The Supreme Court recognized the defense of entrapment in the fed-
eral system in *Sorrells v. United States.* The decision reached in *Sorrells* relied, for the

most part, on the state of mind of the accused rather than on whether or not the government's conduct was reasonable, i.e. would I have been independently predisposed to go to Sacramento to open a Club Checking Account without the intervention of the government?

Since IRS must prove beyond a reasonable doubt that the I was disposed to commit the criminal act in question prior to first being approached by government agents *Jacobson vs. United States*, 503 U.S. 540.549 (1992), it must show my predisposition to commit the crime. In *Sherman vs. United States*, 356 U.S. 369, 373 (1958) the court distinguishes between a trap for an unwary innocent and a trap for an unwary criminal, e.g. was my susceptibility to open a Club account in Sacramento not predicated on many previous years of IRS abuse and a sincere desire to bring the O.I.C. appeal to a fair and successful conclusion?

I can prove that I am in the former category, as an unwary innocent, for whom the government's solicitations were intended to manipulate me into participating in a criminal activity. This is especially egregious because it was not the first time I was exposed to a government entrapment scheme. Given the opportunity through the discovery process in court, I believe I can prove that the woman who offered herself for a sexual encounter in July 2000 worked for IRS or another agency. When someone pretending to be a lost partygoer appeared in my driveway and less than a half-hour later was inside my house pushing for a sexual encounter, a line was crossed and my rights were violated because I believe that person worked for the government. This woman had the opportunity to entrap me in a sexual encounter if she had claimed was nonconsensual. In *Jacobson v United States* Justice White wrote, "when the Government's quest for convictions leads to the apprehension of an otherwise law-abiding citizen who, left to his own devices, likely would have never run afoul of the law, the courts should intervene."

I have taken the Ninth Circuit's application of a multi-element test in which the court looked on a variety of related facts to determine the "predisposition" to commit a crime, as my proposed standard to address the issues of entrapment.

1. Defendant's character and reputation
2. Whether the government initially suggested the criminal activity
3. Whether the defendant engaged in the activity for profit
4. Whether the defendant showed any reluctance
5. The nature of the government's inducement

Herein is part of the evidence I have compiled in support of my allegation that IRS agents, working in conjunction with other government agencies and personnel, attempted to entrap me in the commission of a crime:

**1.    Defendant's character and reputation.**

I am a physician in good standing in the community. Over the past twenty years, I have treated thousands of patients, giving each of them the highest standard of

4

care possible. Before leaving Indiana in 1998, I was a very successful physician with a thriving psychiatric practice and an excellent income. I have never been convicted of anything having to do with illegal bank accounts, manipulating funds to hide them from the government, initiating or using any type of scheme to evade paying taxes, or helping those who do. I have no history as a tax protester. I have a well-documented five-year history of IRS abuse, having followed every administrative and procedural step necessary to have this abuse addressed. I had done everything humanly possible to have IRS address these instances of abuse, but I my complaints were ignored, placated or disregarded.

2.    **Whether the government initially suggested the criminal activity.**

Yes. As I told the counsel to the Senate Finance Committee, when I went to Washington, D.C., after closing the account and reporting it to the Taxpayer Advocates Office, the only reason I agreed to meet with Mr. Pewthers was because I wanted to reconcile my O.I.C. appeal, reach a settlement with I.R.S. and move on with my life. Inspite of my stated intentions, three government agents, with the assistance of two civilians, encouraged me to take aggressive actions and fight the IRS to stop the abuses I have experienced. Not only did these government agents suggest the criminal activity; the IRS enabled my participation financially, by dispersing monies to me from the Amen Clinic that they had previously withheld earlier in 2000. This was critical, because I had overdrawn my own bank account numerous times during that summer because I had no money! I couldn't even afford a place to live (first and last plus security) during the months following my move to Los Angeles. And, I certainly did not have the money to open another bank account in Sacramento. What in heavens name did Mr. Pewthers think I had to protect, anyway? Nonetheless, the government's plan was to coordinate my discussions with Carolyn Trace about a meeting with Mr. Pewthers in September 2000 with the simultaneous disbursement of checks from the Amen Clinic patient accounts that had been miraculously collected just in time for me to deposit them in the soon to be opened Sacramento account. These were the funds diverted by IRS earlier that year from the Amen Clinic. I believe testimony from employees and former employees of the Amen Clinic will confirm that Siebel, Bennett and/or Hedlund influenced the Amen Clinic to fire me from my job in April 2000, in retaliation for refusing to sign the O.I.C. and collateral agreement. In the months preceding my termination, approximately $8,000-$9,000 was diverted, withheld or stolen from me, which I discovered and did the work necessary to uncover how the diversion occurred and to recoup more than half of the total before I left the clinic in June. A substantial amount was still unaccounted for after my departure. Then, as if on cue, monies from the Amen Clinic started flowing in my direction during September, October and November, providing me with the means to deposit a fairly large portion of it into the Sacramento bank account if I had not been so reluctant to believe in the line of trash Mr. Pewthers was talking.

