RECEIVED

SEP 1 0 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**George M. Lewis, M.D.**
George M. Lewis, M.D., Pro Se
7095 Hollywood Blvd.
# 1245
Hollywood, Ca. 90028
323-512-0198

*Plaintiff*

**vs.**

**Senator Evan Bayh, United States
Senator from Indiana**
*Defendant*

_____/

**CASE No. 1:07-CV-0939 (RMU)**

**AMENDED CIVIL COMPLAINT
FOR DAMAGES PURSUANT TO
42 U.S.C. 1983, 1985, and 1986**

 

**COMES NOW** George M. Lewis, M.D., appearing Pro Se, who asks this honorable court to her this complaint (Haines v. Kener 1972 401US 519, 30L Ed. 2d 652 92 S.Ct. 594), who submits this amended civil complaint for damages pursuant to Federal Rules of Civil Procedure Rule 15 that grants Plaintiff leave to submit an Amended Complaint one time, without the Court's permission, if it is filed before Defendant's response. Plaintiff contacted Counsel Morgan Frankel at 202-224-5991 on August 13, 2007 to advise him of Plaintiff's intention to file an amended complaint. At that time, Mr. Frankel indicated he would not oppose Plaintiff's submission amended complaint,

1

because Defendant Senator Evan Bayh had not yet filed a response to the original complaint.

## JURISDICTION

This civil complaint for damages arises from alleged violations of 42 U.S.C. 1983, [1] 42 U.S.C. 1985, AND 42 U.S.C. 1986; this District Court has subject matter jurisdiction pursuant to 28 U.S.C. 1331 because it presents several federal questions arising under the Constitution and the laws of the United States. With respect to Plaintiff's claims based on 42 U.S.C. 1985 (3) and 1986, the Court also has jurisdiction pursuant to 28 U.S.C. 1343(a)(3). Supplemental jurisdiction over the Plaintiff's pendent state-law claims is conferred by 28 U.S.C. 1367(a).

## VENUE

Plaintiff filed a civil complaint in the Central District of California, Los Angeles Division as Case No. CV-04-2950 AHS against Senator Bayh and other defendants who were alleged to have violated Plaintiff's civil and constitutional rights to equal protection under the law. Senator Evan Bayh was named Respondete Superior in the complaint. The District Court's dismissed the claims without prejudice against all other defendants save Senator Evan Bayh, whose claim was dismissed without prejudice because it had been filed in the wrong venue. In November 2005, the district court gave Plaintiff leave to

---

[1] Complaint which alleges that federal officials acted in conspiracy with state officials under color of state law may properly be filed under 42 USCS 1983. American Civil Liberties Union v. Chicago 91976, ND Ill) 431 F Supp 25 subsequent app (1977, CA 7 Ill) 558 F2d 1031, cert den (1977) 434 US 828, 54 L Ed 2d 87, 98 S Ct 108, subsequent cert den (1977, CA7 Ill) 565 F2d 975, 24 FR Serv 2d 547 9criticized in Hodgers-Durgin v De La Vina (1999, CA9 Ariz) 165 F3d 667, 99 CDOS 326, 99 Daily Journal DAR 403, 42 FR Serv 3d 837)

refile the complaint in the proper venue. This would be the venue in which Senator Evan

Bayh lives, or the location where the violation of rights was alleged to have taken place.

This matter was reviewed and affirmed by the Ninth Circuit Court of Appeals on

April 7, 2007. In the matter now filed before this District Court, venue is appropriate in

this judicial district under 28 U.S.C. 1332 because the case involves diversity of

citizenship and a part or substantial part of the events or omissions giving rise to

Plaintiff's complaints occurred in this or other districts.

### 42 U.S.C. 1983, 42 U.S.C. 1985 and Fourteenth Amendment Violations, Civil Rights Conspiracy, Unintentional Infliction of Emotional Harm, Theft, Obstruction of Justice, Civil Conspiracy

### Preliminary Statement

1.     The fundamental ground upon which this tort action arises is based on the

misconduct of Senator Evan Bayh who, acting in a personal capacity,

participated in a civil conspiracy[2] against Plaintiff's civil rights. Then

Defendant Senator Evan Bayh requested and reviewed several investigative

reports from the Department of Treasury Disclosure Office that pertained to

complaints Plaintiff had filed between November 1998 and January 2001

about those in Indiana who conspired to deprive him of equal protection under

the law. These reports contained information from the Department of

Treasury's investigations into allegations that private citizens, members of the

---

[2]  Complaint to recover for conspiracy to deprive one of his civil rights is sufficient if it alleges (1) a conspiracy between two or more persons for the purpose of depriving any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the law, and (2) an act by one of the conspirators in furtherance of the object of the conspiracy whereby another person was (a) injured, or (b) deprived of exercising any right or privilege of a citizen of the United States. Girard v. 94th Street & Fifth Ave. Corp. (1975, SD NY) 396 F Supp 450, affd (1976 CA2 NY) 530 F2D 66, cert den (1976)

Indiana Bar, law enforcement officials, a household moving and storage-company, an IRS employee, as well as public officials in Indiana had violated his Fourteenth Amendment Constitutional property rights and then engaged in a conspiracy to deny Plaintiff equal protection under the law because he exposed their criminal wrongdoing.

2.    These reports, as well as others requested from the Indiana Supreme Court, F.B.I., Department of Defense Intelligence Agency, Indiana Judicial Commission and F.D.I.C. included findings about the alleged illegal conduct of high-ranking public officials in Indiana, including Senator Bayh who participated in the conspiracy and intervened on behalf of his constitutients/ co-conspirators to protect them from prosecution. [3] Plaintiff alleged a civil rights conspiracy between these parties that violated his constitutional right to equal treatment under the law.

3.    Plaintiff learned in July 2001 that the Department of Treasury Disclosure Office had seven investigative reports that pertained to his inquiries. During the following seven months, from July 2001 through January 2002, Plaintiff entered the F.O.I.A. administrative process and received a partial disclosure of documents the agency held. Much later, Plaintiff learned there had been

---

[3] In order to prove existence of civil conspiracy, plaintiff is not required to provide direct evidence of agreement between conspirators, and circumstantial evidence may provide adequate proof of conspiracy; plaintiff seeking redress under 42 USCS 1985 for civil conspiracy need not prove that each participant in the conspiracy knew exact limits of illegal plan or identity of all participants therein, and express agreement among all conspirators is not necessary element of civil conspiracy. Hampton v. Hanrahan (1979) CA7 Ill) 600 F2d 600, rvd, in part on other grounds (1980) 446 US 754, 64 L Ed 2d 670, 100 S Ct 1987, reh den (1980) 448 US 913, 65 L Ed 2d 1176, 101 S Ct 33 and reh den (1980) 448 US 913, 65 L Ed 2f 1177, 101 S Ct 33.

another third party congressional review of the documents, and it wasn't until much more time had passed before he alleged that Senator Bayh was the third party congressional entity that had made two separate requests for two of these investigative reports **(Exhibit A)**

4.    Plaintiff alleged that two investigative reports had been reviewed by Defendant Senator Evan Bayh; and that his conduct constituted behavior that went beyond the speech and debate protections for which legislators would normally be accorded immunity.

5.    After Plaintiff submitted allegations to various agencies about these eleven individuals, three state agencies, a commercial moving company, the Clerk, Indiana Supreme Court, and the Hamilton County Sheriff's Department [4] stating they had conspired to violate his civil rights, there was an immediate and intense retaliation against Plaintiff to intimidate, harass, and threaten his livelihood. Plaintiff alleges this information is contained in the investigative reports that show direct relationships between the co-conspirators. The Indiana Medical Board and the California Medical Board acted illegally to strip Plaintiff of his license to practice medicine in retaliation for his refusal to cease and desist his efforts to have the wrong doings in Indiana investigated. These actions taken by the co-conspirators under the color of state law prevented Plaintiff from receiving equal protection under the law. Their actions prevented him from gathering evidence (Clerk, Indiana Supreme

---

[4] Where federal officials act in complicity with state defendants to deprive person of constitutional rights, federal defendants may be liable in damages under 42 USCS 1983. Telebraph Sav. & Loan Ins. Corp. (1981, ND Ill) 947 F Supp 1252.

Court, Indiana Judicial Commission); The co-conspirators used connections to obstruct justice (Indiana Judicial Commission, F.B.I., U.S. Attorney's Office, Indiana Medical Board, Indiana DMV), threw administrative obstacles in his path, ignoring his rightful requests for intervention, from the state and federal agencies responsible for insuring equal protection under the law. This violated 42 U.S.C.S. 1985.

6.     At the very heart of the conspiracy was an invidiously crass racial animus towards Plaintiff, expressed by Steven Siedel, when, after he had convinced the Hamilton County Deputy Sheriff to leave before the packing of Plaintiff's belongings was done, said, "This is where we separate the men from the boys, George". At the time, this confrontation took place, Plaintiff was a fifty-one year old African-American man, who was in fact, older than the white male that made the racial slur. [5] Plaintiff was nowhere close to being a boy.

7.     Plaintiff understood the implicit racism in Siedel's evocation of an old racial stereotype that was once quite popular among whites with low self-esteem. He expressed his hatred towards blacks, using "age" and "maturity" contrasted with "youth" and "inexperience" as a metaphor for "superiority" and "inferiority". Siedel's hubris conveyed to Plaintiff, the notion that they "the whites" were "the men", and "African American men" were "the boys" in the tradition of Indiana's Jim Crow legacy. The timing of Siedel's use of this racial insult was purposeful and important. Siedel intended to emphasize his

---

[5] Specific intent need not be alleged in a suit under 42 USCS 1985 (3); facts pleaded must merely show an "invidiously discriminatory animus" behind the conspirators' action. Azar v. Conley (1972, CA6 Ohio) 456 F2d 1382, 15 FR Serv 2d 1179.

racial superiority and his race's (Caucasian) ability to exercise the power derived there from, with impunity. At the time of this racial assault upon Plaintiff, Siedel used the words "**we**" and "**men**", both in the plural, intending to convey he was not acting alone. Siedel's reference to "**we**" and "**men**" included a Hamilton County Deputy Sheriff, Attorney Kenneth Kern, Atlantic Relocations Moving and Storage's movers, warehouse people, and administrators, A&R Vice President John Schroeder, the Clerk, Indiana Supreme Court, United States Attorney for the Southern District of Indiana, Tim Morrison, and Defendant Senator Evan Bayh (D) Indiana. Yes, the men had taken the boy's household goods, and Plaintiff was told repeatedly over the next nine years to give up, there was nothing he could do about it.

8. Siedel's braggadocio betrayed his bigotry at a critical moment during the theft of Plaintiff's household goods. It **"reinforced"** Plaintiff's sense of isolation, helplessness, and despair over his powerlessness to do anything that would stop Siedel and the other white co-conspirators. Plaintiff's belongings were gone, case closed. These co-conspirators defrauded Plaintiff, committed conversion, obstruction of justice, intimidation, and harassment. The co-conspirators (who were all Caucasian) in this conspiracy deprived Plaintiff (an African American) of his right to equal protection under the law and violated 42 USC 1983, 42 USC 1985, 42 USC 1986, and Fourteenth Amendments of the constitution. [6]

---

[6] 42 USCS 1985 (3) provides cause of action only when plaintiff's right to equal protection, privileges or immunities is violated, and this means that there must be some racial, or perhaps class-based, invidiously discriminatory animus. Jennings v. Shuman

9.    In January 2001, Plaintiff went to Senator Charles Grassley and reported official misconduct by officials in Indiana and California that began in 1998. Plaintiff had not received a response to his many inquiries about official misconduct. Senator Grassley requested a congressional inquiry into the allegations of official misconduct in April 2001.

10.    In July 2001, Plaintiff was informed by the Department of Treasury that the Disclosure Office had seven investigative reports that pertained to the numerous complaints Plaintiff had filed between 1998 and 2001. This did not include complaints that had been investigated by the F.B.I. and the Department of Justice, Inspector General's Office, as well as the Department of Justice Office of Professional Responsibility.

11.    Plaintiff entered the F.O.I.A. administrative process with the Disclosure Office in August 2001. When it concluded in January 2002, only 509 of 714 pages were released by the Department of Treasury and the remaining 205 pages were withheld for privacy and law enforcement exemptions. Plaintiff was told in January 2002 that he would have to file a complaint in Federal District Court if he wished to obtain the remaining 205 pages. By the time he filed the civil complaint in Los Angeles district court, Plaintiff had reviewed the F.O.I.A. documents but did not identify the pages that contained entries about two additional *third party congressional requests,* other than the

---

(1977, CA3 Pa) 567 F2d 1213 9 superseded by statute on other grounds as stated in Atiyeh v. Hairston (1993, ED Pa) 1993 US Dist LEXIS 18059); Byrd v. Clark (1986, CA 11 Ga) 783 F2d 1002; Nashoba Valley Christian Fellowship, Inc. v. Ayer (1985, DC Mass) 623 F Supp 542.

congressional inquiry made by Senator Grassley. Plaintiff did not make the connection between this reference and a specific person until July 2003.

12. These two *third party requests were quite specific.* The first third party congressional request was made on June 19, 2001. This one was for the Marion County, Indiana reports and attachments. **(Exhibit A)** And, the second third party congressional request was made two days later, on June 21, 2001 for the Hamilton County, Indiana reports and attachments. **(Exhibit A)** Plaintiff alleges these two reports, which Plaintiff had been denied access to, pertained to the alleged official misconduct of the public officials, private citizens, business, law enforcement officer, members of the bar, and other Indiana constitutients who were participants, along with Senator Evan Bayh in the conspiracy to deprive Plaintiff of his constitutional rights to equal protection under the law. [7]   Plaintiff's question is **"What did Senator Bayh know and when did he know it?"**

13. Before Plaintiff became aware of the existence of these investigative documents on July 21, 2001, Senator Bayh had already requested and reviewed the two reports involving his Indiana constitutients on June 19 & 21 2001, and was already fully appraised as to the contents of these investigative reports by the time Plaintiff received them. Defendant Senator Bayh had full knowledge of the contents of these reports. He would have known the degree to which these reports implicated the complicity of the Clerk, Indiana

---

[7] Defendants need not be participants in conspiracy under 42 USCS 1985 (3) for liability to attach under 42 USCS 1986; if defendants knew of conspiracy, were in position to prevent its implementation, and neglected or refused to prevent it, they would be liable under 1986. Park v. City of Atlanta (1997, CA 11 Ga) 120 F3d 1157, 11FLW Fed C 482.

Supreme Court, Hamilton County Sheriff's Department, and Title IV-D Court and the extent these **state officials** official misconduct. Therefore, Plaintiff alleges **Senator Bayh had the opportunity, the motive, and power to take deliberate steps to block the release of redacted pages of the remaining 205 pages** to Plaintiff during the F.O.I.A. administrative process that Plaintiff did not complete until January 2002. [8]

14.    Plaintiff alleges that Senator Bayh conducted the review of these documents on behalf of <u>himself</u> and his constitutients/<u>co-conspirators</u>. Plaintiff alleges Senator Bayh was part of this conspiracy to deprive Plaintiff of his civil rights (42 USCS 1983 and 42 USCS 1985) from the <u>earliest times of this controversy.</u> His participation in this conspiracy constitutes conduct that falls outside the protections for speech and debate for which legislators would normally be accorded immunity. Senator Bayh and his constitutients/co-conspirator's actions have caused Plaintiff substantial monetary losses, emotional pain, and suffering, alienation of affection, damage to his professional reputation, physical illness, anxiety and depression as was caused by their collective intention to deny Plaintiff his constitutional rights to equal protection under the law.