3.    **Whether the defendant engaged in the activity for profit.**

I had absolutely no profit motive in engaging in this activity.

4.    **Whether the defendant showed any reluctance.**

I showed a great deal of reluctance in going to Sacramento. I scheduled and can-
celed a flight before I finally went there to meet Mr. Pewthers request his help.
Mr. Pewthers required me to open a bank account in order to secure his assistance
in resolving the IRS appeals. Before I left Los Angeles, I had no idea what type of
account he was talking about but he insisted that it was necessary to protect me
from IRS when they retaliated for what he was going to do. However, after open-
ing the account, I never followed through with any of the instructions Mr.
Pewthers gave me. I made an initial deposit of only $100.00 into the Club account
and never made any additional deposits thereafter. Although, he had been referred
by a friend through an agent at Taxgate.com, who was referred by someone else, I
was so wary of Mr. Pewthers promises of success, that I asked a friend to listen in
on our conversation, with his permission, and take notes. After five years of
heartburn, he sounded too good to be true. I asked if I could take notes and make
a recording of one of our conversations, which he agreed to, as well. I was trying
to decide if this man could help resolve my I.R.S. obligations. I exchanged emails
with this same friend during the months of October, November and December
about Mr. Pewthers, giving my honest reactions about what was said and what
had taken place. Ultimately, I sensed that his intentions were not really for my
best interest. And, I reluctantly concluded that the entire initiative was illegal and
that I needed to pull out of it and tell the authorities. I investigated it myself. I re-
ported it to the Taxpayer Advocates Office, TIGTA, Senate Finance Committee,
Justice Department and the Washington Post.

5.    **The nature of the government's inducements**

Mr. Pewthers offered to help me resolve my O.I.C. conflict by representing me in
a hearing that he was going to request with six to eight weeks of our encounter.
He claimed to be able to get IRS agents to testify under oath about their wrong-
doing in the instances of abuse I have alleged. If they lied, they would suffer the
penalties of perjury where they could be punished legally. He advised me to go on
the offensive and to treat the IRS as they have treated me. He said that in order to
win, I needed to approach the IRS from the standpoint of a military strategist and
that would require me to develop a killer's instinct in order to prevail. He assured
me that he had done it for hundreds of other clients and he had gotten millions of
dollars in taxes, interest and penalties reversed. He promised me success if I were
aggressive enough to put IRS on the defensive. If I trusted him and gave him my
power of attorney for financial affairs, etc., he would win back all the things that
IRS had taken or destroyed. All I had to do in return was to give him all the evi-
dence I had collected and open a bank account that would protect my funds from

the IRS during the time when he was on the attack and they were trying to retaliate.

## Evidence Included:

Bank Statements
Amen Clinic Check Stubs
Notes from telephone conversation with Mr. Pewthers
Affidavit from friend who listened to my conversation with Mr. Pewthers
E-Mails from October, November and December relating to my reactions to Mr. Pewthers offer.

George M. Lewis, M.D.
Pro Se
636 No. Spaulding Ave.
Los Angeles, California 90036
323-651-1262

## AFFIDAVIT

1.    On or about June 12, 1998, Judge Wayne Sturdyvant heard the matter of

Siedel vs. Lewis, deciding the eviction case in favor of the Plaintiff. However,

Judge Sturdyvant waited to issue his final decision and the court's eviction or-

der at the same time, late in the afternoon of Friday, July 2, 1998, the day be-

fore the long three-day July 4th holiday weekend.

2.    Judge Sturdyvant's order stipulated that the eviction would take place "no

sooner" than 9:00 A.M., Wednesday morning, July 7, 1998, leaving plaintiff

only one day, Tuesday July 6, 1998, in which to appeal the court's decision.