15.    Senator Bayh used his position as a member of the powerful Select Committee on Intelligence, the august power of the United States Senate Office he holds,

---

[8] Misuse of power possessed by virtue of state law and made possible only because wrongdoer is clothed with authority is action taken under the color of state law; private persons whose actions would not otherwise be deemed to be under color of state law may come within the purview of 42 USCS 1983 if they act in concert with state official who does act under color of state law. Timo v. Associated Indem. Corp. (1976, WE Okla) 412 F Supp 1056.

acting under the color of law, to violate Plaintiff's civil rights by participation in this civil conspiracy [9] that deprived Plaintiff of rights guaranteed by statute and under the constitution of the United States. Plaintiff alleges that Senator Bayh and his constinutitents/co-conspirators actions meet the legal requirements for conspiracy under 42 U.S.C.S. 1985 (3) and that Plaintiff can satisfy the court's requirement for evidence of a conspiracy if allowed to submit depositions and affidavits.

16.    Senator Bayh's misconduct was at the very heart of this conspiracy against Plaintiff's civil rights. Plaintiff alleges Senator Bayh acted with state officials, acting under the color of law, using their authority to take Plaintiff's household property. Through depositions and affidavits, Plaintiff can produce evidence of this conspiracy. The co-conspirators used cunning, deceit, and fraud in order to manipulate the legal system, exploit Plaintiff's financial vulnerability, and take advantage of him, all for their own financial gain. Senator Bayh acted to protect constitutients/co-conspirators from the efforts Plaintiff made to exercise his constitutional right to equal protection under the law, violating 42 U.S.C.S. 1983 and 42 U.S.C.S. 1985.

17.    They saw Plaintiff as an African American professional whom they could exploit with impunity. Taking place against the backdrop of Indiana's long history of racial injustice, the late 80's and most of the 90's, when this controversy began, were still in the process of a transition to the type of racial

---

[9] A tort of civil conspiracy contains three elements: (1.) a combination of two or more persons; (2.) for the purpose of injuring the plaintiff; (3.) causing plaintiff special damage, Kuznik v. Bees Ferry Associates, 342 S.C. 579, 538 S.E. 2d. 15 (Ct. App. 2000), cert. Granted, (July 3, 2001).

climate that exists in Indiana today. This was not the racial climate of the 1990's, where Siedel and the others knew they were protected because they are Caucasian, they were politically well connected, insulated from law enforcement, and, ultimately, empowered to do whatever they wanted to do. And, through the offices of Senator Evan Bayh, they were able to keep this racially motivated attack on Plaintiff covered up for nearly ten years. Siedel was so sure they would not be held accountable for their conduct; it emboldened him to brag about his bigotry. Others were more circumspect.

18.   The damages caused by this long and well-coordinated civil rights conspiracy against Plaintiff involved the illegal actions of the Indiana co-conspirator's during 1998, 1999, and 2000 that began with the theft of property and the violations of Plaintiff's civil rights (42 U.S.C. 1983, 1985) that were driven by racism, greed, and envy. [10]

19.   After these /co-conspirators had violated of law, they subsequently used extraordinary measures to deprive Plaintiff of his constitutional right to equal protection under the law; this arose from the coordinated actions taken by a wide variety of people (both inside and outside of Indiana) **and** government agencies (both state and federal), which were themselves participants in the illegal cover-up of the initial civil rights violations, violating 42 U.S.C.S. 1983.

---

[10] The Fourteenth Amendment was ratified by the states in 1868 because southern states and localities had enacted black Codes to regulate the status and conduct of the newly freed slaves. These codes deprived blacks of many basic rights accorded to whites, including full rights to own property, to testify in court in cases in which whites were parties, to make contracts, travel, preach, assemble, speak, and bear arms. In crafting this statute, Congress created a federal right protected by 42 U.S.C.S. 1983.

20. There were specific acts of criminal misconduct perpetrated by citizens, state and federal agencies, officials, and a commercial moving company in Indiana. The initial acts of theft, fraud, conversion, and obstruction of justice were in violation of 42 USC 1983, 42 USC 1985, and the Fourteenth Amendment of the U.S. Constitution, denying a federally guaranteed right to equal protection under the law. They occurred in Marion County and Hamilton County, Indiana and were investigated by F.D.I.C., F.B.I., Indiana Judicial Commission, [11] and T.I.G.T.A, as well as other agencies, at Plaintiff's request. The two specific Treasury reports were among the documents Plaintiff sought through F.O.I.A. Plaintiff alleges Senator Bayh conducted a third party congressional review of selected reports on June 19 and 21 2001 and then took steps to block their release in order to protect himself and his Indiana constitutients.

21. The misconduct of these co-conspirators was the direct cause of injuries to Plaintiff. When Plaintiff had the temerity to speak out about this injustice of these civil rights violations over the past nine years, they intensified their efforts to deny him equal protection under the law; Plaintiff claims of injury include intentional infliction of emotional harm, abuse of process, defamation of character, obstruction of justice, the conversion of stolen property, and

---

[11] In action under 42 USCS 1983 in which it was alleged that federal officials were engaged in conspiracy with state officials to deprive plaintiff of constitutional rights, allegations against state officials provided requisite allegations of state action to make entire conspiracy actionable under 42 USCS 1983. Hanmpton v. Hanrahan (1979), CA 7 Ill) 600 F2d 600, revd, in part (1980) 446 US 756, 64 L Ed 2d 670, 100 S Ct 1987, reh den (1980) 446 US 913, 65 L Ed 2d 1177, 101 S Ct. 33.

unintentional infliction of emotional harm upon Plaintiff, for which Plaintiff is entitled to damages.

## TIMELINESS OF FILING THE INITIAL CIVIL COMPLAINT

22.    In August 2002, Plaintiff met and retained the services of Los Angeles attorney Leotis Matthews. He represented Plaintiff in his F.O.I.A. request to obtain the seven investigative reports in the Disclosure Office. Matthews was well qualified for the job, having been a former Assistant United States Attorney with more than a dozen years of experience in the Department of Justice, he seemed an ideal choice. Yet, Matthews *did nothing to advance this case* between August 2002 when he entered his appearance as counsel and June 2003 when Judge Cooper ruled in favor of the government's motion for summary judgment.

23.    During the ten-month period between August 2002 and June 2003, Matthews failed to file a single motion to advance the case; he failed to request an in-camera review of the withheld 205 pages with Judge Cooper; he failed to submit interrogatories to a single person named in the F.O.I.A. complaint; he failed to obtain depositions from any of the parties named whom Plaintiff had alleged violated his civil rights during the previous four years; and, finally he failed to preserve Plaintiff's appeal rights, through a combinations of misrepresentations, lies and lack of cooperation. In short, Mr. Matthews' conduct was an enigma, or part of the effort to deny Plaintiff his right to equal protection under the law.

14

24.    However, when Matthews walked out of the June 6, 2003 final hearing that allegedly took place in Judge Francis Marie Cooper Courtroom, where he supposedly made final arguments on Plaintiff's behalf in (CV-02-3249 FMC), [but asked Plaintiff and his friends (Dianne Curran and Howard Courtney Hughes) not to come into the courtroom,] When Matthews emerged and recapped the hearing, he brought up one particular point that caught Plaintiff's ear. This was the fact that there had been a "third party" congressional inquiry made about these documents by a member in congress other than Senator Grassley, to whom Plaintiff had taken his suspicions and concerns in January 2001.

25.    Until June 2003, Plaintiff had no reason to believe any of these events were related. At different points, Plaintiff thought IRS might have driven the controversy because he had been trying to resolve an Offer-in-Compromise. Or, Plaintiff thought it might have been the Title IV-D Court in Indianapolis pushing this to an extreme, or, even his ex-wife, through her connections with military intelligence, Homeland Security, or some combination of the above.

26.    But Plaintiff had not connected the dots, didn't connect the warning given to him by a former colleague, Donald Dukes who told him that his life would be in danger if he pursued the F.O.I.A. documents during a meeting they had in Los Angeles during May 2002. This meeting resonated with a particular dramatic play Plaintiff saw in Laguna Beach in the summer of 2003. It was about an Oncologist who was so eager to win a Nobel Prize that he cheated and instead of being rewarded for the discovery of a new cure for cancer, his

15

deception was uncovered and he was discredited. It was during that play that the "third party congressional review" finally made sense. He relived the experience of the first attempt on his life in December 2002. The technical complexity of delivering the poison was a sophisticated way to eliminate a life. Plaintiff recalled all the chicanery of Leotis Matthews particularly his seeming indifference to Plaintiff assertion that someone had tried to kill him. It was <u>there</u>, thinking about how cancer spreads and how it can be prevented that he had an awakening. The puzzling and unique combination of people that converged from so many different directions to become part of the same controversy, were conceivable that Plaintiff first began to see a pattern in the ebb and flow of events.

27.    With respect to the statute of limitations, July 2003 was the first time Plaintiff suspected the confluence of these disparate forces were not coincidental. Plaintiff adduced the "third party" may have been the titular head of the Indiana Democratic Party, Senator Evan Bayh. This wasn't a wild guess, but in July 2003, Plaintiff had no actual proof of his suspicions. He had not been able to locate the particular citation about the third party reviewer Matthews had referred to in the massive 504 pages of F.O.I.A. documents he received from the Department of Treasury.

28.    However, later in July 2003, Plaintiff traveled to Washington, D.C. By that time, he was certain enough in his mind and confident enough in his soul to write the Senate Ethics Committee (**SEE EXHIBIT H**) making an audacious claim, stating his belief Senator Evan Bayh had used the august power and

authority of his office as a United States Senator to violate Plaintiff's civil and constitutional rights and deny him equal protections under the law. This was extremely stressful. Plaintiff had already reported having his cellular telephone wiretapped numerous times. Federal marshals arrested Plaintiff for failure to pay child support, two months after he filed the F.O.I.A. complaint in Los Angeles District Court. His life was threatened by an attempt to kill him. His car was stolen. His office was burglarized. He was flooded with strange calls and emails. Unusual patients began showing up at his office with manufactured needs and suspicious motives for seeking care. This was far from normal. These were the continuing examples of the "indirect" harassment and abuse Plaintiff withstood while trying to exercise his constitutional right to seek equal protection under the law.

29.    In August 2003, having received no response from the Senate Ethics Committee, Plaintiff followed that letter with separate letters to each of the Republican member on the Senate Intelligence Committee, stating his believe that Senator Bayh had abused his position as a member of the Intelligence Committee to violate Plaintiff's civil and constitutional rights, protect the guilty offenders in Indiana and deny Plaintiff equal protection under the law.

30.    This timing is important because Plaintiff was not aware of the role Senator Bayh may have played until July 2003 and he filed the civil complaint less than one year later in July 2004, well within the statute of limitations for a civil rights complaint alleging actions that denied Plaintiff equal protection under the law.

17

## CAUSE OF ACTION # 1

### Plaintiff Alleges Constitutional and Civil Rights violations; Basis of Claims that Defendant Caused Intentional Infliction of Emotional Harm, Conversion, Abuse of Process and Obstruction of Justice

31.    Plaintiff restates as if fully set forth here each and every claim, assertion, and allegation set forth in the foregoing Paragraphs 1-30 of this complaint:

Between November 1998 and September 2006, Plaintiff's complaints were submitted to the Federal Bureau of Investigations (**Exhibit C**), F.D.I.C., the Attorney General, U.S. Department of Justice, U.S. Attorney for the Southern District of Indiana, U.S. Attorney for the Northern District of California, the U.S. Attorney for the Central District of California, Department of Homeland Security (**Exhibit D**), the Indiana Judicial Commission, Taxpayer Advocates Office, IRS (**Exhibit E**), Director of Practice, T.I.G.T.A, Inspector General, Department of Justice, Office of Professional Responsibility, Department of Justice, and the U.S. Senate Ethics Committee.

32.    Upon information and belief, Plaintiff alleges the attempt that was made to take his life was part of a long and voluminous history of abuses and civil rights violations that began in September 1997 and has continued until the present. The Defendant Senator Evan Bayh played a role in the egregious acts of misconduct that took place in this complex conspiracy. Plaintiff alleges that after the theft of Plaintiff's household belongings, money, and automobile had taken place, the conspiracy against his civil and constitutional right to equal protection under the law there was a far-reaching effort to protect the

18

constituents/co-conspirators of Senator Bayh and Senator Bayh, himself, from culpability for their criminal wrongdoing.

33.    Upon information and belief, Plaintiff alleges these are the basis for the actions described in more detail later, occurring between 1997 and 2006, all documented below, were in violation of federal statutes 42 U.S.C. 1983, 42 U.S.C. 1985, and 42 U.S.C. 1986, as well as the Fourth, Fifth, and Fourteenth Amendments of the United States Constitution. These violations of rights took place in multiple jurisdictions and involved many different individuals, for different lengths of time since December 1998, when Plaintiff filed the first complaint with the Indiana Judicial Commission, outlining violations of 42 U.S.C.S. 1985. Plaintiff references, with specificity, all such alleged violations of law and violations of constitutional right to equal protection under the law herein.

34.    In (**Exhibit A**), Plaintiff submits evidence that is circumstantial [12] but Defendant Senator Bayh participated in a civil conspiracy against Plaintiff's rights. [13] It reveals the illegal conduct of Senator Bayh was tied to the alleged criminal behavior of his Indiana constitutients in 1998. It reveals that a

---

[12] In order to prove existence of civil conspiracy, plaintiff is not required to provide direct evidence of agreement between conspirators, and circumstantial evidence may provide adequate proof of conspiracy; Hampton v. Hanrahan (1979) CA7 Ill) 600 F2d 600, rvd, in part on other grounds (1980) 446 US 754, 64 L Ed 2d 670, 100 S Ct 1987, reh den (1980) 448 US 913, 65 L Ed 2d 1176, 101 S Ct 33 and reh den (1980) 448 US 913, 65 L Ed 2f 1177, 101 S Ct 33.

[13]    The elements of a civil conspiracy are: (1) an agreement, (2) a wrongful act by any of the conspirators pursuant to that agreement, and (3) damages. <u>Stone v. Regents of University of California,</u> 77 Cal. App. 4th 736, 92 Cal. Rptr. 2d 94, 140 Ed. Law Rep. 1012 (4th Dist. 1999).

congressional party, other than the one requested by Plaintiff had sought and secured the review of two investigative reports. Those two reports concerned alleged criminal conduct in Marion County, Indiana, and Hamilton, County, Indiana.

35.    Upon information and belief, Plaintiff alleges Defendant Senator Evan Bayh misused both the offices and the authority the public entrusted to him, as a United States Senator from Indiana and through his appointment as a member of the Select Committee on Intelligence, to exploit both position and power, and the resources of the United States government to destroy Plaintiff's life for the purpose of protecting the alleged illegal and racist conduct of his Indiana constitutients, and then Senator Bayh participated in efforts to cover-up of his complicity in this conspiracy, after the fact.  As a United States Senator, Senator Bayh certainly had the right to contact the Executive Branch about the investigative reports concerning his constitutients/co-conspirators, but Plaintiff alleges that his participation in this conspiracy went much further than that. [14]

36.     The conduct and actions taken by Defendant Senator Evan Bayh and these co-conspirators denied Plaintiff his constitutional right to equal protection under the law and caused injuries to Plaintiff. Plaintiff's injuries caused him

---

[14]  Recovery under 42 U.S.C.S. 1985 (3) can be had only if plaintiff suffered injury as result of act taken in furtherance of conspiracy; nevertheless, proof of agreement itself, as distinct from compensable injury, can derive from evidence of act done by conspirators, whether or not act caused injury that would be actionable under 1985 (3). Hobson v. Wilson (1982, DC Dist Col) 556 F Supp 1157, affd in part and revd in part on other grounds (1984, App DC) 237 US App DC 219, 737 F2d 142, 105 S Ct 1843 and (criticized in Atchinson v. District of Columbia (1996, App DC) 315 US App DC 318, 73 F3d 418, 33 FR Serv 3d 1033).

emotional and physical hardship, and exacerbated a chronic medical condition. The causes of action for these injuries support Plaintiff's claims of abuse of process, intentional infliction of emotional harm, defamation of character, and unintentional infliction of emotional harm for which Plaintiff is entitled to damages.