3.    On Friday evening July 2, 1998, plaintiff contacted attorney Kenneth Kern,

who had represented plaintiff in the Noblesville hearing before Judge Sturdy-

vant, and they discussed a plan to petition Chief Justice Randal Sheppard for a

stay in the eviction order that he (Kern) would prepare and deliver in the form

of a Writ of Habeas Mandamus, to be filed at the Indiana Supreme Court on

Tuesday July 6, 1998. Plaintiff agreed to wait on a call from Mr. Kern then

meet him at the Supreme Court when the writ was ready to be filed.

4.    Between 2:00 P.M. and 3:00 P.M. on July 6, 1998, Kern called plaintiff and

asked him to drive to the Indiana State House where Kern would be prepared

to file the writ before the court's closing at 4:30 P.M. Plaintiff and Kern failed

*07 0939*

FILED

MAY 2 1 2007      FN 15

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

to connect immediately and finally met outside the office of the Clerk, Indiana

Supreme Court at or about 3:45 P.M.

5.      Plaintiff took the paperwork from Kern and commenced filling out the neces-

sary court forms to file the appeal while Kern left to seek out the Clerk in an-

other office. At about 4:15 P.M., plaintiff finally finished the paperwork, and

brought all documents to a counter where he logged his identifying data on a

sheet of paper where a clerical assistant, reviewed the documents, collected

the $ 375.00 filing fee, issued a receipt for payment of the fee, and assigned

sequential Supreme Court case numbers to each appellant. *After* receiving the

assignation of a case number, paying the fees, and turning over the documents

Kern had provided, the woman behind the counter asked plaintiff to return and

observed that the material was incomplete and, thus, could not be accepted.

6.      She called for the Clerk because we were nearing the 4:30 P.M. deadline for

filing the Writ of Habeas Mandamus, asking Chief Justice Sheppard to stay

the eviction order. The court's Clerk and Kern emerged from and upstairs of-

fice and reviewed the documents and both of them agreed that the Writ of Ha-

beas Mandamus could not be filed without the simultaneous submission of a

certified copy of the hearing transcript, signed by Judge Sturdyvant. The entry

of plaintiff's name and the information about his Noblesville trial, along with

the case number was lined out on the same sheet of paper on Tuesday between

4:25 P.M. and 4:30 P.M. July 6, 1998.

7.      Kern urged Plaintiff to leave the filing fee on the books because Kern, in the

presence of the Clerk, and with her assent, promised to obtain several copies

FN 15

of the missing signed court transcript and return to the court on the following morning to complete the filing process for plaintiff's appeal. Outside the Clerk's office, Kern explained to plaintiff that he would have no trouble obtaining the documentation and would arrive before the Supreme Court opened for business at 9:00 A.M. the following morning, whereupon the appropriate paperwork would be duly filed.

8. The eviction of plaintiff took place as scheduled promptly at 9:00 A.M., July 7, 1998 when the Hamilton County Sheriff's Department arrived with a half dozen sheriff's personal and more than a dozen movers from Atlantic Relocations and methodically executed a plan to pack, load, and store the household belongings from Plaintiff's five thousand square foot home.

9. Plaintiff learned of this around 9:10 A.M. and began trying to reach Mr. Kern numerous times between 9:00 A.M. and 2:00 P.M. on July 7, 1998. That afternoon Kern finally answered his phone. It was well after the eviction had gotten underway, and he reported that he had timely filed plaintiff's appeal that morning, as they had planned, and that he had, thus far, heard nothing from Chief Justice Sheppard.

10. At approximately 3:00 P.M., a Hamilton County Sheriff's Deputy ordered plaintiff to leave the premises, although the packing and loading of plaintiff's household goods was not yet completed. Plaintiff protested and the sheriff threatened to arrest him if he didn't voluntarily leave the premises. Plaintiff asked why he *had* to leave before the packing had been completed. The sheriff told him that Mr. Siedel was on his way over and wanted to plaintiff to be off

FN 15

the premises. Plaintiff called Kern, who promptly took his call, to ask him to intervene with the sheriff but was advised by Kern, since the threat of arrest had already been raised, simply to leave the premises and avoid any type of conflict that might lead to plaintiff's arrest.

11.   Plaintiff's household goods were initially stored at Atlantic Relocations under the name of Steve Siedel where plaintiff paid monthly storage fees based on the calculations from overall weight of the furnishings that Atlantic Reloca- tions had inventoried and moved into the storage facility.