### CAUSE OF ACTION # 2

**Plaintiff Alleges Constitutional and Civil Rights violations; Basis of Claims that Defendant Caused Unintentional Infliction of Emotional Harm, Abuse of Process and Obstruction of Justice**

37.    Plaintiff restates as if fully set forth here each and every claim, assertion, and allegation set forth in the foregoing Paragraphs 1-30, and Paragraphs 31-36 of this Complaint:

38.    Upon information and belief, Plaintiff alleges Defendant Senator Evan Bayh had knowledge of but did not act to protect the rights of Plaintiff *after* he learned about an act of judicial misconduct that took place in 1997. At that time, Plaintiff was called to testify in a child support hearing in a Title IV-D Court hearing. Commissioner Barbara Collins ordered the Court Reporter to turn off the tape machine and she allowed the Deputy Prosecutor Lorraine Bradley to attempt to extort money from Plaintiff as his attorney, Kenneth Kern, stood by and did nothing. [15]

39.    Upon information and belief, Plaintiff alleges Defendant Senator Evan Bayh knew about but did not act to protect Plaintiff's rights when he had knowledge

---

[15] 42 U.S.C.S 1985 (3) does not require defendant to act under color of state law. Jennings v. Shuman (1977, CA3 Pa) 567 F2d 1213 (superseded by statute on other grounds as stated in Attire v. Hairston (1993, ED Pa) 1993 US Dist LEXIS 18059)

that the court had forced Plaintiff to give Kern his power of attorney with IRS to insure that he would work with Revenue Officer Keith Clayton, under the threat of losing his Indiana medical license. Plaintiff was advised by a former IRS agent to ask IRS if he was the target of a criminal investigation. He was told in 98, 99, and 2000 that he was not the subject of a criminal investigation.

40.    In his numerous contacts with IRS, he made it clear that he was not a tax protester, and had no desire to avoid paying taxes, but the difficulties in resolving the tax matters persisted. Plaintiff reported the misconduct of Collins, Kern, Bradley, and the court to the Indiana Judicial Commission, which later found unprofessional conduct had "not" occurred. Defendant Senator Evan Bayh knew about but did not act on the knowledge he had about the conduct of these parties to protect the abrogation of Plaintiff's rights. This resulted in injuries to Plaintiff and led to his claims of abuse of process, intentional infliction of emotional harm, and defamation of character.

41.    Upon information and belief, Plaintiff alleges Defendant Senator Evan Bayh knew about but did not act on the knowledge to protect the rights of Plaintiff *after* IRS Revenue Officer Keith Clayton conspired with Steven Siedel to steal Plaintiff's automobile, a Corvette, using the offices of James Kingsolver, vice president of a Noblesville bank to disguise their intent to defraud Plaintiff.

42.    Mr. Siedel ended up keeping the car while Kern promised to file a suit for conversion in the Marion County Court, which he failed to do. Plaintiff reported these actions to the Tax Advocates Office, the Director of Practice, the Regional Director of IRS, the F.B.I., the F.D.I.C., and the U.S. Attorney

for the Southern District of Indiana. Plaintiff alleges Defendant Senator Evan Bayh knew about but intervened with the F.D.I.C. to thwart Plaintiff's effort to have the matter investigated and reviewed.

43.    Therefore, upon information and belief, Plaintiff alleges that Defendant Senator Evan Bayh had knowledge of these two specific violations of Plaintiff's rights. But Plaintiff's question is still "how much did Senator Bayh know and when did he find out?" Plaintiff further alleges that Defendant did not act on the knowledge to protect Plaintiff's rights in the first instance, violating 42 USCS 1986; and that Defendant took steps to intentionally block government agency oversight, in the second instance (42 USCS 1983).

44.    Defendant Senator Evan Bayh's actions and those of his co-conspirators denied Plaintiff equal protection under the law and resulted in injuries to Plaintiff and his family. Plaintiff is entitled to damages from the cause of his claim is fraud, theft, conversion, abuse of process, obstruction of justice, and intentional infliction of emotional harm, for which he is entitled to damages.

## CAUSE OF ACTION # 3

**Plaintiff Alleges Constitutional and Civil Rights violations; Basis of Claims that Defendant Caused Intentional Infliction of Emotional Harm, Abuse of Process and Obstruction of Justice**

45.    Plaintiff restates as if fully set forth here each and every claim, assertion, and allegation set forth in the foregoing Paragraphs 1-30, Paragraphs 31-36, and Paragraphs 37-44 of this Complaint:

Upon information and belief, Plaintiff alleges Defendant Senator Evan Bayh knew about but did not act on the knowledge to protect Plaintiff's rights *after*

he became aware that on July 3, 1998, Plaintiff was served an eviction notice on the day before the long July 4th weekend, with the date of eviction set for **"no later than 9:00 am Wednesday July 8, 1998"**. This order gave Plaintiff no opportunity to respond, appeal, arrange for moving the contents of a 5000 sq. ft. household, or challenge the decision in any way **(Exhibit F)**. However, Plaintiff's attorney Kenneth Kern, who had represented him in the Noblesville courtroom where Judge Sturdyvant issued the order, came up with a possible solution for Plaintiff, violating 42 U.S.C.S. 1983.

46.    Kern suggested that he submit, on behalf of Plaintiff, a Writ of Habeas Mandamus to Randal Sheppard, Chief Justice, Indiana Supreme Court, asking for a stay of the eviction order. Because the fourth of July fell on a Saturday, it was a long holiday weekend. Monday, July 6th was a legal holiday. That left only one business day, Tuesday July 7th for Kern to submit the Writ of Habeas Mandamus to the Supreme Court of Indiana. Kern said it could be done on Tuesday, July 7, 1998, the day before the eviction was scheduled to take place.

47.    Kern was certain this last-minute appeal to the Chief Justice would set aside the eviction order temporarily. Plaintiff and Kern arrived at the Clerk of the Supreme Court's office around 4:00 pm on the afternoon of July 7. However, because they arrived one half hour before closing and did not have a signed copy of the Noblesville Superior Court transcript, the Clerk turned them away. However, the filing fees were paid. The docket number (which was entered on a sequentially numbered roster of cases that had been <u>docketed for that day</u>)

24

was scratched out, but Kern promised to return first thing the following morning, July 8, 1998, presumably before the eviction was to have taken place at 0900, with the signed transcript and file the petition in the Clerk's Office.

48.     The eviction took place promptly on the following morning at 0900, on July 9th, 1998. Kern ignored all of Plaintiff's calls that day until around 1400 to 1500 when the packing was nearly completed. Kern stated that he had heard nothing from Chief Justice Sheppard on the appeal he had filed earlier that morning in the Indiana Supreme Court. Later, when Plaintiff would make an official request for the document, the Clerk issued one that had no time stamp and had an ambiguous date, obstructing justice and violating 42 USCS 1983.[16]

49.     Plaintiff alleged the document that purported to represent Kern's "filing of the Writ of Mandamus" as timely and honorably filed was <u>intended to create the verisimilitude of judicially propriety,</u> of procedural correctness, when in fact the Court Clerk, and Kern both knew there was no chance whatsoever of delaying the eviction. <u>Plaintiff alleges the document was never filed in the Supreme Court of Indiana. Kern and the Clerk of the Court were guilty of abuse of process, obstruction of justice, and fraud,</u> violating 42 USCS 1983.

50.     Kern could not have protected his acts of misconduct or those of the other co-conspirators, by himself. The Supreme Court Clerk was also a voluntary co-conspirator by issuing a forged document, trying to represent the filing as having been honorably and timely submitted, when it was neither. Attorney

---

[16]    A successful 42 U.S.C.S. 1983 claim requires a showing of the deprivation of a constitutional or federal statutory "right". This showing is required because 1983 creates a remedy when rights are violated but does not create any rights itself, Maine v. Thiboutot, 448 U.S. 1, 100 S. Ct 2502, 65 L. Ed2d 555 (1980).

Kenneth Kern participated in this civil conspiracy to defraud Plaintiff out of household goods, property, money, and time, violating 42 USC 1983 and U.S.C.S. 1985. The Clerk sought to cover-up this criminal misconduct, and was, in fact, a co-conspirator, herself, violating 42 USCS 1986.

51.    Plaintiff's evidence of Senator Bayh's involvement is circumstantial, but upon information and belief, Plaintiff alleges Defendant Senator Evan Bayh knew about the criminal misconduct of the Indiana constituent/co-conspirators named herein and did not act on that knowledge to protect Plaintiff's rights, or to *prevent* the continued abuses of Plaintiff's rights, thereafter, violating 42 USCS 1985 and 42 USCS 1986.

52.    Plaintiff experienced depression, symptoms of PTSD, loss of community standing, the disruption and eventual separation of his family, alienation of love, and reactivation of a chronic medical condition. Defendant Evan Bayh acted to deny Plaintiff equal protection under the law and are the basis for Plaintiff's claims of abuse of process, intentional infliction of emotional harm, and obstruction of justice, for which Plaintiff is entitled to damages.

## CAUSE OF ACTION # 4

**Plaintiff Alleges Constitutional and Civil Rights violations; Basis of Claims that Defendant Caused Intentional Infliction of Emotional Harm, Conversion, Theft, Abuse of Process and Obstruction of Justice**

53.    Plaintiff restates as if fully set forth here each and every claim, assertion, and allegation set forth in the foregoing Paragraphs 1-30, Paragraphs 31-36, Paragraphs 37-44, and Paragraph 45-52 of this Complaint:

Upon information and belief, Plaintiff alleges that Defendant Senator Evan Bayh knew about the abuse of Plaintiff's rights and disregarded that knowledge in favor of acting to protect the Hamilton County Sheriff's Department for its criminal neglect in overseeing Plaintiff's eviction and Mr. Steve Siedel's theft of personal property after Siedel had contracted with Atlantic Relocations to pack and store Plaintiff's household goods. But Plaintiff's question is still "what did Senator Bayh know, and when did he know it?"

54.   On the day of the eviction, Kern spoke with Siedel, then assured Plaintiff that his household goods would be protected. However, the sheriff's department ordered Plaintiff off the premises **before** the packing was completed, threatening him with arrest, if he did not comply. The Deputy Sheriff attempted to assuage Plaintiff's doubts by again falsely restating the claim that Plaintiff's property would be safe, violating 42 U.S.C.S. 1985

55.   During the following year, Plaintiff paid monthly storage fees to Atlantic Relocations in Indianapolis, Indiana based on the estimated weight AR assessed in charges for storing the contents of a 5000 square foot home which included a seven foot slate topped pool table, Bicycles, Golfing, Camping, and other types of recreational equipment, outdoor furniture, an outdoor gas grill and rotisserie, a free standing de-humidifier, lawn furniture, gardening tools, including a mower, and snow removal tools, etc. However, *none* of these household goods was delivered to Plaintiff, although they all should have been removed from the premises, violating 42 U.S.C.S. 1985

56.    Upon information and belief, Plaintiff alleges Defendant Senator Evan Bayh had knowledge of these criminal acts and took steps to protect his Indiana co-conspirators/constitutients from culpability and to prevent Plaintiff from obtaining honorable responses from state and federal government agencies responsible for protecting his rights, and prosecuting his case in the courts. Defendant Senator Evan Bayh acted to protect Kenneth Kern, Steve Siedel, and the Clerk of the Supreme Court of Indiana, Atlantic Relocations, and the Hamilton County Sheriff's Department, violating 42 U.S.C.S. 1985 and 42 U.S.C.S 1986.

57.    Plaintiff suffered mental and physical distress, resulting from the abuse perpetrated by these co-conspirators. The injuries to Plaintiff and his family resulted from these co-conspirators denial of Plaintiff's right to equal protection under the law and resulted in damages caused by abuse of process, obstruction of justice, conversion, theft, intentional infliction of emotional distress, and violation of Plaintiff's Fourteenth Amendment rights guaranteed by the Constitution, and violating 42 U.S.C.S. 1985.

## CAUSE OF ACTION # 5

**Plaintiff Alleges Constitutional and Civil Rights violations; Basis of Claims that Defendant Caused Unintentional Infliction of Emotional Harm, Abuse of Process and Obstruction of Justice**

58.    Plaintiff restates as if fully set forth here each and every claim, assertion, and allegation set forth in the foregoing Paragraphs 1-30, Paragraphs 31-36, Paragraphs 37-44, Paragraphs 45-52, and Paragraphs 53-57 of this Complaint:

In November 1998, Plaintiff wrote a detailed account of everything that had happened in Indianapolis and personally presented it to the F.B.I. office in Indianapolis, Indiana. The investigation was done and when Plaintiff called to ask for the results or findings in February or March 1999, he was told that nothing was found that constituted any violations of any law. All of Plaintiff's subsequent attempts to have those investigative reports released through F.O.I.A. have resulted in denials of access and no investigative documents have been released by F.B.I.

59.    In March 1999, Plaintiff filed a complaint with the Taxpayer Advocates Office in Oakland, California. In it, he alleged that Kern and IRS agent Keith Clayton had stolen money that should have been applied toward his tax lien. Plaintiff alleges that Kern was engaged in illegal Insider Trading and they were intending to use this money to invest in penny stocks for their personal gain and would not have been detected had Plaintiff remained in Indiana and not gone to California. Plaintiff learned F.B.I. and IRS had concluded their investigations into his allegations simultaneously and reached conclusions around this time.

60.    However, Plaintiff would not be made aware that "any investigations" had actually taken place until July 2001, *after his request for a Congressional inquiry.* And, although Plaintiff lawfully petitioned for those investigative reports through F.O.I.A., Plaintiff alleges Defendant Senator Evan Bayh reviewed the reports relating to Marion County and Hamilton County, Indiana and took steps to block their release to Plaintiff, violating 42 U.S.C.S. 1986.

61.    In May 1999, Atlantic Relocations of Hamilton County, Indiana, unilaterally decided to transfer Plaintiff's household goods, without Plaintiff's prior knowledge or his consent, to Fairfield, California where Plaintiff had moved in September 1998. A moving van from Atlantic Relocations arrived in Fairfield with no warning and with no inventory, which AR claimed to have lost or not to have completed at the time of the eviction.

62.    In May 1999, AR called Plaintiff with an ultimatum. Either accept the delivery or pay transportation costs to have it returned to Indiana. Plaintiff demanded an accounting of the truck's contents before he would accept delivery of the shipment. The driver arrived with a shipment that was 3000 pounds less than the weight Plaintiff had been paying for during the previous ten months of storage.

63.    Plaintiff refused to accept the Indiana shipment. Facing a stalemate with Plaintiff, AR in Indiana called for the assistance of an outsider. Plaintiff spoke with Atlanta, Georgia based vice President John Schroeder. Plaintiff negotiated and settled on an adjusted fee for the cost of transporting the goods with AR vice president John Schroeder. Plaintiff made Schroeder aware that property that was supposed to have been stored was missing. He described the circumstances around the move of his household goods to AR for storage. Plaintiff pointed out the ten months of fraudulent billing, the fact that the shipment arrived without an inventory, and the collusion between Steve Siedel and Ken Kern to cover up their wrongdoing, violating 42 U.S.C.S. 1985, 18 U.S.C. 1346, and 18 U.S.C. 1349.

64.    Plaintiff also informed the U.S. Attorney for the Southern District of Indiana, and the Hamilton County Prosecutor's Office. Schroeder instructed Plaintiff to submit the insurance claim to settle his differences with, first, the Evansville Office, then, second, with the nationwide insurer in New Hampshire.