12.   Plaintiff's household goods were held in storage from July 1998 until May 1999 when they were shipped to northern California. During that time, plain- tiff and his family had made two trips to the storage facility to remove items necessary for daily living. No furniture was removed. Only clothing was re- moved before plaintiff and his family moved to California in September 1998. In October Ryan DeMott, the teenage son of plaintiff's fiancée reported to plaintiff that he stopped by the old residence and looked in the downstairs windows where he saw a pool table, pool cues, and a sofa still present at the residence.

13.   In November 1998, plaintiff went back to the storage facility once more be- cause plaintiff's fiancée was moving back to Indianapolis and needed to re- move some additional clothing to accommodate the winter weather. At that time, the Atlantic Relocations personnel monitoring the removal of the addi- tional clothing explained to plaintiff the method that monthly charges were derived from the weight calculated for each container stored. We counted the

FN 15

4

containers and it correlated with the estimated weight that would have been expected *if all* plaintiffs' belongings had been put into storage. Plaintiff had knowledge that this was a deception because he already had the report of Ryan DeMott that Atlantic Relocations had **not** removed **all** of plaintiff's household furnishings on July 7, 1998.

14.    In early May 1999, plaintiff's former fiancée and her brothers returned to AR to remove some furniture to furnish a one-bedroom apartment she planned to occupy and plaintiff gave permission for her to take what amounted to several pieces of furniture along with clothing and personal affects. She reported that AR personnel monitored and observed her and kept track of the modest number of items she removed. She stated that it appeared to her that the same number of large wooden crates were present that had been there the previous November when we visited AR together.

15.    This explains, in part, why plaintiff was so taken aback when AR shipped the remaining household goods to California without prior warning, or permission. He became adamant about not accepting delivery of the shipment, when without warning, without prior authorization or approval, and questioned why Atlantic Relocations simply loaded plaintiff's household goods on a truck and shipped them to California. Repeated calls from AR in Indianapolis threatening to drop the household goods off and charge plaintiff for storage in Fairfield, California.

16.    Plaintiff asked specific questions about the shipment's contents and it became clear that the driver had no inventory of the cargo he was transporting. AR

FN 15

claimed not have had an inventory of the goods and claimed that the inventory had either been lost or had never been completed. Plaintiff **already knew** from a reliable source that there were *missing items* and suspected he might possibly discover others that he had yet to learn about.

17.    Unable to reach any accord with Atlantic Relocations, plaintiff was referred to a company vice president in Atlanta, Georgia to negotiate the final delivery. Plaintiff discovered there were over twenty thousand dollars of damaged, missing or stolen property and that he had been overcharged during the months of storage because the estimated weight did not include the pool table, furniture, lawn equipment, or various other tangibles that were not present at the time of delivery.

I swear under the penalty of perjury that the forgoing is true and correct. Executed on: January 20, 2005.

George M. Lewis, M.D.
Pro Se
636 No. Spaulding Ave.
Los Angeles, California 90036
323-651-1262

FN 15

6



9967 Westpoint Drive
Indianapolis, Indiana 46256

# ATLANTIC RELOCATION SYSTEMS
### 9967 WESTPOINT DRIVE
### INDIANAPOLIS, IN 46256

### 317/594-1333
### 800/333-0058

### FAX NO. - 317/594-1330

**PLEASE DELIVER THE FOLLOWING PAGE(S) TO:**

**NAME:** Mr George Lewis

**COMPANY:**

**PHONE NO.**

**FAX NO.** 317-377-5310

**NUMBER OF PAGES FAXED INCLUDING THIS COVER LETTER:** 2

***************************************************************

**FROM: MARK WHITAKER, V.P. OFFICE & INDUSTRIAL RELOCATIONS**

**NOTES:** If you have any other questions,
please feel free to call
                                    thanks -
                                    Mark

Atlas Van Lines Agent

World-Class Moving.

Telephone 317/594-1333 • 800/333-0058 • Fax 317/594-1330

Other Locations: Phoenix, AZ; Irvine, CA; Denver, CO; Sarasota & Tampa, FL; Atlanta & Tucker, GA; Chicago, IL; Indianapolis; Dallas, TX

07 0939

FILED

MAY 2 1 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

ATLANTIC Relocation Systems

# GEORGE LEWIS' STORAGE BREAKDOWN

**TOTAL CRATES:**          **11**
**TOTAL WEIGHT:**          **13,200LBS.**

**PICK UP CHARGES:**                    **$ 891.00**
**STORAGE CHARGES:** (1st MONTH)        **$ 330.00**
**STORAGE CHARGES:** (2nd MONTH)        **$ 330.00**
**WAREHOUSE HANDLING:**                 **$ 363.00**
**CONT. & PACKING:**                    **$ 905.31**