65.    Upon information and belief, Plaintiff alleges that Defendant Senator Evan Bayh knew about these attacks on Plaintiff rights and did not act on that knowledge to protect Plaintiff *after* he was made aware of it. Plaintiff further alleges Defendant Senator Evan Bayh took steps to *prevent* Plaintiff from receiving fair treatment from the agencies designated to address such complaints, violating 42 U.S.C.S. 1985, 42 U.S.C.S. 1986.

66.    Furthermore, upon information and belief, Plaintiff alleges that Atlantic Relocations intentionally manipulated Plaintiff into believing that all of his household goods were in storage between July 1998 and May 1999. AR presented a monthly bill for the storage of Plaintiff's household goods that was based on calculations of overall weight and the size and number of containers used in storage.

67.    Atlantic Relocations submitted fraudulent billing each month through the United States Postal Service to conceal the fact that it had colluded with Kern and Siedel to steal Plaintiff's household property. A monthly bill should have reflected charges for what was *actually* in storage and the contents in storage should have included *everything* that had been removed from the premises on July 9, 1998.

31

68.    Upon information and belief, Plaintiff alleges this was not the case. Plaintiff alleges that AR knew that all of Plaintiff's household goods had not been placed in storage. In order to conceal the theft of property, AR began issuing fraudulent billing for the purpose of disguising the commission of a crime, acting in furtherance of a civil conspiracy, and to defraud Plaintiff. These action clearly constituted a violation of the United States Criminal Code 18 U.S.C. 63, 18 U.S.C. 1346, and 18 U.S.C. 1349 for Mail Fraud which is punishable by fine and imprisonment **(Exhibit G)**.

69.    In May 1999, after a long series of delays and confusion about who was the responsible for authorizing payment for damage claims at AR, the burden was shifted from Hamilton County, Indiana, to Atlanta, Ga., to Evansville, Indiana. AR finally decided that Evansville, Indiana would receive the claim for damages, and Plaintiff submitted a claim for $15,000.00 in lost or damaged goods to Atlantic Relocations in July 1999, violating 42 U.S.C.S. 1985.

70.    In addition to the loss of property, Plaintiff also suffered economic losses from additional expenses, lost time from work, losses of professional opportunities, and losses in salary, sleep disturbance, anxiety, depression, further disruptions in his family, and an exacerbation of a chronic medical condition.

71.    For more than a year afterwards, Atlantic Relocations, through vice president Schroeder strung Plaintiff along for more than a year, with one excuse after

32

another for the delay in obtaining an insurance settlement, until November 2000, violating 42 U.S.C.S. 1985, 42 U.S.C.S. 1986.

72. During this year, Schroeder promised an investigation that should have been consistent with that of the F.B.I. and T.I.G.T.A. Plaintiff alleges that AR and Schroeder never intended to honor Plaintiff's claim. The promises Schroeder made to Plaintiff about insurance reimbursements for his losses were all bogus. Schroeder was a co-conspirator in that he assisted in furthering this conspiracy against Plaintiff's rights. He helped to cover-up the wrongdoing of the AR facility in Hamilton County, Indiana and helped protect the other members of this conspiracy from culpability for their wrongdoing, violating 42 U.S.C.S. 1985, 42 U.S.C.S. 1986.

73. Upon information and belief, Plaintiff alleges Defendant Senator Evan Bayh knew about the criminal conduct of this Hamilton County, Indiana business and took actions to protect these people from culpability for their criminal misconduct, violating 42 U.S.C.S. 1985 and 42 U.S.C.S. 1986. Plaintiff alleges that the timing of Mr. Schroeder's rejection was targeted to occur around the same time a separate scheme was set into motion to entrap Plaintiff in Sacramento, California in October 2000. The purpose of this entrapment scheme was to prevent Plaintiff from violating 42 U.S.C.S. 1985.

74. Mr. Schroeder called just days after Plaintiff had returned from Sacramento, California where other members of this civil conspiracy had acted with stealth, deceit, and malice, to defraud Plaintiff by manipulating him into

opening an illegal banking account. Plaintiff had traveled to Sacramento from Los Angeles for assistance with and IRS offer-in-compromise.

75.    Plaintiff alleges there was collusion here between these parties at a much higher level than had previously been employed in this conspiracy against Plaintiff's rights. When the Hamilton County co-conspirators reached out and brought in Schroeder from Atlanta, Georgia to attack Plaintiff from a different front, the collusion between the parties in this conspiracy grew in its complexity. Schroeder's introduction and participation for more than one year presented and entirely separate set of circumstances from what had gone on in 1998 and 1999, violating 42 U.S.C.S. 1985.

76.    Plaintiff alleges that since his household goods had already been stolen, Schroeder's role had been to mollify Plaintiff, persuading him not to file any more official complaints, while he waited for the "promised" reimbursements Schroeder and all but guaranteed Plaintiff was entitled to. This tactics of the conspiracy had shifted, while the motive remained the same. The conspiracy still protected the Indiana white-collar criminals alleged to have been protected by Senator Bayh, violating U.S.C.S. 1985, and 42 U.S.C.S. 1986.

77.    Plaintiff alleges there was a connection between the co-conspirators in Indiana [17] and those people who became the individual links in another, completely separate, chain of events used to manipulate Plaintiff into opening an illegal

---

[17]    In general, to constitute a civil conspiracy there must be two or more persons, an object to be accomplished, a meeting of the minds on the object or course of action, one or more unlawful overt acts, and damages proximately resulting there from. See Corpus Juris Secundum, 15A.p. 355.

joint checking account with Jay Pewthers at Wells Fargo Bank in Sacramento, California. This intended entrapment was meant to silence Plaintiff and deny him equal protection under the law, violating 42 U.S.C.S. 1985.

78. This separate chain of events leading up to the failed entrapment scheme in Sacramento, California represented the shift in the goals of the co-conspirators in this conspiracy away from protecting the Indiana participants to executing schemes that would have had Plaintiff jailed, silenced, and discredited.

79. Plaintiff wrote numerous complaints about these events to Indiana authorities, federal agencies, the U.S. Attorney for the Southern District of Indiana, and other agencies. In these complaints, Plaintiff stated that he had the eyewitness account of a very credible witness who stated that several months after the move was supposed to have been completed, that Plaintiff's pool table was seen still situated on the lower level of the Giest Road house, exactly where it had been standing on the day of the eviction. This massive slate-topped pool table could not have been in storage.

80. Along with the other missing items, (at the time of delivery in California) the pool table could not have been calculated in the total weight in storage. It could not have been included in the move. Therefore, Plaintiff alleges AR colluded with Steven Siedel, Kenneth Kern, and the Hamilton County Sheriff's Office to deprive Plaintiff of his Fourteenth Amendment rights to property, violating 42 U.S.C.S. 1985.

81. Upon information and belief, Plaintiff alleges that Defendant Senator Evan Bayh was, at the very least, knowledgeable about the conduct of Atlantic

Relocations' and its participation in the unlawful conspiracy against Plaintiff, and then he took steps to protect their illegal conduct and deny Plaintiff equal protection under the law. But Plaintiff's question is still, "what did Senator Bayh know and when did he know it?"

82. Upon information and belief, Plaintiff also alleges that Defendant Senator Evan Bayh knew about the co-conspiracy involved in the alleged entrapment scheme at Wells Fargo Bank in Sacramento. Plaintiff does not know exactly when Senator Bayh became aware of this illegal action. But if the Treasury documents contain information about any willful misconduct and show Senator Bayh's failure to prevent it, this is a violation of 42 U.S.C. 1985 and 42 U.S.C.S 1986. Senator Bayh's failure to take steps to preserve Plaintiff's rights under the law may have resulted in financial losses and emotional suffering to Plaintiff, in violation of 42 U.S.C.S. 1985. The actions of these co-conspirators, acting in concert with Defendant Senator Evan Bayh denied Plaintiff equal protection under the law and was the cause for Plaintiff's claim of theft, fraud, conversion, intentional infliction of emotional harm, and defamation of character, for which Plaintiff is entitled to damages.

### CAUSE OF ACTION # 6

**Plaintiff Alleges Constitutional and Civil Rights violations; Basis of Claims that Defendant Caused Intentional Infliction of Emotional Harm, Conversion, Abuse of Process and Obstruction of Justice**

83. Plaintiff restates as if fully set forth here each and every claim, assertion, and allegation set forth in the foregoing Paragraphs 1-30, Paragraphs 31-35,

Paragraphs 36-44, Paragraphs 45-52, Paragraphs 53-57, and Paragraphs 58-82 of this Complaint:

In June 1999, Plaintiff's son was away for a planned summer visit with his mother in Kentucky and Plaintiff was home alone. Plaintiff alleges that the conspiracy to protect the Indiana officials, citizens, agencies, and commercial business from culpability for their criminal acts and their participation in a civil conspiracy extended to include others, violating 42 U.S.C.S. 1983 and 42 U.S.C.S. 1985.

84. Plaintiff alleges these "others" who joined in this conspiracy operated apart from the Indiana co-conspirators but they were in concert with the *modified* goal to have Plaintiff arrested and/or discredited, and/or silenced in order to protect the Indiana constitutients/co-conspirators Plaintiff alleged to have denied him equal protection under the law.

85. Upon information and belief, Plaintiff alleges that Defendant Senator Evan Bayh had knowledge of the conspiratorial acts targeting Plaintiff to jail and silence his protests about civil rights violations in Indiana. The first such attempt to entrap Plaintiff in the possible commission of a crime occurred when Plaintiff came home from work one Friday evening and encountered an inebriated, attractive young woman in his driveway who asked if she could come into the house to use his telephone.

86. He invited her into his home where she established immediate rapport by revealing the unusual coincidence that the names of her two children were

identical to the first name of his ex-girlfriend's son and the middle name of her oldest niece.

87.   Very shortly thereafter, this young woman sat on his lap and partially disrobed, becoming intensely amorous. Within fifteen minutes of her arrival, she had determined Plaintiff was alone and suggested the she could spend the night. Plaintiff felt this was all wrong.

88.   He had *never* before in his life arrived home from work and found an attractive young woman waiting in his driveway wanting to have sex with him. Plaintiff declined her offer and, instead, drove her to her house.

89.   After thinking about this encounter, Plaintiff alleged this was pre-arranged and designed to entrap him in a sexually compromising situation for which he could be charged with some crime and imprisoned. He alleged that possibly the government had orchestrated the encounter for the purpose of entrapping him in what could have been alleged was a sexual assault.

90.   This violated Plaintiff's Fourth Amendment rights to privacy and constituted an unwarranted invasion of privacy. This behavior on the part or parts of the people involved in this conspiracy caused the intentional infliction of emotional harm, fraud, and concealment for which Plaintiff is entitled to damages.

91.   In July 1999, after resettling in California, Plaintiff was involved in ongoing negotiations with IRS for an Offer-in-Compromise to settle a tax debt. He noticed a discrepancy of about $10,000.00 between the funds actually

collected by IRS from liens on his accounts and the amount shown credited to his account. He made inquiries to his accountant who had no explanation.

92.    However, he would later discover that an amount equal to that had been added to his account that he had not paid, or been responsible for paying himself. Plaintiff alleges this was a readjustment for the monies he claimed had been stolen through the alleged misconduct of IRS Agent Keith Clayton and Attorney Kenneth Kern.

93.    However, this was not done in accordance with IRS regulations that required the taxpayer should be informed and that the proceedings receive public notification, documentation of the amounts secured from the sale of property, etc. None of this was done in Plaintiff's situation.

94.    Rather than receiving an explanation for this unexpected correction in his IRS account, when Plaintiff raised the issue later, he was threatened by with the removal of the amount that had been credited, if Plaintiff was stating that the credit was a mistake. Plaintiff alleges this money was connected to the alleged misconduct of the two Indiana conspirators and their motives for depriving Plaintiff's rights.

95.    Upon information and belief, Plaintiff alleges that Defendant Senator Evan Bayh had knowledge of the two Indiana conspirators' misconduct and the actions taken to protect them, including returning a portion of the money alleged to have been stolen to Plaintiff.

96.    Plaintiff alleges that Defendant Senator Evan Bayh not only knew that these Indiana Defendants had broken the law, and that he had not only attempted to

protect them from culpability for the crimes they committed, but that he was also aware of the knew about schemes to incarcerate, discredit, and silence Plaintiff for making the malfeasance of Defendant's Indiana constitutients a matter of the public record.

97.    Plaintiff alleged they had stolen funds, or diverted tax monies for private use in the buying penny stocks, where Kern was involved as an inside trader on behalf of himself and other Democrats in the legal community in the Indianapolis community. Plaintiff alleges the misconduct of Clayton and Kern had been protected by the actions taken by Defendant Evan Bayh to deny Plaintiff equal protection under the law and resulted in substantial injury to Plaintiff.

98.    The violation of rights damaged Plaintiff's mental and physical health and was the cause for his claims of the unintentional infliction of emotional harm, fraud, obstruction of justice, abuse of process, and violated Plaintiff's Fourteenth amendment rights, for which he is entitled to damages.

### CAUSE OF ACTION # 7

**Plaintiff Alleges Constitutional and Civil Rights violations; Basis of Claims that Defendant Caused Unintentional Infliction of Emotional Harm, Abuse of Process and Obstruction of Justice**

99.    Plaintiff restates as if fully set forth here each and every claim, assertion, and allegation set forth in the foregoing Paragraphs 1-30, Paragraphs 31-35, Paragraphs 36-44, Paragraphs 45-52, Paragraphs 53-57, Paragraphs 58-82, and Paragraphs 83-98 of this Complaint:

Upon information and belief, Plaintiff alleges that beginning in May or June 1999, the goal of the conspiracy turned to efforts to have Plaintiff jailed, discredited, or silenced for publicly exposing the malfeasance of the Indiana constituents Defendant Senator Evan Bayh had been protecting. In July 1999, Dan Weaver, an Indianapolis attorney contacted Plaintiff. They had talked in 1996 about this case and neither of them thought it would go very far because it lacked any substantive basis for which a claim of damages could be made.

100.  This time Weaver stated that Plaintiff's former psychiatric patient had an attorney who filed her "intention" to file a malpractice claim against Plaintiff and two Indianapolis hospitals. This was the same psychiatric patient (name withheld) that submitted the 1996 claim on her own behalf.

101.  This patient suffered from a severe Bipolar Disorder and Plaintiff had treated her at the request of her parents, after she had been discharged from the Post Office for threatening to kill her supervisor, and had claimed, among other things, that a male psychiatric technician surreptitiously entered her room at night and stuffed dollar bills into her vagina.

102.  In addition, she alleged that Plaintiff had hospitalized her against her will and had failed to appropriately supervise the male attendants on the hospital staff.

103.  In July 1999, Plaintiff was informed that Marilyn Moores a respected, politically well-connected, highly competent attorney from the prestigious Indianapolis law firm of Cohen and Malad had decided to represent the same indigent bipolar patient (on contingency) who had filed her Intention to File a Claim as a Pro Se litigant.

104. Plaintiff alleges that it was not a coincidence that Cohen and Malad had close ties to Defendant Senator Evan Bayh. Cohen and Malad is one of a handful of high-powered Indianapolis' legal establishments that had been a large contributor to the 1998 Indiana Senate race of then Governor Evan Bayh's campaign for the U.S. Senate. The addition of Ms Moore to the case proved to be a key turning point. It would require Plaintiff to respond to long and technical interrogatories and the necessity of his pouring of attention, time, and precious resources into his own defense for the next five years.

105. The malpractice case went on until 2003, when pursuant to Indiana's statutory requirement a panel of three physicians heard all the evidence for the Indiana Department of Insurance. After what had turned out to be a seven-year ordeal, the panel voted unanimously in Plaintiff's favor for the case to be dropped because it had no merit, violating 42 U.S.C.S. 1983 and 42 U.S.C.S. 1985.