**TOTAL DUE BEFORE DELIVERY**          **$2819.31***

**LOCAL DELIVERY:**              **$ 891.00**
**SANFRANCISCO DELIVERY:** **$7500.00**

* THE CHARGES OF $2819.31 MUST BE PAID IN FULL PRIOR TO
FURNITURE BEING RELEASED FROM ATLANTIC RELOCATION SYSTEMS
WAREHOUSE. PAYMENT MUST BE RECEIVED IN THE FORM OF A
CASHIERS CHECK, MONEY ORDER OR CERTIFIED CHECK.

Agent for ATLAS VAN LINES

Telephone 317/594-1333 • 800/333-0058 • Fax 317/594-1330
Other Locations: Phoenix, AZ; Irvine, CA; Denver, CO; Sarasota & Tampa, FL; Atlanta & Tucker, GA; Chicago, IL; Houston & Dallas, TX

**George M. Lewis, M.D.**
**18430 Brookhurst Street  Suite 201 H**
**Fountain Valley, California 92708**
**714-593-770   Ph.   714-593-0710 Fax**

June 22, 2003

United States Senate
Ethics Committee, Chairman
Washington, D.C.

Dear Senator::

I am writing to express concern about what I believe to be the abuse of power by Senator Evan Bayh of Indiana and to request an inquiry into his involvement in covering up the criminal misconduct of several Indiana citizens. I made several complaints to TIGTA about IRS abuse during 1998, 1999 and 2000. I also met with Ms Lauren Fuller, counsel to Senator Grassley, who requested a congressional inquiry into the same complaints. I learned in July 2001 that I had the right to request their investigative reports through the Freedom of Information Act. I initiated the process to obtain the documents immediately and by January 2002 the TIGTA Disclosure Office had released 504 of 711 pages, claiming exemptions 5(c) and 7 (a), with respect to the withheld information. They informed me of my right to appeal their decision in Federal Court, which I did in April 2002. The government filed a summary motion to dismiss in April 2003 and Judge Florence Marie Cooper ruled in favor of that motion on June 2, 2003.

The documents TIGTA disclosed to me showed that another, a third party congressional investigation took place, however, TIGTA used the exemption 7 (c) to withhold the identity of that third party from me. I believe that the third-party congressional investigation that TIGTA has denied me access to involved activity initiated by Senator Even Bayh's office. The bulk of my complaints, the efforts to cover-up the wrongdoing I reported, and the subsequent escalation of the level of harassment came from citizens in Indiana. My original complaints not only involved employees of the IRS in Indiana, but also included businessmen, private citizens, members of the Indiana Bar, as well as officials at the Indianapolis Title IV-D Child Support Court, the Superior, and Indiana State Supreme Courts. If Senator Bayh's investigation resulted in opposition to the release of those investigative documents, in order to protect his constituents, that is his right.

Beginning last year, after I petitioned in federal court under the FOIA for access to the investigative reports concerning my complaints, there has been an intensified ongoing pattern of harassment and abuse directed towards me by government personnel. During that time, my ability to earn a living was sabotaged through the manipulation and delay of my credit card collection capacity; I have been followed; and, during last November and December, I

PN 12,13

believe an attempt was made on my life by exposing me to a toxic substance in the liquid soap I used, which produced Congestive Heart Failure. I survived, but barely. I reported these events to the Justice Department. At first, I was sure that the illegal monitoring of my cellular telephone had stopped. However, I realized that my computer was being continually hacked. Files were destroyed or stolen, my access to familiar web sites denied, my email disrupted (all violations of the Computer Fraud and Abuse Act). During the week of April 29, 2003, as I prepared for the FOIA hearing on the motion for summary judgment, I believe my close friend, Dianne Curran's cellular telephone was illegally wire tapped (425-681-8511) and our conversations monitored (another violation of federal. electronic monitoring laws).

My hope is that Senator Bayh's office did not use his position on the Senate Intelligence Committee to facilitate, directly or indirectly, any of these punitive activities towards me. One of the most serious complaints I submitted to the TIGTA and to Senator Grassley concerned a man named Mr. Jay Pewthers. Under the guise of helping me resolve an Offer-in-Compromise, Mr. Pewthers induced me to open an illegal bank account in Sacramento, California. He told me that he worked for the Phoenix Group, a consulting organization based in Huntsville, Alabama, that I now believe has extensive federal private contracts. This organization's expertise is in the field of conducting "counterintelligence" operations for business and government agencies. However, I think Phoenix, or an organization like it, has been engaged in an ongoing pattern of harassment and abuse, attempting to thwart my efforts to gain access to the documents I am entitled to see through FOIA. Furthermore, I believe the Mr. Bayh exercised his power on the Senate Intelligence Committee to protect his friends and supporters in Indiana who have broken the law.