106. Upon information and belief, Plaintiff alleges that Defendant Senator Evan Bayh, as the titular head of the Democratic Party in Indiana, had the power, authority, and opportunity to reward Ms Moores for furthering the conspiracy to protect these Indiana constitutients, and by this point in the controversy, himself, as well.

107. Plaintiff alleges this series of events was used to deny Plaintiff equal protection under the law and that Defendant Senator Evan Bayh rewarded Ms. Moores, a democrat, for the years she spent pursuing a case that had little hope of succeeding. Yet, it consumed Plaintiff's time, energy, and resources. Ms Moores' participation in this conspiracy was intended to discredit Plaintiff.

42

Plaintiff alleges that during year after the medical panel decided in Plaintiff's favor, Ms. Moores was rewarded by an appointment to an important Judgeship where she took administrative control of the Juvenile Justice system of Marion County, Indiana, violating 42 U.S.C.S. 1983 and 42 U.S.C.S. 1985.

### CAUSE OF ACTION # 9
**Plaintiff Alleges Constitutional and Civil Rights violations; Basis of Claims that Defendant Caused Unintentional Infliction of Emotional Harm, Abuse of Process and Obstruction of Justice**

108.   Plaintiff restates as if fully set forth here each and every claim, assertion, and allegation set forth in the foregoing Paragraphs 1-30, Paragraphs 31-35, Paragraphs 36-44, Paragraphs 45-52, Paragraphs 53-57, Paragraphs 58-82, Paragraphs 83-98, and Paragraphs 99-107 of this Complaint:

In August 1999, an Indianapolis attorney named Gregory Poore called Plaintiff and told him that he was recommending that someone else take over the Guardianship of Plaintiff's father, George M. Lewis, Sr. who resided in an Indianapolis nursing home. Poore said that because Plaintiff lived in California, the Probate Court had asked him to find someone else to assume Guardianship of George M. Lewis, Sr., Plaintiff's father.

109.   Plaintiff had countered with the alternative plan to move his father to California when he found accommodations, but Poore told him the only way Plaintiff could influence the court's decision about the guardianship of his father was by returning to Indianapolis and making an appearance before the Probate judge.

110.    Although it had been an extremely difficult and painful decision for Plaintiff, he refused to return to Indiana. Plaintiff alleges that Poore, another Marion County democrat, acted to further the conspiracy to protect those Indiana constitutients of Defendant Senator Evan Bayh whom Plaintiff alleged had broken the law. Plaintiff alleges Poore attempted to further the conspiracy by luring Plaintiff back to Indiana to have him jailed, silenced, and discredited. Plaintiff alleges that Poore was a co-conspirator with Defendant Senator Evan Bayh to protect those who had violated Plaintiff's constitutional right to equal protection under the law, violating 42 U.S.C.S. 1983.

111.    Upon information and belief, Plaintiff alleges Defendant Senator Evan Bayh and these Indiana co-conspirators had enormous resources at their disposal to have Plaintiff jailed, silenced, and discredited. Plaintiff alleges they were willing to go to any means to bring Plaintiff back to Indiana, where he alleged they intended to put him in jail and silence him for his outspoken allegations about those who had violated his constitutional right to equal protection under the law.

112.    Plaintiff alleges these acts of intimidation and harassment caused severe personal and professional damage to his life and career. Plaintiff alleges the actions taken by these co-conspirators caused mental suffering, disruption of his family, depression, and exacerbation of a chronic medical condition. The cause of these injuries are the basis for his claims of abuse of process, obstruction of justice, and intentional infliction of emotional harm, for which he is entitled to damages.

## CAUSE OF ACTION # 8

**Plaintiff Alleges Constitutional and Civil Rights violations; Basis of Claims that Defendant Caused Unintentional Infliction of Emotional Harm, Abuse of Process and Obstruction of Justice**

113.  Plaintiff restates as if fully set forth here each and every claim, assertion, and allegation set forth in the foregoing Paragraphs 1-30, Paragraphs 31-35, Paragraphs 36-44, Paragraphs 45-52, Paragraphs 53-57, Paragraphs 58-82, Paragraphs 83-98, Paragraphs 99-107, and Paragraphs 108-113 of this Complaint:

On September 21,1999 Plaintiff had made the difficult decision to remain in California, as the conspirators attempted to tightened the noose around his neck. Plaintiff alleges that his rebuff of Mr. Poore led to another group of conspirators coming on stage with the same goal of denying Plaintiff equal protection under the law. Plaintiff alleges another group of conspirators were trying to achieve the same goal of having Plaintiff jailed, silenced, and discredited for the purpose of protecting the Indiana constituitients of Defendant Senator Evan Bayh.

Plaintiff alleges that about a week after Poore failed to achieve the conspiracy's, on September 29, 1999, just days after the Indiana Probate court took the guardianship of George M. Lewis, Sr. from Plaintiff, the California Medial Board of Quality Assurance informed Plaintiff that his California medical license to practice in California had been suspended.

114.  The order for suspension was pursuant to a request from the Indianapolis, Indiana Title IV-D Court. That court issued an order for suspension to the

Indiana Medical Board. The Indiana Medical Board contacted the California Medical Board and requested the suspension of Plaintiff's California medical license, based on the suspension in Indiana license for child support arrearages.

115.    As a result of a reciprocal agreement between state medical boards designed to protect the public from practitioners who had clearly demonstrated incompetence or malfeasance, the California board chose to honor the Indiana suspension order. It suspended Plaintiff's medical license in an order dated September 29, 1999.

116.    However, at the time of the suspension, on 09/29/99, Plaintiff did not have an Indiana medical license. Plaintiff had held an Indiana license at one time, but allowed it to expire on June 30, 1999, because of his permanent change of residence to California, and his intention to forego any further medical activity in Indiana.

117.    However, the Indiana Medical Board *pre-dated* a suspension order to March 30, 1999 to make it appear that it had been issued over 180 days before Plaintiff was officially notified in California. This was such an obvious violation of professional ethics and the statute. It grieves Plaintiff to allege to admit that his professional career was sabotaged by the illegal conduct of these state officials who violated 41 U.S.C.S. 1983. [18]

---

[18] Qualified immunity normally shields officials from liability for damages so long as their actions are objectively reasonable, as measured in light of the legal rules that were clearly established at the time of their actions. The doctrine's "clearly established violation" standard "provides ample protection to all but the plainly incompetent or those who knowingly violate the law". Malley v. Briggs, 475 U.S. 335, 341 (1986).

Their actions were the proximate cause of injury to Plaintiff. They denied Plaintiff equal protection under the law, violating the Fourteenth Amendment protection against loss of property. Plaintiff alleges Defendant Senator Evan Bayh acted with or on behalf of these co-conspirators in desperate attempts to silence, discredit, incarcerate, and murder Plaintiff to prevent and deny him equal protection under the law. [19]

118.    Plaintiff had not been charged with professional misconduct, negligence, malpractice, incompetence, or malfeasance, which was the statutory basis used by the California medical board for its suspension order.

119.    Yet, Plaintiff was required by California law to inform all of his patients that he was no longer able to provide services for them and had to disband his practice. He referred all of his patients to other psychiatrists who assumed responsibility for their prescriptions and day to day care.

120.    On October 3, 1999, Plaintiff wrote a letter to the Indiana Judicial Commission in which he offered proof of his allegations about the official misconduct of Commissioner Barbara Collins, Deputy Prosecutor Lorraine Bradley, and Kenneth Kern. The letter was mailed only to the Indiana Judicial Commission, but the result of this letter was almost immediate.

---

[19] To determine if a Defendant is entitled to qualified immunity, the action is subject to a three-prong test in which the court first determines whether "the facts alleged show the officer's conduct violated a constitutional right." Saucier v. Katz, 533 U.S. 194, 201 (2001) (citing Siegert v. Gilley, 500 U.S. 226, 232 (1991). If a violation could be made out on a favorable view of the parties submissions, the second prong is to ask whether the right was clearly established at the time of the alleged act. Last, does the conduct make it sufficiently clear that a reasonable official would understand that what he is doing violates the right…[T]he unlawfulness must be apparent.

121.  Plaintiff's medical license was reinstated on October 5, 1999, but the Indiana Judicial Commission would eventually determine, several months later, that none of these parties were guilty of any unprofessional conduct **(Exhibit H)**.

122.  Plaintiff had pointed out to Supervising Deputy Attorney General Gail Heppell that the suspension was contrary to California Section 2310 that stated, "suspension of a practitioner's medical license for any reasons other than unfitness, incompetence, or being a danger to the community were barred". Ms Heppell and the Director, California Medical Board knew the *only* justification offered by the Indiana Title IV-D Court for suspending Plaintiff's medical license was alleged child support arrearages, yet they had ordered the suspension based on the Indiana request anyway.

123.  On October 4, 1999, the Deputy Attorney General for California called Plaintiff to deliver the news about the reinstatement of his license. He alleged the conduct of the medical board violated his Fourteenth amendment property rights and resulted in personal and professional injury to Plaintiff. Plaintiff never received an apology from any of these parties. Instead, the California Medical Board responded with a punitive official sanction of Plaintiff for failure to inform them about his change of personal residence.

124.  Although Plaintiff had maintained the same professional address since his arrival in California, the medical board posted an unmeritorious sanction and fine against Plaintiff on its Internet website. Plaintiff alleges this was an act of revenge for the pressure he exerted on the board to reverse the damaging error it had made.

125.    Upon information and belief, Plaintiff alleges this egregious abuse of power by all the parties was a desperate attempt to have Plaintiff returned to Indiana where he would be incarcerated, silenced, and discredited. Plaintiff alleges the California Medical Board entered into the conspiracy to deny Plaintiff equal protection under the law and rights guaranteed by state stature, when it unlawfully suspended Plaintiff's medical license at the request of authorities in Indiana.

126.    The California Medical Board's cavalier conduct damaged Plaintiff's community and professional reputation and caused him financial, emotional, and mental harm, for which he is entitled to damages. This board acted in concert with the Indiana Medical Board who falsified the records to make it appear as though its order was timely and honorable when it was neither.

127.    Upon information and belief, Plaintiff alleges Defendant Senator Evan Bayh had knowledge of the Indiana Medical Board's actions and its attempts to deprive Plaintiff of his constitutional right to equal protection under the laws by issuing an illegal order to suspend Plaintiff's license. Defendant Senator Bayh did not act upon that knowledge to repair remedy or protect those rights. Plaintiff alleges Defendant Senator Evan Bayh reviewed the two investigative reports from Marion and Hamilton County to determine if any others had been named for violating the law in addition to those whom he had been protecting.

128.    Plaintiff alleges the Indiana Judicial Commission failed to discharge its duty in an impartial manner. Plaintiff alleges that this agency became part of the conspiracy to deprive Plaintiff of his rights when it exonerated Collins,

Bradley, and Kern. Plaintiff alleges Defendant Senator Evan Bayh had knowledge of the IJC action and failed to act on it to protect Plaintiff's rights or prevent further abuses from taking place.

129.    As a direct consequence of these acts of abuse, Plaintiff was forced to endure mental anguish, psychological trauma, pain and suffering, and claims damages for the causes of abuse of process, intentional infliction of emotional harm, defamation of character.

## CAUSE OF ACTION # 10

130.    Plaintiff restates as if fully set forth here each and every claim, assertion, and allegation set forth in the foregoing Paragraphs 1-30, Paragraphs 31-35, Paragraphs 36-44, Paragraphs 45-52, Paragraphs 53-57, Paragraphs 58-82, Paragraphs 83-98, Paragraphs 99-107, Paragraphs 108-113, and Paragraphs 114-129 of this Complaint:

131.    During the summer of 2003, Plaintiff alleged that Senator Bayh used the power and authority of his office and his position on the Select Committee on Intelligence in an effort to deprive Plaintiff of rights that were guaranteed by statute and by the United States Constitution. Plaintiff mailed this letter to the United States Senate Ethics Committee (**Exhibit I**) and never received an acknowledgement or a response. Until that time, it had been inconceivable to him that the Defendant Senator Evan Bayh would have been involved in criminal conduct. In April 2004, Plaintiff filed a complaint, alleging a civil conspiracy, naming Defendant Evan Bayh as the Respondete Superior.

50

132. Plaintiff alleges the conspiracy went well beyond the events and identities of agencies and persons cited herein.[20] Plaintiff alleges that his phones were wiretapped, his life was threatened, his health was severely damaged, he was harassed, intimidated, and subjected to other abuses, all as a result of exercising his constitutional right to equal protection under the law by reporting the illegal conduct of the people in Indiana who broke the law and seeking documents through F.O.I.A.

133. Plaintiff alleges the other participants in this conspiracy have direct or indirect ties to Defendant Senator Evan Bayh and they should be accounted for in this legacy of lawless, unethical abuse. These other activities [21] and co-conspirators were representative of what happens in conspiracies.

### Argument

134. Plaintiff alleges that Senator Evan Bayh was at the heart of this civil conspiracy from the very beginning and that this conspiracy formed to deprived Plaintiff of rights guaranteed by the Constitution of the United States. From the earliest stages of this controversy, Plaintiff had only asked for fair treatment. In 1998, his life was burdened with several financial concerns. He turned to people whom he had thought he could trust. Instead of lending a helping hand, the ugly head of racism emerged and he became the victim of a plan to deprive him of his household property, automobile, money, and good name.

---

[20] See CV-04-2950 AHS cites incidents and includes evidence of a conspiracy reaching beyond the events raised in this complaint.
[21] Illegal wiretapping is banned in the United States, except for the actions of the F.I.S.A. Court. As are attacks on personal computers.

As Plaintiff asked more questions and pressed for believable answers, refusing to accept the rejections from state and federal government agencies, the responses included 1.) Efforts to justify, and attempts to rationalize the egregious violations of the law; 2.) Efforts to cover-up the misconduct and wrongdoing of the Indiana co-conspirators by involving others to justify, and rationalize the misconduct; 3.) Attempts to intimidate, harass, incarcerate, rationalize, or kill Plaintiff for exercising his constitutional rights to equal protection under the law. So, what began as a conspiracy motivated by the racial animus of a few Indiana good ole boys grew to involve people that were far removed from the source of the original act of malfeasance.

Plaintiff alleges that Senator Bayh was involved in the conspiracy against Plaintiff's right to equal protection under the law and used his august position as a United States Senator to review the U. S. Treasury's investigative reports. These reports would have implicated him in the alleged misconduct of his Indiana constituitents.

### Other Considerations for Statute of Limitations for Filing this Against Senator Bayh

135.    Plaintiff restates as if fully set forth here each and every claim, assertion, and allegation set forth in the foregoing Paragraphs 1-30, Paragraphs 31-35, Paragraphs 36-44, Paragraphs 45-52, Paragraphs 53-57, Paragraphs 58-82, Paragraphs 83-98, Paragraphs 99-107, Paragraphs 108-113, Paragraphs 114-129, and 130-134 of this Complaint:

Plaintiff noted in Para. 4, Page 4, Para 20-28 P. 11-14, he filed the initial complaint in April 2004, and that it had been docketed in July 2004. Although the

racially motivated theft of property and violations of Plaintiff rights included in the complaint occurred during 1998, 1999, 2000, and 2001, the claim accrued because Plaintiff did not become aware of Senator Bayh's possible involvement until July 2003, while attending a play in Laguna Beach and subsequently made his concerns knows to the Senate Ethics Committee later that same month, and to the Republican members of the Senate Intelligence Committee in August 2003.

### Other Allegations "Included"

**A.** In **May 2005**, Plaintiff alleged to the Los Angeles District Court that at least three of his former patients reported they had been contacted and asked for derogatory information about Plaintiff. Two of these former patients and/or their family members were asked to file complaints with the California Medical Board of Quality Assurance. Plaintiff filed this motion for relief with the district court, because he felt it was another attempt to deny him equal protection under the law, violating 42 U.S.C.S. 1983. Plaintiff alleges Senator Bayh may have been connected with this effort to prevent him from prosecuting his case and asks the court to consider the allegation that this separate and new attack upon Plaintiff to deprive him of rights guaranteed by the constitution.