I am concerned about the recent reports that private collection agencies were under consideration to replace IRS in the area of collections of back taxes. In my humble opinion, that would be a disaster. Mr. Pewthers told me that the Phoenix Group's philosophy was honed during the Viet Nam war. He said that they were trained to do anything necessary to control the citizenry, influence the outcomes of political elections, using torture, entrapment, misinformation, psychological manipulation, and assassinations to achieve their goals. I believe this is happening, here, today, in America. I raise this point only because I believe Senator Bayh may have misused his position as a member of the Intelligence Committee.

Sincerely,


George M. Lewis, M.D.

FN 12, 13

# ZONE
**A Check Point Company**

ZoneAlarm Pro Alert

How useful was this article?
○ Very  ○ Somewhat  ○ Not at all   [Let Us Know]

Provide more feedback

## AlertAdvisor

[Overview]  [Technical Ir]

Report Info    Whois Detail    Location Details    Event Reporting

**STAY INFORMED**

**who** is connected to your machine?

**where** are they connecting from?

**what program** is being used?

Get a complete profile of vital information about active connections to your PC and much more.

**New connection utility available**

More Info

[Print This Article]

### Whois Report from Zone Labs

Details about 205.58.228.162, the IP address of the computer that caused the alert you received from ZoneAlarm Pro, are provided in the Whois report below. The information in the Whois report comes from the Regional Internet Registry (RIR) for the region where 205.58.228.162 is located: ARIN, RIPE, LACNIC or APNIC. The name of the RIR appears in the Whois report.

The Whois report includes the name, address and contact information for the Internet Service Provider (ISP) that administers the block of IP addresses that contains 205.58.228.162. The report probably does not list the administrator of the specific computer at IP address 205.58.228.162.

You should not assume that individuals listed in this report are responsible for the alert you received on your computer.

Top of page

Map

MapPoi

Click c
find tl
this ac

### Whois Information

```
OrgName:    DoD Network Information Center
OrgID:      DNIC
Address:    7990 Science Applications Ct
Address:    M/S CV 50
City:       Vienna
StateProv:  VA
PostalCode: 22183-7000
Country:    US

NetRange:   205.0.0.0 - 205.117.255.255
CIDR:       205.0.0.0/10, 205.64.0.0/11, 205.96.0.0/12, 205.112
NetName:    JMCIS-BLOCK
NetHandle:  NET-205-0-0-0-1
Parent:     NET-205-0-0-0-0
NetType:    Direct Allocation
NameServer: NCC.NCTS.NAVY.MIL
NameServer: GATE.NCTS.NAVY.MIL
NameServer: NS1.NOSC.MIL
Comment:    DOD Network Information Center
Comment:    Space and Naval Warfare Systems
Comment:    Washington, DC 20363-5100 US
RegDate:
Updated:    2004-09-20
```

```
TechHandle: LS529-ARIN
TechName:   Slade, Lawana
```

FN #1, #3, #5, #4, #17, #18

```
TechPhone:    +1-850-452-7562
TechEmail:    LSLADE@nnic.navy.mil

OrgTechHandle: MIL-HSTMST-ARIN
OrgTechName:   Network DoD
OrgTechPhone:  +1-703-676-1051
OrgTechEmail:  HOSTMASTER@nic.mil

# ARIN WHOIS database, last updated 2005-06-21 19:10
# Enter ? for additional hints on searching ARIN's WHOIS databa
```

**Report Event Information**

Powered by
**my | NetWatchman**

### View open incidents for "205.58.228.162"

You have the option to anonymously submit information about this event for aggregat
event aggregator will:

- Gather intrusion event information from multiple parties.
- Analyze all the aggregated event information.
- Escalate the events to their respective sources as necessary.

To report your inbound firewall event information, click the submit button below. To vi
the IP tied to this firewall event, click on the "View open incidents"link below.

148.201.0.0. - 148.250.255<65

One or two years of access to updates, support, and services included with purchase of Zone Labs software; annual maintenance contract required for
subsequent access.