**B.** In **June 2005**, Plaintiff changed Internet security providers from Norton to Zone Alarm and discovered at least two instances where the Department of Defense had attempted to enter his computer. **(Exhibit H)** Without justification for these entry attempts, this constituted an unwarranted invasion of privacy and Plaintiff submitted the log of Alerts as evidence in a motion for injunctive relief to district court, but it was disregarded by the court. Plaintiff alleges Senator Bayh

may have been connected with this effort to prevent him from prosecuting his case and asks the honorable district court to consider the allegation that this separate and new attack upon Plaintiff to deprive him of rights guaranteed by the constitution, violating 42 U.S.C.S. 1985. This was part the co-conspirator's ongoing pattern of harassment, abuse, and attempts to deny Plaintiff equal protection under the law.

Plaintiff had complained in 2001, 2002, 2004, and again in 2005 that his computer had been hacked by government. Then during the course of hearing his complaint of civil and constitutional rights violations, it occurred again in July 2005. Plaintiff alleged this was part of Senator Bayh's ongoing use of his position on the Senate Intelligence Committee to deny Plaintiff equal protection under the law. Plaintiff asks the court to consider this as a separate and new attack on Plaintiff and asks the court to allow him to submit depositions or affidavits to substantiate his claims.

**C. In July 2005,** Plaintiff submitted another motion for injunctive relief to the district court from what he alleged was government's ongoing illegal monitoring of his cellular telephone. In a reply brief, the federal defendants' stated that Plaintiff had offered no proof of the alleged illegal wiretap. Plaintiff was not allowed to obtain depositions or affidavits about these attempts to deny equal protection under the law. Plaintiff alleges Senator Bayh may have been connected with this effort to prevent him from prosecuting his case and asks the court to consider the allegation that this separate and new attack upon Plaintiff to deprive him of rights guaranteed by the constitution.

**D.** In **August 2005**, Plaintiff faced a deadline in submitting a responsive brief to the federal defendant's motion for dismissal. During the previous months, Plaintiff's computer had been hacked into and documents were altered or deleted. His cellular telephone was electronically monitored and he experienced power failures in critical instances during the process of preparing responsive briefs to several of defendant's motions.

Plaintiff received multiple (hang-up) phone calls in the early morning hours; he received many strange and sexually suggestive text messages at different times of the day and night. This was frustrating to Plaintiff and brought him to the brink of filing motions late on more than one occasion. He alleges this was an attempt to obstruct justice and prevent him from prosecuting his case effectively, denying him equal protection under the law. Again, Plaintiff was not allowed to collect or submit depositions or affidavits.

In **September 2005**, on the day Plaintiff's responsive brief to the federal defendant's motion was due in district court, Plaintiff was concerned about the intensity of harassment he had received while attempting to prosecute his case. Plaintiff left his apartment around 10 a.m. without taking his cellular phone, credit cards, watch, or anything other item that could have been used to track him or identify his location. He found an Internet Café not far from his residence and began working on the completion of the document.

At some time around 1300 to 1400, Plaintiff had the sense that an ominous event was about to occur, again. He saved the data he had compiled just before all the power for the west side of Los Angeles went out. Otherwise, it would have

been irretrievably lost. This event left millions of people without electricity for about a half hour in Los Angeles County.

In **September 2005**, the official reason given for this power outage was human error at a switching station in Toluca Lake, Ca. Plaintiff alleges Senator Bayh may have misused his position on the Senate Intelligence Committee to prevent him from prosecuting his case and asks this honorable district court to consider the allegation as a separate and new attack upon him. Plaintiff alleges Senator Bayh used in power and influence to intimidate and harass Plaintiff to deprive him of rights guaranteed by the constitution. Plaintiff alleges this power outage was part of the ongoing pattern of abuse directed at Plaintiff by defendant Senator Evan Bayh and his constitutients/co-conspirators to deny him equal protection under the law.

Plaintiff alleges that Senator Bayh has misused his position on the Senate Intelligence Committee, or intermediaries to prevent Plaintiff from completing and timely submitting his responsive brief in opposition to the federal defendant's motion to dismiss, attempting to obstruct justice, violating 42 U.S.C.S. 1985 in the ongoing attempt to deny Plaintiff's constitutional rights.

**E.** The power outage does not stand by itself as an <u>extreme</u> example of the Senator Bayh and his constitutients/co-conspirators ongoing pattern of abuse, harassment, and intimidation. Later in the evening of that September 2005 night, after his motion had been successfully filed in Los Angeles District court, Plaintiff was in his apartment in bed and heard the sound deafening sounds of a

giant egg beater get louder. He realized it was the spinning rotors of a large helicopter directly above his residence.

Helicopters followed plaintiff, several times in April, May, July, August, and September while he attempted to prosecute the case (CV-04-2950 AHS) against Senator Evan Bayh in Los Angeles District Court. But on this September 2005 night, what must have been a very large helicopter had stopped over Plaintiff's building and hovered for several minutes. It hovered at such a low altitude that its rotating blades created a deafening sound. When it lifted up, the force of its powerful rotors created an updraft that was so strong that the Venetian blinds on Plaintiff's bedroom windows were sucked out against the screens, as the helicopter finally ascended and flew away.

Plaintiff asks this honorable district court to consider this allegation of a separate and new attack on is right to equal protection under the law by defendant Senator Evan Bayh and his constitutients/co-defendants. Plaintiff alleges that Senator Bayh misused his position on the Senate Intelligence Committee to deploy the military assets to intimidate, threaten, and harass to deny Plaintiff equal protection. This was a violation of 42 U.S.C.S. 1985. It was an abuse of process and it caused Plaintiff deep psychological trauma.

Plaintiff alleges these events and new and separate attacks, motivated by the same irrational racial animus to deprive him of equal protection under the law. Plaintiff believes that his claims can be proved through depositions and affidavits if the district court permits him leeway to obtain information that is not classified as evidence. Surely, the number of bases from which military helicopters could

take-off and land is limited. Surely, the number of military helicopters flying over Los Angeles must have filed flight plans before their missions at the times Plaintiff has alleged the harassment. Surely, the record will contain information about the source, cause, and reason for the September 2005 power outage. The statute of limitations tolled from the time these five events too place would provide evidence they are connected to the original civil complaint for violation of 42 U.S.C.S. 1983, 42 U.S.C.S. 1985, and 42 U.S.C.S. 1986

### The Plaintiff's Injuries

136.  Plaintiff restates as if fully set forth here each and every claim, assertion, and allegation set forth in the foregoing Paragraphs 1-28, Paragraphs 29-46, Paragraphs 47-54, Paragraphs 55-59, Paragraphs 60-84, Paragraphs 85-100, Paragraphs 101-109, Paragraphs 110-114, Paragraphs 115-131, and Paragraphs 132-137 of this Complaint:

137.  This is a civil right conspiracy, initially driven by a racial animus to exploit Plaintiff and then to abuse, harass, intimidate, incarcerate, illegally monitor, expose Plaintiff to dangers that threatened his life, and deny Plaintiff equal protection under the law, violating his Fourteenth Amendment rights. This has caused significant injury to Plaintiff and his family.

138.  Plaintiff suffered anxiety and depression, disruptions in family, personal, and professional areas of his life. A United States Senator has enormous power and Plaintiff alleges he misused that power to deny Plaintiff equal protection under the law on behalf of himself and his co-conspirators.

139. Plaintiff has been psychologically traumatized by these events and continues to fear for his own safety and the safety of his children and grandchildren as a result of Defendants' misconduct. Plaintiff has lost a promising career, personal and professional standing in the community, his good reputation, potential for advancement, opportunities to further his education, research, and academic growth, and the critical times in the lives of his children, his father, and other family members because of his concern for their safety and well being, as a result of Defendant's capricious, vindictive, and irrational racial animus towards Plaintiff. For the past nine years, Defendant and con-conspirators have conspired to deny Plaintiff equal protection under the law.

140. Plaintiff lost proprietary control over training programs he developed for use in prisons in Indiana, Ohio, Utah, Pennsylvania, and Texas. The programmed text workbooks called Taking Charge, Tough Assignments, True Security, and Total Choice, which were stolen and used illegally by institutions without Plaintiff's consents. This resulted in lost income, and lost the opportunity to build upon a promising start helping former prisoners re assimilate in their communities.

141. Plaintiff has frequent exacerbations of a chronic medical problem; and he has recently been diagnosed with congestive heart failure as a result of Defendants' actions and the denial of equal protection under the law when he tried to have these and other issues investigated and the wrongful conduct exposed.

142. Plaintiff has been deprived of his constitutional right to equal protection under the Fourth and Fourteenth Amendment as a result of the Defendants' actions. As a result of this abuse, Plaintiff lost personal and professional belongings and equipment. He was disassociated from his father, children, had his medical license illegally suspended, his life threatened, harassed, intimidated and nearly killed because he continued to stand up for his rights. Many of things that were taken are irreplaceable. Love, ability to give support those you care about, and the psychological trauma of knowing the U.S. government has total and complete power to destroy a person's life has left enduring emotional scars. Plaintiff's fears that his family would suffer from these same displacements, held fears for their safety, and doubted he would ever be able to receive equal protection under the law.

### Demand

143. Plaintiff holds and claims the above to be true and the conduct and actions, taken in a personal capacity, by Defendant Senator Evan Bayh and the co-conspirators who deprived Plaintiff of his right to equal protection under the law, did cause injury to Plaintiff and his family. Therefore, he states a claim for the negligent infliction of emotional distress, abuse of process, obstruction of justice, invasion of privacy, theft, and conversion, damages that were a direct result of the misconduct presented in this complaint.

144. Therefore, under 28 U.S.C. 1346, 28 U.S.C. 2671, and 28 U.S.C. 2680 he demands a jury trial and unspecified damages, including compensatory, punitive, consequential and discretionary damages.

Respectfully Submitted,

George M. Lewis, M.D.
7095 Hollywood Blvd. # 1245
Los Angeles, California 90028
323-512-0198

09/08/07

**Proof of Service**

**Defendant**

Senator Evan Bayh
United States Senate
131 Hart Building
Washington, D.C.

George M. Lewis, M.D.
7135 Hollywood Blvd. PH 3-West
Los Angeles, California 90046

DATE: 09/08/07

# EXHIBIT LIST SHEET

| Exhibit Number | Description | Pages |
|---|---|---|
| 1 | Letter from Senator CHARLES GRASSLEY, dated April 9, 2001, with attached copy of complaint from GEORGE LEWIS. | 6-17 |
| 2 | Form 2028M, Memorandum of Interview, dated May 24, 2001, regarding an interview of DR. GEORGE LEWIS with attachments. | 18-69 |
| 3 |  | 70-71 |
| 4 |  | 72 |
| 5 |  | 73 |
| 6 |  | 74-75 |
| 7 | Form 2028M, Memorandum of Activity, dated June 19, 2001, regarding a record review of Hamilton County, Indiana records with attachments. | 76-91 |
| 8 |  | 92-93 |
| 9 | Form 2028M, Memorandum of Interview, dated June 20, 2001, regarding an interview of ANGELA SMITH-JONES, Director, Indiana Medical Certification Board with attachments. | 94-104 |
| 10 | Form 2028M, Memorandum of Activity, dated June 21, 2001, regarding a record review of Marion County, Indiana records with attachments. | 105-108 |
| 11 |  | 109-112 |
| 12 |  | 113-169 |
| 13 | Form 2028M, Memorandum of Interview, dated August 20, 2001, regarding an interview of DAVID THORTON, Chief Enforcement, Medical Board of California, with attachments. | 170-172 |
| 14 |  | 173-176 |

b7c

| Case Number: 62-0105-0027-I | Case Title: BENNETT, JEFFREY |
|---|---|

TIGTA Form OI 2028A (Rev. 03/2001)          Treasury Inspector General for Tax Administration

**OFFICIAL USE ONLY**

THIS DOCUMENT IS PROVIDED FOR OFFICIAL USE ONLY. ANY REQUEST FOR DISCLOSURE OR FURTHER DISSEMINATION OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO HEADQUARTERS, TREASURY INSPECTOR GENERAL FOR TAX ADMINISTRATION.

**U.S. Department of Justice**

*United States Attorney*
*Southern District of Indiana*

*10 West Market Street*
*Suite 2100*
*Indianapolis, IN 46204-3048*

*(317)226-6333*
*TDD (317)226-5438*

*FAX NUMBERS:*
*Main (317)226-6125*
*Administration (317)226-5176*
*Civil (317)226-5027*
*FLU (317) 226-6133*
*OCDETF (317)226-5953*

June 1, 2001

George M. Lewis, M.D.
3328 Stevens Avenue
Rosemead, California 91770

Dear Mr. Lewis:

    Although I read your May 12 letter and attached 23-page "Chronology of IRS Abuse," I found nothing to support the allegations of criminal activity you made against seventeen persons and institutions (Yes, I counted them). Although it is difficult to discern from your "chronology," it appears these conflicts arose when various state and federal agencies attempted to collect child support, student loans and back income taxes you purportedly owed.

    My office evaluates the information gathered by investigative agencies, including the FBI and IRS, to determine whether sufficient evidence exists to sustain proof of a crime beyond a reasonable doubt. Since you reject the impartiality and fairness of these agencies, you will reject any decisions by my office based upon their investigative product. We are not staffed with investigators.

Sincerely,

Timothy M. Morrison
United States Attorney

**George M. Lewis. M.D.**
**636 No. Spaulding Ave.**
**Los Angeles, California 90036**
**323-651-1262**

November 20, 2004

Federal Bureau of Investigation
575 No. Pennsylvania Ave.
Indianapolis, Indiana 46204

Re: George M. Lewis, M.D.
SSN: 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

Dear Sir or Madam:

In November of 1998, I delivered a detailed complaint to the Indianapolis Federal Bureau of Investigation, outlining numerous instances of abuse involving my constitutional and civil rights. That document outlined the actions of attorney Kenneth Kern, Steven Siedel, Atlantic Relocations, and the Hamilton County Sheriff's Department, who, together, conspired to steal my personal and household property. Their conduct violated the criminal code 18 U.S.C. 241, which states that "if two or more persons conspire to injure, oppress, threaten, or intimidate any person in any State, Territory, Commonwealth, Possession, or District in the free exercise or enjoyment of any right or privilege secured by the Constitution of the United States..." they are guilty of a crime that is punishable by imprisonment.

That document also provided facts and information about the way Kenneth Kern and the Indiana Supreme Court Clerk violated 42 U.S.C. 1983 and 42 U.S.C. 1985.

FN 12

To reacquaint you with the issues presented in 1998: In June 1998, Judge Wayne Sturdyvant heard the matter of Siedel vs. Lewis, deciding the eviction case in favor of Mr. Siedel. Judge Sturdyvant issued his final decision and the eviction order of the court at the same time, late in the afternoon of Friday, July 2, 1998, the day before the long three-day July 4th holiday weekend. Judge Sturdyvant's order stipulated that the eviction take place no sooner than 9:00 A.M., Wednesday morning, July 7, 1998, leaving me **one day**, July 6, 1998, in which to appeal the court's decision.

On July 6, 1998, late in the afternoon, attorney Kern met me at the Indiana Supreme Court where he planned to file a Writ of Habeaus Mandamus, asking Chief Justice Randal Sheppard to stay the eviction scheduled for the following day, July 7, 1998. Mr. Kern failed to produce a signed copy of the transcript from the Noblesville, Indiana hearing, or any other form of certification from the Noblesville Superior Court, but nonetheless urged me to pay the $ 375.00 filing fee to obtain a filing number. Beyond the questions about Judge Sturdyvant's issuing a decision that allowed only one day to file an appeal and whether the Indiana Supreme Court is the appropriate venue to file such an appeal, Mr. Kern was turned away at 4:30 P.M. on July 6, 1998, although he promised to return with the necessary documentation before 9:00 A.M. the following morning.