Copyright ©1999-2005 Zone Labs, LLC, 475 Brannan Street, San Francisco, CA 94107, USA.
All rights reserved. All other trademarks are the property of their respective owners.

**Privacy Policy**

Microsoft MapPoint Terms of Use, Privacy Statement

FN  1,3,4,5, 17, 18

# STATE *of* INDIANA



**INDIANAPOLIS, 46204-3417**

## DISCIPLINARY COMMISSION
## OF THE
## SUPREME COURT

115 West Washington Street
Suite 1060 South Tower
Phone (317) 232-1807
Fax (317) 233-0261
TDD For Deaf: (317) 233-6111

**DONALD R. LUNDBERG**
EXECUTIVE SECRETARY

October 20, 1999

George M. Lewis, M.D.
2753 Kaanapali Drive
Fairfield, California 94533

Dear Dr. Lewis:

Your Request for Investigation concerning attorney Lorraine A.
Hitz-Bradley was received by this office on October 6, 1999.

This matter was considered by this office.  After reviewing the
complaint, we have determined that it does not raise a
substantial question of misconduct that would warrant
disciplinary action.  Therefore, the complaint has been
dismissed.

Thank you for bringing this matter to the attention of the
Disciplinary Commission.

Sincerely,

Donald R. Lundberg
Executive Secretary

DRL/jw

*07 0939*

# FILED

MAY 2 1 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

# STATE OF INDIANA



**INDIANAPOLIS, 46204-3417**

## DISCIPLINARY COMMISSION
## OF THE
## SUPREME COURT

115 West Washington Street
Suite 1060 South Tower
Phone (317) 232-1807
Fax (317) 233-0261
TDD For Deaf: (317) 233-6111

**DONALD R. LUNDBERG**
EXECUTIVE SECRETARY

October 20, 1999

George M. Lewis, M.D.
2753 Kaanapali Drive
Fairfield, California 94533

Dear Dr. Lewis:

Your second Request for Investigation concerning attorney Kenneth C. Kern was received by this office on October 5, 1999.

This matter was considered by this office. After reviewing the complaint, we have determined that it does not raise a substantial question of misconduct that would warrant disciplinary action. Therefore, the complaint has been dismissed.

Thank you for bringing this matter to the attention of the Disciplinary Commission.

Sincerely,

Donald R. Lundberg
Executive Secretary

DRL/jw



**Indiana Judicial Nominating Commission**
**Indiana Commission on Judicial Qualifications**

115 West Washington Street  Suite 1080
Indianapolis, Indiana 46204-3417
(317) 232-4706
FAX (317) 233-6586

November 17, 1999

Dr. George M. Lewis
2753 Kaanapali Drive
Fairfield, CA 94533

Re:    Complaint against Commissioner Barbara Collins, Marion Superior Court

Dear Dr. Lewis:

The Indiana Commission on Judicial Qualifications has received your complaint against Commissioner Collins. The complaint will be added to the Commission's agenda and, as soon as a decision is reached in your case, you will be notified. The Commission members will review the basis of your written complaint. If you want to add to your complaint or for any reason communicate with the Commission members or staff, please be sure to do so in writing.

The procedure followed by the Commission is found in IC 33-2.1-6-9, and Admission and Discipline Rule 25, which requires the Commission to furnish a copy of your complaint to the judge at some point during the course of its review and resolution of your complaint. All papers filed with the Commission and the substance of any Commission action taken, unless formal charges are filed by the Commission, are kept confidential by the Commission. Pursuant to Indiana Supreme Court Admission and Discipline Rule 25 VIII D, you are immune from civil suit against you based on the content of your allegations of judicial misconduct, if made without malice, only to the extent those allegations are made to the Commission. Therefore, you are not immune from civil suit for any allegations you make public or which you communicate to any entity other than the Commission.

The Qualifications Commission does not have the authority to intervene on your behalf or to change a decision entered by a court. Most disputes about the merits of a judge's decision are outside the Commission's jurisdiction. If the Commission were to determine that judicial misconduct occurred, the determination would not have a direct impact on your case; instead, it would constitute a disciplinary matter between the judge and the Commission. If you have any questions about this, I urge you to discuss them with an attorney. Neither the Qualifications Commission nor its staff can give you legal advice.