The eviction took place as scheduled at 9:00 A.M., July 7, 1998 when the Hamilton County Sheriff's Department arrived with more than a dozen movers from Atlantic Relocations and methodically executed a plan to pack, load and store the household belongings from my 5,000 square foot home. The household

FN 12

goods were initially stored in the name of Mr. Siedel, leading Plaintiff to believe

that the move had been planned and coordinated well in advance of the decision

handed down by Judge Sturdyvant on the afternoon of July 2, 1998.

Mr. Kern did not call me until late in the afternoon of July 7, 1998 to say

that the appeal had been filed and that he had heard nothing from Chief Justice

Sheppard. I doubted that my appeal rights had been upheld by Mr. Kern and

questioned if my rights could have been upheld at all, since Mr. Kern failed to file

the Writ of Habeus Mandamus on July 6, 1998, the day before the eviction was

to have taken place, as he had planned. The Hamilton County Sheriff's Depart-

ment Deputy ordered me off the premises before the packing of my household

goods had been completed. Thereafter, I paid monthly storage fees based on the

overall weight of the furnishings that Atlantic Relocations had calculated was be-

ing held in storage.

I alleged that the Hamilton County Sheriff's Department, Atlantic Reloca-

tions, Kenneth Kern, and Steve Siedel used the eviction and the legal authority

upholding the enforcement of the eviction, acting under the color of law, to steal

my household goods, violating 42 U.S.C. 1983 and my fourteenth Amendment

rights, protecting property as guaranteed by the United States Constitution.

I moved from Indiana to northern California in September 1998, leaving

my household goods in storage until ay 1999, when, without my prior knowledge

or authorization, Atlantic Relocations shipped my household goods to Fairfield,

California (this time frame happened to coincide with the end of the first investi-

gation conducted into my allegations, CV-02-3249 FMC, although I was not in-

FN 12

formed of the findings then, nor have I been informed about the contents of <u>any</u> investigation into the matters I have meticulously detailed in my complaints to the U.S. Attorney for the Southern District of Indiana and the Indianapolis FBI. Atlantic Relocations sent the shipment without advanced notice, demanding payment in full, without an inventory, asserting that the original inventory was never completed or had been lost.

I refused to accept delivery and demanded Atlantic Relocations complete another inventory, under my supervision, before I would accept delivery and pay the invoice. There was a difference of more than three thousand pounds between what Atlantic Relocations purported to have stored and shipped, according to its own estimates, and what actually arrived and was inventoried in Fairfield, California. There was more than a twenty thousand dollars in damaged, missing or stolen furnishings, violating 42 U.S.C. 1983 where my missing property resulted from the deprivation of my rights guaranteed under the Fourteenth Amendment of the Constitution.

Under the provisions of the Freedom of Information Act (5 U.C.S. 552), I am now requesting all the investigative reports produced from the FBI's investigation of those 1998 complaints. In addition, because of communications I had with the FBI in early 1999 I have strong reasons to believe that attempts were made to thwart the investigation. Specifically, I believe U.S. Attorney Tim Morrison and/or Senator Evan Bayh may have interceded on behalf of the accused to derail the investigation I requested, which would be a violation of 42 U.S.C. 1985.

FN 12

This also violates 18 U.S.C. 242 that states "whoever, under the color of any law, statute, ordinance, regulation, or custom, willfully subjects any person in any deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States…" is guilty of a crime that is punishable by imprisonment.

However, my understanding is that some sort of investigation was completed and I am requesting the documents connected with this matter and a full disclosure of the findings of your completed your inquiry. Thank you in advance for your help and cooperation.

Sincerely,

George M. Lewis, M.D.

FN 12

Kenneth Kern
Attorney-at-Law
5407 E. Pleasant Run Pkwy. S. Dr.
Indianapolis, Indiana 46219

Atlantic Relocations
9967 Westpoint Drive
Indianapolis, Indiana 46256-3334

Hamilton County Sheriff Department
18100 Cumberland Road
Nobelsville, Indiana 46060

Steve Siedel
11639 W. Georgetown Rd.
Columbus, Indiana 47201

Indiana Supreme Court
Clerk
Room 217
200 W. Washington St.
Indianapolis, Indiana 46204

PN 12

*Gmh*



U.S. POSTAGE
=0.37=
PB METER
7136410

U.S. POSTAGE
=0.12=
PB METER
7136410

JUL 21'03
WASHINGTON D.C.

JUL 21'03
WASHINGTON D.C.

FIRST CLASS

Mr. George M. Lewis, M.D.
18430 Brookhurst Street, Suite 201 H
Fountain Valley, CA  92708

Department of Homeland Security
Office of the Inspector General
Office of Investigations
245 Murray Drive
Building 410
Washington, D.C. 20528

FN 12

**George M. Lewis, M.D.**
**18430 Brookhurst Street  Suite 201 H**
**Fountain Valley, California 92708**
**714-593-770   Ph.   714-593-0710  Fax**

June 22, 2003

Department of Homeland Security
Office of the Inspector General
Washington, D.C. 20528

I am writing about concerns that I asked your office to investigate last November 2002 regarding harassment and abuse by Justice Department employees after my arrest for violating child support statutes. At that time I expressed concerns about the illegal electronic monitoring of my cellular telephone, the limiting of my ability to earn a living through sabotaging, manipulating and delaying of my credit card collection capacity. After making that complaint the Los Angeles U.S. Attorney's Office tried to withdraw my signed plea agreement, which I also reported in a separate November complaint.

Beginning sometime after filing my last complaint to the Justice Department in November 2002, I believe that an attempt was made on my life by exposing me to a toxic substance that was placed in a liquid soap I used, producing the nearly fatal constellation of symptoms found in Congestive Heart Failure. I barely survived and have been recovering through my participation in a University of Southern California / Los Angeles County Hospital Cardiology study.

After I was discharged from the USC Cardiology Unit in January 2003, I honestly felt that a significant change had taken place. For example, I felt that the illegal monitoring of my cellular telephone had stopped. However, I was aware of other disturbing events. My computer was being continually hacked. Needless to say, I did not consent to this type of invasion of privacy. However, my computer files were destroyed or stolen, my access to familiar web sites denied, my email disrupted and destroyed (all violations of the Computer Fraud and Abuse Act). During the week of April 29, 2003, as I prepared for the FOIA hearing on the government's motion for summary judgment, I believe my close friend, Dianne Curran's cellular telephone was illegally wire tapped (425-681-8511) and our conversations monitored (another violation of the federal electronic monitoring laws).

In November, I reported to the Justice Department that my ability to collect payments from credit card sales resulted in excessive bank charges. This occurred at a Wells Fargo Bank, the same bank that Mr. Jay Pewthers used to induce me to open an illegal checking account in a Sacramento, California in October 2000.

FN 12

At that time Mr. Pewthers told me that he was part of the Phoenix Group, a consulting organization based in Huntsville, Alabama, that I believe has extensive federal contracts. This organization's expertise is in the field of conducting counterintelligence operations for business and government agencies. However, I think Phoenix, or an organization like it, has been participating in an ongoing pattern of harassment and abuse, directed towards me, well before the time USC discharged me from the Cardiac Intensive Care Unit.

I have maintained membership in an online dating service named Match.com for several months. Until recently, I had free access until a hacker blocked my ability to launch that web page. Beginning in March 2003, three women (Stacy Frick, Sunny Foor, and Teri Schriber), whose telephone numbers I have upon request, contacted me to initiate some form of social interaction. I believe these women were directed by law enforcement to obtain information from me and/or set me up to be accused of committing a crime (see previous complaints). Ms Foor told me that she worked for the Orange County District Attorney's Office as a rape counselor. She was openly seductive, inviting my sexual response. Ms Foor even agreed to let me work in her office to satisfy any community restitution requirements the court might impose. The other two were less predatory. Even if these women were only gathering intelligence about me, it was without my knowledge or permission and their actions do not, in my opinion, constitute actions consistent with the voluntary consent doctrine. They invaded my privacy, without probable cause, for reasons that are still unclear to me.

When I suggested that Ms Foor talk with my attorney, Mr. Leothis Matthews, she stopped our interaction dead in its tracks. I do not know if these women's actions were initiated by Justice Department personnel or by a private organization like the Phoenix Consulting Group. I know that when I went to Sacramento thinking I was resolving my conflicts with IRS (see previous complaints), Mr. Pewthers told me that the Phoenix Group's philosophy was honed during the Viet Nam war. He said that they were trained to do anything necessary, to control the citizenry, influence the outcomes of political elections, using torture, entrapment, misinformation, psychological manipulation, and assassinations to achieve their goals. Their mission at that time was to control the population and change the government. I believe that is happening here, today, in America.

Sincerely,


George M. Lewis, M.D.

FN 12





# DEPARTMENT OF HOMELAND SECURITY

### Office of Inspector General
### Washington, DC 20528

JUL 1 7 2003

George M. Lewis, M.D.
18430 Brookhurst Street, Suite 201 H
Fountain Valley, CA 92708

OIG Complaint Number: C03-04341

Dear Mr. Lewis:

The purpose of this letter is to acknowledge receipt of your correspondence on July 9, 2003. It will be reviewed by the staff of the Investigations Division, Office of Inspector General. If additional information is required for this review, you will be notified.

Thank you for your interest in the elimination of fraud, waste and abuse in the programs and operations of the Department of Homeland Security.

Sincerely,

Elizabeth M. Redman
Assistant Inspector General
for Investigations

FN 12

George M. Lewis, M.D.
Pro Se
636 No. Spaulding Ave.
Los Angeles, California 90036
323-651-1262

## AFFIDAVIT

1.     On or about June 12, 1998, Judge Wayne Sturdyvant heard the matter of

Siedel vs. Lewis, deciding the eviction case in favor of the Plaintiff. However,

Judge Sturdyvant waited to issue his final decision and the court's eviction or-

der at the same time, late in the afternoon of Friday, July 2, 1998, the day be-

fore the long three-day July 4th holiday weekend.

2.     Judge Sturdyvant's order stipulated that the eviction would take place "no

sooner" than 9:00 A.M., Wednesday morning, July 7, 1998, leaving plaintiff

only one day, Tuesday July 6, 1998, in which to appeal the court's decision.

3.     On Friday evening July 2, 1998, plaintiff contacted attorney Kenneth Kern,

who had represented plaintiff in the Noblesville hearing before Judge Sturdy-

vant, and they discussed a plan to petition Chief Justice Randal Sheppard for a

stay in the eviction order that he (Kern) would prepare and deliver in the form

of a Writ of Habeas Mandamus, to be filed at the Indiana Supreme Court on

Tuesday July 6, 1998. Plaintiff agreed to wait on a call from Mr. Kern then

meet him at the Supreme Court when the writ was ready to be filed.

4.     Between 2:00 P.M. and 3:00 P.M. on July 6, 1998, Kern called plaintiff and

asked him to drive to the Indiana State House where Kern would be prepared

to file the writ before the court's closing at 4:30 P.M. Plaintiff and Kern failed

FN 15

to connect immediately and finally met outside the office of the Clerk, Indiana Supreme Court at or about 3:45 P.M.

5. Plaintiff took the paperwork from Kern and commenced filling out the necessary court forms to file the appeal while Kern left to seek out the Clerk in another office. At about 4:15 P.M., plaintiff finally finished the paperwork, and brought all documents to a counter where he logged his identifying data on a sheet of paper where a clerical assistant, reviewed the documents, collected the $ 375.00 filing fee, issued a receipt for payment of the fee, and assigned sequential Supreme Court case numbers to each appellant. *After* receiving the assignation of a case number, paying the fees, and turning over the documents Kern had provided, the woman behind the counter asked plaintiff to return and observed that the material was incomplete and, thus, could not be accepted.

6. She called for the Clerk because we were nearing the 4:30 P.M. deadline for filing the Writ of Habeas Mandamus, asking Chief Justice Sheppard to stay the eviction order. The court's Clerk and Kern emerged from and upstairs office and reviewed the documents and both of them agreed that the Writ of Habeas Mandamus could not be filed without the simultaneous submission of a certified copy of the hearing transcript, signed by Judge Sturdyvant. The entry of plaintiff's name and the information about his Noblesville trial, along with the case number was lined out on the same sheet of paper on Tuesday between 4:25 P.M. and 4:30 P.M. July 6, 1998.

7. Kern urged Plaintiff to leave the filing fee on the books because Kern, in the presence of the Clerk, and with her assent, promised to obtain several copies

FN 15

of the missing signed court transcript and return to the court on the following morning to complete the filing process for plaintiff's appeal. Outside the Clerk's office, Kern explained to plaintiff that he would have no trouble obtaining the documentation and would arrive before the Supreme Court opened for business at 9:00 A.M. the following morning, whereupon the appropriate paperwork would be duly filed.

8.    The eviction of plaintiff took place as scheduled promptly at 9:00 A.M., July 7, 1998 when the Hamilton County Sheriff's Department arrived with a half dozen sheriff's personal and more than a dozen movers from Atlantic Relocations and methodically executed a plan to pack, load, and store the household belongings from Plaintiff's five thousand square foot home.

9.    Plaintiff learned of this around 9:10 A.M. and began trying to reach Mr. Kern numerous times between 9:00 A.M. and 2:00 P.M. on July 7, 1998. That afternoon Kern finally answered his phone. It was well after the eviction had gotten underway, and he reported that he had timely filed plaintiff's appeal that morning, as they had planned, and that he had, thus far, heard nothing from Chief Justice Sheppard.

10.    At approximately 3:00 P.M., a Hamilton County Sheriff's Deputy ordered plaintiff to leave the premises, although the packing and loading of plaintiff's household goods was not yet completed. Plaintiff protested and the sheriff threatened to arrest him if he didn't voluntarily leave the premises. Plaintiff asked why he *had* to leave before the packing had been completed. The sheriff told him that Mr. Siedel was on his way over and wanted to plaintiff to be off

3

FN 15

the premises. Plaintiff called Kern, who promptly took his call, to ask him to intervene with the sheriff but was advised by Kern, since the threat of arrest had already been raised, simply to leave the premises and avoid any type of conflict that might lead to plaintiff's arrest.

11. Plaintiff's household goods were initially stored at Atlantic Relocations under the name of Steve Siedel where plaintiff paid monthly storage fees based on the calculations from overall weight of the furnishings that Atlantic Reloca-tions had inventoried and moved into the storage facility.

12. Plaintiff's household goods were held in storage from July 1998 until May 1999 when they were shipped to northern California. During that time, plain-tiff and his family had made two trips to the storage facility to remove items necessary for daily living. No furniture was removed. Only clothing was re-moved before plaintiff and his family moved to California in September 1998. In October Ryan DeMott, the teenage son of plaintiff's fiancée reported to plaintiff that he stopped by the old residence and looked in the downstairs windows where he saw a pool table, pool cues, and a sofa still present at the residence.

13. In November 1998, plaintiff went back to the storage facility once more be-cause plaintiff's fiancée was moving back to Indianapolis and needed to re-move some additional clothing to accommodate the winter weather. At that time, the Atlantic Relocations personnel monitoring the removal of the addi-tional clothing explained to plaintiff the method that monthly charges were derived from the weight calculated for each container stored. We counted the

FN 15

containers and it correlated with the estimated weight that would have been expected *if all* plaintiffs' belongings had been put into storage. Plaintiff had knowledge that this was a deception because he already had the report of Ryan DeMott that Atlantic Relocations had **not** removed **all** of plaintiff's household furnishings on July 7, 1998.