Sincerely,

Meg Babcock
Counsel

MB/db



**Indiana Judicial Nominating Commission**
**Indiana Commission on Judicial Qualifications**

115 West Washington Street  Suite 1080
Indianapolis, Indiana 46204-3417
(317) 232-4706
FAX (317) 233-6586

December 8, 1999

Mr. George M. Lewis
590 Versailles Lane
Suisun, CA 94585

Re:   Complaint against Judge Wayne A. Sturtevant, Hamilton Superior Court 5

Dear Mr. Lewis:

The Indiana Commission on Judicial Qualifications has received your complaint against Judge Sturtevant. The complaint will be added to the Commission's agenda and, as soon as a decision is reached in your case, you will be notified. The Commission members will review the basis of your written complaint. If you want to add to your complaint or for any reason communicate with the Commission members or staff, please be sure to do so in writing.

The procedure followed by the Commission is found in IC 33-2.1-6-9, and Admission and Discipline Rule 25, which requires the Commission to furnish a copy of your complaint to the judge at some point during the course of its review and resolution of your complaint. All papers filed with the Commission and the substance of any Commission action taken, unless formal charges are filed by the Commission, are kept confidential by the Commission. Pursuant to Indiana Supreme Court Admission and Discipline Rule 25 VIII D, you are immune from civil suit against you based on the content of your allegations of judicial misconduct, if made without malice, only to the extent those allegations are made to the Commission. Therefore, you are not immune from civil suit for any allegations you make public or which you communicate to any entity other than the Commission.

The Qualifications Commission does not have the authority to intervene on your behalf or to change a decision entered by a court. Most disputes about the merits of a judge's decision are outside the Commission's jurisdiction. If the Commission were to determine that judicial misconduct occurred, the determination would not have a direct impact on your case; instead, it would constitute a disciplinary matter between the judge and the Commission. If you have any questions about this, I urge you to discuss them with an attorney. Neither the Qualifications Commission nor its staff can give you legal advice.

Sincerely,

Meg Babcock
Counsel

MB/db

07-939
RMU

JS-44
(Rev.1/05 DC)

# CIVIL COVER SHEET

## I. (a) PLAINTIFFS

George M. Lewis, M.D.

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF 88888
(EXCEPT IN U.S. PLAINTIFF CASES)

Los Angeles, California

## DEFENDANTS

Senator Evan Bayh

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT DC
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

JURY ACTION

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
George M. Lewis, M.D.  Pro Se
7095 Hollywood Blvd. #1245
Hollywood, Co 90028

Case: 1:07-cv-00939
Assigned To : Urbina, Ricardo M.
Assign. Date : 5/21/2007
Description: Civil Rights-Non Employ.

## II. BASIS OF JURISDICTION

(PLACE AN x IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff

☒ 3 Federal Question (U.S. Government Not a Party)

☒ 2 U.S. Government Defendant

☐ 4 Diversity (Indicate Citizenship of Parties in item III)

## III. CITIZENSHIP

FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ☐ 1 | ☒ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT

(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

### ☐ A. Antitrust

☐ 410 Antitrust

### ☐ B. Personal Injury/Malpractice

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

### ☐ C. Administrative Agency Review

☐ 151 Medicare Act

**Social Security:**
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)

**Other Statutes**
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

### ☐ D. Temporary Restraining Order/Preliminary Injunction

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

### ☐ E. General Civil (Other) OR ☒ F. Pro Se General Civil

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Tort to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

③

| ☐ G. *Habeas Corpus/ 2255* | ☐ H. *Employment Discrimination* | ☐ I. *FOIA/PRIVACY ACT* | ☐ J. *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment<br>(criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| ☐ K. *Labor/ERISA (non-employment)* | ☑ L. *Other Civil Rights (non-employment)* | ☐ M. *Contract* | ☐ N. *Three-Judge Court* |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☒ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**
☒ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☒ 5 Transferred from another district (specify)   ☐ 6 Multi district Litigation   ☐ 7 Appeal to District Judge from Mag. Judge

THE CASE WAS DISMISSED BECAUSE OF IMPROPER VENUE. CV-04-2950 AHS

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

**VII. REQUESTED IN COMPLAINT**   CHECK IF THIS IS A CLASS ☐ ACTION UNDER F.R.C.P. 23   DEMAND $   Check YES only if demanded in complaint JURY DEMAND ☒ YES   ☐ NO

**VIII. RELATED CASE(S) IF ANY** p.f.   (See instruction)   ☐ YES ☒ NO   If yes, please complete related case form.

DATE 05/18/07   SIGNATURE OF ATTORNEY OF RECORD

21

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.   COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.   CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.   CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.   CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.   RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

Forms\js-44.wpd