14.  In early May 1999, plaintiff's former fiancée and her brothers returned to AR to remove some furniture to furnish a one-bedroom apartment she planned to occupy and plaintiff gave permission for her to take what amounted to several pieces of furniture along with clothing and personal affects. She reported that AR personnel monitored and observed her and kept track of the modest number of items she removed. She stated that it appeared to her that the same number of large wooden crates were present that had been there the previous November when we visited AR together.

15.  This explains, in part, why plaintiff was so taken aback when AR shipped the remaining household goods to California without prior warning, or permission. He became adamant about not accepting delivery of the shipment, when without warning, without prior authorization or approval, and questioned why Atlantic Relocations simply loaded plaintiff's household goods on a truck and shipped them to California. Repeated calls from AR in Indianapolis threatening to drop the household goods off and charge plaintiff for storage in Fairfield, California.

16.  Plaintiff asked specific questions about the shipment's contents and it became clear that the driver had no inventory of the cargo he was transporting. AR

FN 15

claimed not have had an inventory of the goods and claimed that the inventory had either been lost or had never been completed. Plaintiff **already knew** from a reliable source that there were *missing items* and suspected he might possibly discover others that he had yet to learn about.

17.   Unable to reach any accord with Atlantic Relocations, plaintiff was referred to a company vice president in Atlanta, Georgia to negotiate the final delivery. Plaintiff discovered there were over twenty thousand dollars of damaged, missing or stolen property and that he had been overcharged during the months of storage because the estimated weight did not include the pool table, furniture, lawn equipment, or various other tangibles that were not present at the time of delivery.

I swear under the penalty of perjury that the forgoing is true and correct. Executed on: January 20, 2005.

_____
George M. Lewis, M.D.
Pro Se
636 No. Spaulding Ave.
Los Angeles, California 90036
323-651-1262

FN 15

6

# ATLANTIC
## RELOCATION SYSTEMS

9967 Westpoint Drive
Indianapolis, Indiana 46256

## ATLANTIC RELOCATION SYSTEMS
### 9967 WESTPOINT DRIVE
### INDIANAPOLIS, IN 46256

317/594-1333
800/333-0058

**FAX NO. - 317/594-1330**

**PLEASE DELIVER THE FOLLOWING PAGE(S) TO:**

NAME: _Mr George Lewis_

COMPANY: _____

PHONE NO. _____

FAX NO. _317-377-5310_

NUMBER OF PAGES FAXED INCLUDING THIS COVER LETTER: _2_

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

FROM: **MARK WHITAKER**, V.P. OFFICE & INDUSTRIAL RELOCATIONS

NOTES: _If you have any other questions,_
_please feel free to call_
_thanks -_
_Mark_

## Atlas Van Lines Agent

World-Class Moving.

Telephone 317/594-1333 • 800/333-0058 • Fax 317/594-1330

Other Locations: Phoenix, AZ; Irvine, CA; Denver, CO; Sarasota & Tampa, FL; Atlanta & Tucker, GA; Chicago, IL; Houston & Dallas, TX

ATLANTIC Relocation Systems

# GEORGE LEWIS' STORAGE BREAKDOWN

**TOTAL CRATES:**             11
**TOTAL WEIGHT:**             13,200LBS.

**PICK UP CHARGES:**              $ 891.00
**STORAGE CHARGES:** (1ST MONTH)  $ 330.00
**STORAGE CHARGES:** (2ND MONTH)  $ 330.00
**WAREHOUSE HANDLING:**           $ 363.00
**CONT. & PACKING:**              $ 905.31

**TOTAL DUE BEFORE DELIVERY**        $2819.31 *

**LOCAL DELIVERY:**              $ 891.00
**SANFRANCISCO DELIVERY:** $7500.00

\* THE CHARGES OF $2819.31 MUST BE PAID IN FULL PRIOR TO
FURNITURE BEING RELEASED FROM ATLANTIC RELOCATION SYSTEMS
WAREHOUSE. PAYMENT MUST BE RECEIVED IN THE FORM OF A
CASHIERS CHECK, MONEY ORDER OR CERTIFIED CHECK.

Agent for ATLAS VAN LINES

Telephone 317/594-1333 • 800/333-0058 • Fax 317/594-1330

Other Locations: Phoenix, AZ; Irvine, CA; Denver, CO; Sarasota & Tampa, FL; Atlanta & Tucker, GA; Chicago, IL; Houston & Dallas, TX



# STATE of INDIANA



**INDIANAPOLIS, 46204-3417**

### DISCIPLINARY COMMISSION
### OF THE
### SUPREME COURT

115 West Washington Street
Suite 1060 South Tower
Phone (317) 232-1807
Fax (317) 233-0261
TDD For Deaf: (317) 233-6111

**DONALD R. LUNDBERG**
EXECUTIVE SECRETARY

October 20, 1999

George M. Lewis, M.D.
2753 Kaanapali Drive
Fairfield, California 94533

Dear Dr. Lewis:

Your Request for Investigation concerning attorney Lorraine A. Hitz-Bradley was received by this office on October 6, 1999.

This matter was considered by this office. After reviewing the complaint, we have determined that it does not raise a substantial question of misconduct that would warrant disciplinary action. Therefore, the complaint has been dismissed.

Thank you for bringing this matter to the attention of the Disciplinary Commission.

Sincerely,

Donald R. Lundberg
Executive Secretary

DRL/jw

# STATE of INDIANA



**INDIANAPOLIS, 46204-3417**

### DISCIPLINARY COMMISSION
### OF THE
### SUPREME COURT

**DONALD R. LUNDBERG**
EXECUTIVE SECRETARY

115 West Washington Street
Suite 1060 South Tower
Phone (317) 232-1807
Fax (317) 233-0261
TDD For Deaf: (317) 233-6111

October 20, 1999

George M. Lewis, M.D.
2753 Kaanapali Drive
Fairfield, California 94533

Dear Dr. Lewis:

Your second Request for Investigation concerning attorney Kenneth C. Kern was received by this office on October 5, 1999.

This matter was considered by this office. After reviewing the complaint, we have determined that it does not raise a substantial question of misconduct that would warrant disciplinary action. Therefore, the complaint has been dismissed.

Thank you for bringing this matter to the attention of the Disciplinary Commission.

Sincerely,

Donald R. Lundberg
Executive Secretary

DRL/jw



# Indiana Judicial Nominating Commission
# Indiana Commission on Judicial Qualifications

115 West Washington Street  Suite 1080
Indianapolis, Indiana 46204-3417
(317) 232-4706
FAX (317) 233-6586

November 17, 1999

Dr. George M. Lewis
2753 Kaanapali Drive
Fairfield, CA 94533

     Re:    Complaint against Commissioner Barbara Collins, Marion Superior Court

Dear Dr. Lewis:

The Indiana Commission on Judicial Qualifications has received your complaint against Commissioner Collins. The complaint will be added to the Commission's agenda and, as soon as a decision is reached in your case, you will be notified. The Commission members will review the basis of your written complaint. If you want to add to your complaint or for any reason communicate with the Commission members or staff, please be sure to do so in writing.

The procedure followed by the Commission is found in IC 33-2.1-6-9, and Admission and Discipline Rule 25, which requires the Commission to furnish a copy of your complaint to the judge at some point during the course of its review and resolution of your complaint. All papers filed with the Commission and the substance of any Commission action taken, unless formal charges are filed by the Commission, are kept confidential by the Commission. Pursuant to Indiana Supreme Court Admission and Discipline Rule 25 VIII D, you are immune from civil suit against you based on the content of your allegations of judicial misconduct, if made without malice, only to the extent those allegations are made to the Commission. Therefore, you are not immune from civil suit for any allegations you make public or which you communicate to any entity other than the Commission.

The Qualifications Commission does not have the authority to intervene on your behalf or to change a decision entered by a court. Most disputes about the merits of a judge's decision are outside the Commission's jurisdiction. If the Commission were to determine that judicial misconduct occurred, the determination would not have a direct impact on your case; instead, it would constitute a disciplinary matter between the judge and the Commission. If you have any questions about this, I urge you to discuss them with an attorney. Neither the Qualifications Commission nor its staff can give you legal advice.

                    Sincerely,

                    Meg Babcock
                    Counsel

MB/db



# Indiana Judicial Nominating Commission
# Indiana Commission on Judicial Qualifications

115 West Washington Street  Suite 1080
Indianapolis, Indiana 46204-3417
(317) 232-4706
FAX (317) 233-6586

December 8, 1999

Mr. George M. Lewis
590 Versailles Lane
Suisun, CA 94585

Re:     Complaint against Judge Wayne A. Sturtevant, Hamilton Superior Court 5

Dear Mr. Lewis:

The Indiana Commission on Judicial Qualifications has received your complaint against Judge Sturtevant. The complaint will be added to the Commission's agenda and, as soon as a decision is reached in your case, you will be notified. The Commission members will review the basis of your written complaint. If you want to add to your complaint or for any reason communicate with the Commission members or staff, please be sure to do so in writing.

The procedure followed by the Commission is found in IC 33-2.1-6-9, and Admission and Discipline Rule 25, which requires the Commission to furnish a copy of your complaint to the judge at some point during the course of its review and resolution of your complaint. All papers filed with the Commission and the substance of any Commission action taken, unless formal charges are filed by the Commission, are kept confidential by the Commission. Pursuant to Indiana Supreme Court Admission and Discipline Rule 25 VIII D, you are immune from civil suit against you based on the content of your allegations of judicial misconduct, if made without malice, only to the extent those allegations are made to the Commission. Therefore, you are not immune from civil suit for any allegations you make public or which you communicate to any entity other than the Commission.

The Qualifications Commission does not have the authority to intervene on your behalf or to change a decision entered by a court. Most disputes about the merits of a judge's decision are outside the Commission's jurisdiction. If the Commission were to determine that judicial misconduct occurred, the determination would not have a direct impact on your case; instead, it would constitute a disciplinary matter between the judge and the Commission. If you have any questions about this, I urge you to discuss them with an attorney. Neither the Qualifications Commission nor its staff can give you legal advice.

Sincerely,

Meg Babcock/da

Meg Babcock
Counsel

MB/db

believe an attempt was made on my life by exposing me to a toxic substance in the liquid soap I used, which produced Congestive Heart Failure. I survived, but barely. I reported these events to the Justice Department. At first, I was sure that the illegal monitoring of my cellular telephone had stopped. However, I realized that my computer was being continually hacked. Files were destroyed or stolen, my access to familiar web sites denied, my email disrupted (all violations of the Computer Fraud and Abuse Act). During the week of April 29, 2003, as I prepared for the FOIA hearing on the motion for summary judgment, I believe my close friend, Dianne Curran's cellular telephone was illegally wire tapped (425-681-8511) and our conversations monitored (another violation of federal electronic monitoring laws).

My hope is that Senator Bayh's office did not use his position on the Senate Intelligence Committee to facilitate, directly or indirectly, any of these punitive activities towards me. One of the most serious complaints I submitted to the TIGTA and to Senator Grassley concerned a man named Mr. Jay Pewthers. Under the guise of helping me resolve an Offer-in-Compromise, Mr. Pewthers induced me to open an illegal bank account in Sacramento, California. He told me that he worked for the Phoenix Group, a consulting organization based in Huntsville, Alabama, that I now believe has extensive federal private contracts. This organization's expertise is in the field of conducting "counterintelligence" operations for business and government agencies. However, I think Phoenix, or an organization like it, has been engaged in an ongoing pattern of harassment and abuse, attempting to thwart my efforts to gain access to the documents I am entitled to see through FOIA. Furthermore, I believe the Mr. Bayh exercised his power on the Senate Intelligence Committee to protect his friends and supporters in Indiana who have broken the law.

I am concerned about the recent reports that private collection agencies were under consideration to replace IRS in the area of collections of back taxes. In my humble opinion, that would be a disaster. Mr. Pewthers told me that the Phoenix Group's philosophy was honed during the Viet Nam war. He said that they were trained to do anything necessary to control the citizenry, influence the outcomes of political elections, using torture, entrapment, misinformation, psychological manipulation, and assassinations to achieve their goals. I believe this is happening, here, today, in America. I raise this point only because I believe Senator Bayh may have misused his position as a member of the Intelligence Committee.

Sincerely,


George M. Lewis, M.D.

FN 12, 13



ZoneAlarm Pro Alert

**How useful was this article?**
○ Very  ○ Somewhat  ○ Not at all    Let Us Know

Provide more feedback

## AlertAdvisor

Overview | Technical I

Report Info    Whois Detail    Location Details    Event Reporting

**STAY INFORMED**

**who** is connected to your machine?

**where** are they connecting from?

**what program** is being used?

Get a complete profile of vital information about active connections to your PC and much more.

**New connection utility available**

More Info



### Whois Report from Zone Labs

**Details about 205.58.228.162, the IP address of the computer that caused the alert you received from ZoneAlarm Pro, are provided in the Whois report below. The information in the Whois report comes from the Regional Internet Registry (RIR) for the region where 205.58.228.162 is located: ARIN, RIPE, LACNIC or APNIC. The name of the RIR appears in the Whois report.**

**The Whois report includes the name, address and contact information for the Internet Service Provider (ISP) that administers the block of IP addresses that contains 205.58.228.162. The report probably does not list the administrator of the specific computer at IP address 205.58.228.162.**

**You should not assume that individuals listed in this report are responsible for the alert you received on your computer.**

Top of page

Ma

Click o
find th
this a

### Whois Information

```
OrgName:    DoD Network Information Center
OrgID:      DNIC
Address:    7990 Science Applications Ct
Address:    M/S CV 50
City:       Vienna
StateProv:  VA
PostalCode: 22183-7000
Country:    US

NetRange:   205.0.0.0 - 205.117.255.255
CIDR:       205.0.0.0/10, 205.64.0.0/11, 205.96.0.0/12, 205.112
NetName:    JMCIS-BLOCK
NetHandle:  NET-205-0-0-0-1
Parent:     NET-205-0-0-0-0
NetType:    Direct Allocation
NameServer: NCC.NCTS.NAVY.MIL
NameServer: GATE.NCTS.NAVY.MIL
NameServer: NS1.NOSC.MIL
Comment:    DOD Network Information Center
Comment:    Space and Naval Warfare Systems
Comment:    Washington, DC 20363-5100 US
RegDate:
Updated:    2004-09-20

TechHandle: LS529-ARIN
TechName:   Slade, Lawana
```

FN #1, #3, #5, #4, #17, #18

```
TechPhone:    +1-850-452-7562
TechEmail:    LSLADE@nnic.navy.mil

OrgTechHandle: MIL-HSTMST-ARIN
OrgTechName:   Network DoD
OrgTechPhone:  +1-703-676-1051
OrgTechEmail:  HOSTMASTER@nic.mil

# ARIN WHOIS database, last updated 2005-06-21 19:10
# Enter ? for additional hints on searching ARIN's WHOIS databa
```

**Report Event Information**
Powered by
**my | NetWatchman**

View open incidents for "205.58.228.162"

You have the option to anonymously submit information about this event for aggregat
event aggregator will:

- Gather intrusion event information from multiple parties.
- Analyze all the aggregated event information.
- Escalate the events to their respective sources as necessary.

To report your inbound firewall event information, click the submit button below. To vi
the IP tied to this firewall event, click on the "View open incidents" link below.

148.201.0.0. – 148.250.255.255

One or two years of access to updates, support, and services included with purchase of Zone Labs software; annual maintenance contract required for subsequent access.

Copyright ©1999-2005 Zone Labs, LLC, 475 Brannan Street, San Francisco, CA 94107, USA.
All rights reserved. All other trademarks are the property of their respective owners.

**Privacy Policy**

Microsoft MapPoint Terms of Use, Privacy Statement

FN 1,3,4,5, 17, 18