IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**George M. Lewis, M.D.**
George M. Lewis, M.D., Pro Se
7095 Hollywood Blvd.
# 1245
Hollywood, Ca. 90028
323-512-0198

**RECEIVED**

OCT 3 0 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

*Plaintiff*      CASE No. 1:07-CV-0939 (RMU)

**Memoranda submitted in Opposition to Defendant's Second Motion to Dismiss Pursuant to Fed. Rules Civil Proc. Rule 56 (F)**

vs.

**Senator Evan Bayh, United States Senator from Indiana**
           *Defendant*
_____/

**COMES NOW** George M. Lewis, M.D., appearing Pro Se, who submits these four affidavits to this honorable court (Haines v. Kener 1972 401US 519, 30L Ed. 2d 652 92 S. Ct. 594), in support of his motion in opposition to defendant's [second] motion to dismiss Plaintiff's Amended Civil Complaint for damages pursuant to 28 U.S.C. 1983, 1985, and 1986.

Respectfully submitted,

George M. Lewis, M.D.
Pro Se

Date

10/20/07

# PROOF OF SERVICE

I certify that the counsel for defendant Senator Evan Bayh has been served a true and accurate copy of this pleading via USPS, Priority Postage at his official business address at:

Mr. Morgan Frankel
United States Senate Counsel
131 Hart Senate Office Building
Washington, D.C. 2005

Respectfully submitted,

George M. Lewis, M.D.

10/20/07

George M. Lewis, M.D.
7095 Hollywood Blvd. # 1245
Hollywood, Ca. 90028
323-523-0298 (O)

# AFFIDAVIT

October 24, 2007

I swear under the penalty of perjury that these "four documents" are true and correct copies of the emails I exchanged with the Inspector General of the Department of Justice. I sent three emails over the Internet to the Inspector General on November 15, November 22, and November 25, 2002. I received one email in response to my inquiries from the Inspector General, Mr. Glenn Fine, dated December 15, 2002. The onset of life-threatening cardiac symptoms began around the time I submitted the November 15 email and the symptoms increased in severity, until I was admitted to the Cardiac Intensive Care Unit on December 26, 2002.

I felt my life was in danger. I believed someone in the government wanted to suppress what I had to say, to silence me, and kill me. I believe this was done in retaliation for having filed a F.O.I.A. request for documents the government didn't want me to see. And, for filing allegations about the illegal electronic monitoring of my cellular telephone that might have exposed a secret government surveillance program, run without the approval of the F.I.S.A. courts, the congress, and in contravention of Fourth Amendment guarantees of privacy in the United States Constitution.

I shared my concerns about the threats to my life and the illegal wiretaps with my attorney Mr. Lee Matthews. I also told the Pre-Trial Services officer Lisa Lozzano about the attempted murder because I met with her regularly met after I

was discharged from USC Medical Center. And, I shared this information with several close personal friends and family members.

As I stated in the civil complaint, because I had not received a response from the Office of Professional Responsibility by 2007, I spoke with a clerical person named Cynthia. She confirmed the complaints had been referred to the OPR by the Inspector General's office. She said reports had been generated connected with my three online complaints. She said the department did not respond to complaints submitted over the Internet. She advised me to submit a written request for these documents to the Department of Justice Office of Professional Responsibility. I did this in June 2007 and when I had not received a response by August 2007, I called the OPR again and was told they had no record of having received my request.

Respectfully Submitted,

George M. Lewis, M.D.

10/24/07

Subscribed & sworn to before me this Oct 24 2007
by GEORGE M. LEWIS
Proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.

Notary Public (Signature)

SALLY J. KIM
Commission # 1519304
Notary Public - California
Los Angeles County
My Comm. Expires Nov 11, 2008

Oct-13-2007 02:49 From-FedEx Kinko's at Bothell 425-483-0901 Case 1:07-cv-00909-RMU Document 17-2 Filed 10/30/2007 T-701 P.002/006 F-153 Page 3 of 16

Page 1 of 1

**From:** "George Lewis" <percipience@mindspring.com>
**To:** <inspector.general@usdoj.gov>
**Sent:** Friday, November 15, 2002 9:02 PM
**Subject:** Re: Abuse of Plaintiff in CV 02-3249

Dear Mr. Fine,

Please consider this a follow-up on my original request for an investigation and not a separate complaint. I wanted to provide you some background that might be useful in determining the truth.

1. In July 2001, IRS was aware that I intended to pursue a FOIA request of 62-0103-0074, 62-0105-0034, 51-9912-0089, 55-0104-0002, in addition to one additional investigative report.
2. In August 2001, I began searching for a company that processed credit card charges. I was originally directed to Cardservice International. After inquiring about their requirements, I learned that my credit history was too risky for them to grant me the services I wanted. I was transferred to BankCard USA because they dealt with customers that were considered credit risks. BankCard USA still required me to have a co-signer in order to qualify for their service, which started in October 2001.
3. In September 2002, the co-signer, who also happened to be working for me, decided to leave my medical practice and I was informed by BankCard that I would have to reapply for a merchant account number. I submitted that application on September 25, 2002. Since I had a year's excellent history, I was told that I would not have to provide another co-signer. My contact was Mr. Shay (800-589-8200).
4. In October 2002, Mr. Shay asked me to fill out another application with Cardservice International, saying that they often worked together. I submitted the application to Cardservices on October 14, 2002 and my contact was Ms Peggy Skelton (800-456-5969).
5. In October 2002, I contacted Cardservices and was given a bit of their organizational history. A group of former BankCard USA employees saw an opportunity to offer services to credit-challenged clients that had been turned down by Cardservice International and spun off a new organization a half dozen years or so ago. I confirmed this later in a conversation with Ms. Skelton who also wondered why my application had gone to Cardservices when BankCard USA was set up to service with credit histories exactly like mine.
6. On November 7, my application was approved by Cardservice International.

The best types of sabotage are the hardest to uncover and I am alleging that Mr. Zarin and others colluded to create financial hardship for me since the time I filed a complaint for access to government documents under the FOIA. The forty-four day delay in approving my a merchant account application had very disastrous financial consequences for me professionally and personally. I feel this is an indirect form of harassment. In addition, a number of other "unusual", "damaging" and "disruptive" events have happened to me since April 19, 2002 when I filed my FOIA request in the Los Angeles Federal District Court. I would be glad to discuss these issues at length, if you so wish.

Also, Special Agent Brian Goold informed me that Mr. Pewthers had no relationship at all with the government and was described as a "tax-activist". However, this does not explain the criminal conduct of the bank employees who encouraged me to open an illegal account. I am not claiming the Wells Fargo Bank did anything wrong in assessing the applicable fees and late charges. However, Assistant Vice President Bert Dodge and Personal Banker Candi McCoy were either working with and for the government, which Mr. Goold denies, or they are guilty of working with Mr. Pewthers in setting up illegal accounts. I am requesting that you investigate the circumstances surrounding the Justice Department's handling of these individuals in particular. Either they worked on behalf of the government in depriving me of my civil and constitutional rights, or they are criminals that should be prosecuted. If I am wrong, I am willing to be a witness for the government.

Please respond and let me know what disposition has been reached.

FN 3,4,5,11

1/23/05

Oct-13-2007 10:49 From-FedEx Kinko's at Bothell 425-483-0001 T-707 P.003/006 F-153
Case 1:07-cv-00935-RMU Document 17-2 Filed 10/30/2007 Page 4 of 16
Page 1 of 1

From: "George Lewis" <percipience@mindspring.com>
To: <inspector.general@doj.gov>
Sent: Friday, November 22, 2002 1:02 PM
Subject: re: Plaintiff abuses in CV 02-3249

Department of Justice
Office of the Inspector General
Washington, D.C.

November 22, 2002

Dear Mr. Fine:

I never received an acknowledgment from your office about the two previous emails I sent on November 13 and 14, 2002. I will forward them to you via USPS to insure that you have hard copies as well. In addition, I wanted to inform you of the other incidents I alluded to, but did not specify earlier. I believe these incidents were all part of the government's multiple attempts to thwart my efforts to move the FOIA complaint forward. While my requests for documents had been handled in a timely manner by the Treasury Department, I began searching for an attorney in February 2002. I contacted the Los Angeles Bar Association referral line more than a half dozen times to find a lawyer. Each time, I spoke with a woman named Frenerty (sp. ?) who told me that there were no attorneys in Los Angeles familiar with FOIA law. I finally asked a friend to contact the lawyer referral line and she obtained the name of Richard Knickerbocker on her first call. He filed the FOIA complaint on April 19, 2002 (CV 02-3249). Mr. Knickerbocker and I had some communication problems, but the government made a timely response in July 2002. However, after that experience I fired him. Again, I called Frenerty at the Los Angeles Bar referral beginning in July and during the ensuing two months she made one referral to someone who didn't do FOIA appeals. Meanwhile, Mr. Zarin and Mr. Knickerbocker encouraged me to represent myself to meet Federal Court deadlines. I believe my access to legal representation through the Bar referral service was intentionally blocked by the government until I was able, with the help of a friend, to find an attorney to represent me.

Finally, I believe that my cellular telephone continues to be electronically monitored during a time that I am not under investigation for any crime and have been in compliance with Pretrial Services and the Court's orders. My original FOIA request (CV 02-3249) sought information about two other instances when I discovered that the government had placed wiretaps on my cellular telephone. This first occurred in April 2000 and I reported a second instance in December 2001, both times providing the numbers that computers had erroneously identified as my own. I think the government has gone too far in attempting to thwart my efforts to obtain the FOIA documents. After two years of experiencing dropped calls, interruptions, strange clicks, and hollow sounding echoes, I had a brief period of respite. Recently, calls that I have made have been dropped or interrupted by a distinct deadening pause about nine minutes into the conversation. This has been so noticeable that my clients and friends have routinely joked about big brother listening in. The discontinuity in the quality of sound is one thing, but the continued abrogation of my rights to privacy is illegal and a violation of my civil and constitutional rights. Thanks for your prompt attention. I would appreciate a reply.

George M. Lewis, M.D.
percipience@mindspring.com

FN 3, 4, 5, 11

1/23/05

Oct-13-2007 10:49 From-FedEx Kinko's at Bothell 425-483-0901 T-701 P.004/006 F-153
Case 1:07-cv-00939-RMU    Document 17-2    Filed 10/30/2007    Page 5 of 16

Page 1 of 1

**From:** "George Lewis" <percipience@mindspring.com>
**To:** <inspector.general@usdoj.gov>
**Sent:** Monday, November 25, 2002 3:29 PM
**Subject:** Re: Abuse of Plaintiff in CV 02-3249

Department of Justice
Office of the Inspector General
Washington, D.C.

November 22, 2002

Dear Mr. Fine:

I never received an acknowledgment from your office about the two previous emails I sent on November 13 and 14, 2002. I will forward them to you via USPS to insure that you have hard copies as well. In addition, I wanted to inform you of the other incidents I alluded to, but did not specify earlier. I believe these incidents were all part of the government's multiple attempts to thwart my efforts to move the FOIA complaint forward. While my requests for documents had been handled in a timely manner by the Treasury Department, I began searching for an attorney in February 2002. I contacted the Los Angeles Bar Association referral line more than a half dozen times to find a lawyer. Each time, I spoke with a woman named Frenerly (sp. ?) who told me that there were no attorneys in Los Angeles familiar with FOIA law. I finally asked a friend to contact the lawyer referral line and she obtained the name of Richard Knickerbocker on her first call. He filed the FOIA complaint on April 19, 2002 (CV 02-3249). Mr. Knickerbocker and I had some communication problems, but the government made a timely response in July 2002. However, after that experience I fired him. Again, I called Frenerly at the Los Angeles Bar referral beginning in July and during the ensuing two months she made one referral to someone who didn't do FOIA appeals. Meanwhile, Mr. Zarin and Mr. Knickerbocker encouraged me to represent myself to meet Federal Court deadlines. I believe my access to legal representation through the Bar referral service was intentionally blocked by the government until I was able, with the help of a friend, to find an attorney to represent me.

Finally, I believe that my cellular telephone continues to be electronically monitored during a time that I am not under investigation for any crime and have been in compliance with Pretrial Services and the Court's orders. My original FOIA request (CV 02-3249) sought information about two other instances when I discovered that the government had placed wiretaps on my cellular telephone. This first occurred in April 2000 and I reported a second instance in December 2001, both times providing the numbers that computers had erroneously identified as my own. I think the government has gone too far in attempting to thwart my efforts to obtain the FOIA documents. After two years of experiencing dropped calls, interruptions, strange clicks, and hollow sounding echoes, I had a brief period of respite. Recently, calls that I have made have been dropped or interrupted by a distinct deadening pause about nine minutes into the conversation. This has been so noticeable that my clients and friends have routinely joked about big brother listening in. The discontinuity in the quality of sound is one thing, but the continued abrogation of my rights to privacy is illegal and a violation of my civil and constitutional rights. Thanks for your prompt attention. I would appreciate a reply.

George M. Lewis, M.D.
percipience@mindspring.com



9/28/03

Oct-13-2007 10:50 From-FedEx Kinko's at Bothell 425-483-0901 T-701 P.006/006 F-153
Case 1:07-cv-00939-RMU    Document 17-2    Filed 10/30/2007    Page 8 of 16

Page 1 of :

## George Lewis

**From:** "General, Inspector" <Inspector.General@usdoj.gov>
**To:** <percipience@mindspring.com>
**Sent:** Friday, December 13, 2002 8:46 AM
**Subject:** RE: Harassment of Plaintiff in CV 02-3249

Dear Mr. Lewis:

The purpose of this letter is to acknowledge receipt of your Internet submission dated November 14, 2002. The matters that you raised are more appropriate for review by another office or Agency. Therefore, your complaint has been forwarded to:

United States Department of Justice
Office of Professional Responsibility
950 Pennsylvania Avenue NW
Washington, D.C. 20530

Any further correspondence regarding this matter should be directed to that office.

I hope this answers any questions you have relative to this matter.

Sincerely,

The Office of the Inspector General
Department of Justice


-----Original Message-----
From: George Lewis [mailto:percipience@mindspring.com]
Sent: Thursday, November 14, 2002 4:15 AM
To: General, Inspector
Subject: Re: Harassment of Plaintiff in CV 02-3249

<< File: tmp.htm >>

# AFFIDAVIT

Dianne E. Curran
21616 – 9th Avenue S.E., #C-101
Bothell, Washington 98021
425.681.8511

I, Dianne E. Curran, have been asked to submit this affidavit under penalty of perjury.

Between August 2002 and September 2003 I assisted George M. Lewis, M.D. in his private neuropsychiatry practice in Fountain Valley, California in the role of volunteer patient care coordinator. Since I live in Washington State, most of my communication with Dr. Lewis and his patients was via phone, and less frequently, e-mail. Approximately once a month I came to Fountain Valley to take care of filing, additional paperwork and special projects on an as need basis. During this time I began having some very unusual and unnerving experiences primarily in California, but also in Washington State.

The following list is an overview of the experiences that directly impacted me:

- Upon arrival at local airports, I became increasingly curious why it seemed to take longer for my rental car to be ready for me than the customers ahead of me in line. Occasionally, the rental agent would indicate' there was some small item that was still being taken care of on my vehicle'. It happened often enough I began wondering if some type of detection device was being installed so my location activity could be monitored.
- Time was at a premium for me while in California, so I sometimes worked until evening, and when it was dark, I often noticed that a car appeared to be following me between the office and the hotel. I was unable to obtain a license number, but occasionally I would take a different route back to the hotel, or get off at an earlier exit than I needed, then re-enter the freeway, and it still appeared I was being followed.

- On several occasions I noticed I had a 'helicopter escort' [the type with the 'search light'] home from the office.
- I also noticed frequent helicopter activity that seemed uncannily targeted directly at me both day and night no matter where I was in the greater Los Angeles area.
- One evening at dusk I was leaving the Seal Beach area in my rental car. I was the first vehicle in line waiting for a red light at an intersection on the Pacific Coast Highway, and suddenly an extremely bright flash from inside the car directly across the street caused me to blink several times. I remember wondering at the time if someone might be attempting to photograph me, my license plate or any passenger(s) in the car.
- Throughout this time I had repeated challenges with my cell phone both at home in Washington State, in California, or wherever I was, despite numerous calls to my provider and several equipment changes too. In particular I experienced an extremely high number of dropped calls, as well as background static and an 'underwater whooshing' on the line.
- The challenges with my cell phone were the most frequent when I was talking with Dr. Lewis, however I also noticed them when talking with his patients, my own clients, and when making other professional and personal calls as well. I was (and still am) very concerned about the real possibility that both Dr. Lewis' phone lines and mine as well have been compromised by surveillance and the impact that has on each of us professionally and personally.
- Many times during this period my computer malfunctioned for no apparent reason despite adequate software and security systems. Without warning I lost all or part of a word processing document, had unexplainable formatting errors, experienced unusual e-mail errors and deletions, and sometimes I could no longer access a website that I had been able to previously access.

The following is a list of the experiences I observed that directly impacted George M. Lewis while I was on site during my routine monthly office visits to Fountain Valley, California, or that he mentioned to me during cell phone conversations between us during this same period of time, August 2002 – September 2003:

- Dr. Lewis experienced similar cell phone challenges to the ones I did, as well as challenges with land lines during this time period. However, the challenges he experienced were much more invasive as well as more extreme in both frequency and complexity.

2

- He also experienced a series of bizarre errors, malfunctions, deletions and omissions with his computer despite installation of adequate software and security measures. Again his computer challenges were exacerbated exponentially compared to what I experienced.
- We were both concerned about the suspicious cell phone challenges we were both experiencing, and in the increases in particular during my monthly office visits to California, so we were extra cautious when we talked between ourselves 'locally' on our cell phones.
- On one occasion, just moments after a very brief and 'cryptic' call confirming a meeting location; Dr. Lewis was stopped by a local law enforcement officer and issued a ticket. Because of the timing following our call, coincidence was not difficult to rule out in this situation. It was obvious to us that there must either be some type of electronic connection between our phones or our vehicles alerting the officer.
- Whenever I was in Dr. Lewis' Fountain Valley Office, the helicopter 'hovering' increased significantly. One time we were walking across a parking lot and it both looked and felt like the helicopter was going to land right next to us.

I swear the above to be true and correct.

Respectfully Submitted,

Dianne E. Curran     October 5, 2007

*Dianne E. Curran*

3

## WASHINGTON SHORT-FORM INDIVIDUAL ACKNOWLEDGMENT (RCW 42.44.100)

State of Washington  } ss.
County of  Snohomish  

I certify that I know or have satisfactory evidence that __Dianne E. Curran__
Name of Signer

is the person who appeared before me, and said person acknowledged that he/she signed this instrument and acknowledged it to be his/her free and voluntary act for the uses and purposes mentioned in the instrument.

Dated: __October 5, 2007__
Month/Day/Year

__Patricia A Badura__
Signature of Notarizing Officer

__Notary Public__
Title (Such as "Notary Public")

My appointment expires

__July 28, 2009__
Month/Day/Year of Appointment Expiration

Place Notary Seal Above

[Notary Seal: Notary Public State of Washington PATRICIA A BADURA My Appointment Expires Jul 28, 2009]

──────── OPTIONAL ────────

*Although the information in this section is not required by law, it may prove valuable to persons relying on the document and could prevent fraudulent removal and reattachment of this form to another document.*

**Description of Attached Document**

Title or Type of Document: __Affidavit__

Document Date: __Oct. 05, 2007__  Number of Pages: __Three__

Signer(s) Other Than Named Above: __no other signers__

Right Thumbprint of Signer
Top of thumb here

© 1999 National Notary Association • 9350 De Soto Ave., P.O. Box 2402 • Chatsworth, CA 91313-2402 • www.nationalnotary.org
Item No. 5906 • Reorder: Call Toll-Free 1-800-876-6827

# Affidavit

Tricia Woodard                                          October 9, 2007
2740 Amherst Street
Indianapolis, Indiana 46268
317-802-9399

    I, Tricia Woodard, have been asked to provide a sworn statement regarding the circumstances surrounding the eviction from 9516 Geist Road, Fishers, Indiana, on July 9, 1998. It had been my residence since 1995. I was thoroughly familiar with all the contents in the house, all the furniture, equipment, tools, appliances, personal belongings, and recreational items. I had lived there with George M. Lewis, M.D., and our children Gabrielle M. Lewis, and Neil Lewis. All of us had been present at different times of the day during July 9, 1998. The children and left and returned several times, but George stayed throughout the packing, until he was told by the Deputy Sheriff that he had to leave or face going to jail.

    I watched the Atlantic Relocations movers pack, inventory, and load our belongings onto a "Moving Truck". With the permission of the Deputy Sheriff on the premises, I was allowed to remove some personal items that we would need immediately. I took several trips throughout the afternoon to complete this. The Deputy Sheriff told us that our household belongings would be placed in storage at Atlantic Relocations where we could have access to everything after the eviction had been completed.

    We went to Atlantic Relocations in August, where we attempted to retrieve belongings suitable for our needs. It was difficult to judge just what items were present because all of our household goods had been stored in very, very large wooden crates/containers. Because I could not visually satisfy myself that all of our belongings were in the AR warehouse, I drove back to the Geist Road house to inspect it for myself.

    The house was secured and I did not attempt to enter it. Looking inside was difficult because its construction emphasized privacy. However, through a

door on a deck in the back of the house, I saw our seven-foot pool table was still in the same location it had stood in during the previous three years. Also, a large sectional couch was there in the recreation room where it had always been. When George questioned Atlantic Relocations about my findings, he was told that I must have been mistaken because everything had been moved as the court had ordered on July 9, 1998.

But I knew that I saw. Our personal belongings were still in that house more than a month after the eviction was supposed to have taken place. We moved to California September 19, 1998 and Atlantic Relocations charged George storage fees for our belongings, all the while maintaining that <u>everything</u> had been moved out. Our household goods remained in storage until May 1999. I had moved back to Indianapolis and George remained in California. When our belongings were shipped to California in 1999, the pool table and the sectional couch, among many other items were not present.

I swear under the penalty of perjury that the above is true and correct statement.

Respectfully Submitted,                     Date:

*Tricia Woodard* (signature)

Tricia Woodard

State of Indiana ) ss:
County of Marion )

*Jamie L. Morris* (signature)                Date: 10/09/07
Notary Public, Jamie L Morris

My Commission Expires: 05/22/09

CV-9:07-0939 (RMV)

# AFFIDAVIT

Ms. Wendy Moldovan                                October 23, 2007
5512 Kern Drive
Huntington Beach, Ca. 92649

Re: George M. Lewis, M.D.

    I have been asked by George Lewis, M.D. to provide a sworn statement regarding the rapid and unexplained deterioration in his health that occurred in 2002. I have been a Registered Nurse for 31 years and, during my career, I have staffed positions in every professional area and held positions ranging from critical care nursing to administration/management.

    I have always known Dr. Lewis as a person of great integrity, who also demonstrated a great deal of concern about his own health and the health of others. I had daily contact with him and was familiar with his habits and patterns of behavior during most of 2002.

    Until the late fall of 2002, I can attest to the fact that he had been physically active. Dr. Lewis maintained a healthy diet, and took supplements that were health enhancing. He played golf regularly (usually walking each course rather than riding in a cart), went swimming, walked for exercise and fitness, and generally, enjoyed excellent health.

In November 2002, Dr. Lewis told me that he was experiencing some unusual symptoms and asked for my opinion and help. He was exhausted in the mornings when he woke up. After taking a shower, he had to lie down for a two-hour nap. He stopped playing golf. He was not able to keep pace with a small woman (I'm 5'4") walking through a suburban shopping mall. He had trouble climbing a single flight of stairs without stopping for rest; and he said it felt like he was going to drown whenever he lied down to sleep. These symptoms were of sudden onset and they appeared to be those of "end-stage" congestive heart failure, except that he did not have any of the normal symptoms one would have usually seen leading up to this stage (swelling in the extremities, ankle edema, jugular vein distention, etc.)

He was not obese; he has never smoked; he did not abuse alcohol; he did not take illegal drugs; he was not sedentary; and he did not lead a destructive life-style. Dr. Lewis did not have a history to hypertension, diabetes, or coronary artery disease. We discussed possible causes for his symptoms in November and December 2002, as he got progressively worse. But his symptoms did not fit a pattern that was indicative of any medical condition I was familiar with. He continued to deteriorate in late November and early December.

Around Christmas 2002, Dr. Lewis was in fear for his life. He believed someone had been trying to poison him and trying to kill him with an unknown substance that was difficult to identify. For reasons no one seemed to be able to explain, his health rapidly declined, until on December 26, 2002, Dr. Lewis went into USC/LAC Cardiac Intensive Care and was diagnosed with Congestive Heart Failure. The cardiac catheterization of his coronary vessels was normal; his laboratory tests were within normal limits, as well. However, the Echocardiogram revealed an abnormal ejection fraction, one that was consistent with severe, chronic CHF.

I swear under penalty of perjury that I have seen and experienced the events described here, and they are my true recollections of what happened leading up to Dr. Lewis' hospitalization in December 2002.


Submitted by:

*Wendy S. Moldovan*

Wendy S. Moldovan, R.N.
[California License # 292136]

# CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT

State of California

County of __Orange__

On __Oct. 24, 2007__ before me, __Sergio Medina notary public__,
           Date                          Name and Title of Officer (e.g., "Jane Doe, Notary Public")

personally appeared __Wendy Susan Moldovan__
                                    Name(s) of Signer(s)

☐ personally known to me

☑ (or proved to me on the basis of satisfactory evidence)

to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

Signature __Sergio Medina__
           Signature of Notary Public

[Notary Seal: SERGIO MEDINA, Commission # 1753849, Notary Public - California, Orange County, My Comm. Expires Jun 26, 2011]

Place Notary Seal Above

———————————— OPTIONAL ————————————

Though the information below is not required by law, it may prove valuable to persons relying on the document and could prevent fraudulent removal and reattachment of this form to another document.

**Description of Attached Document**

Title or Type of Document: __Affidavit__

Document Date: __Oct. 23, 2007__    Number of Pages: __3__

Signer(s) Other Than Named Above: _____

**Capacity(ies) Claimed by Signer(s)**

Signer's Name: _____
☑ Individual
☐ Corporate Officer — Title(s): _____
☐ Partner — ☐ Limited ☐ General
☐ Attorney in Fact
☐ Trustee
☐ Guardian or Conservator
☐ Other: _____

Signer Is Representing: _____

RIGHT THUMBPRINT OF SIGNER
Top of thumb here

Signer's Name: _____
☐ Individual
☐ Corporate Officer — Title(s): _____
☐ Partner — ☐ Limited ☐ General
☐ Attorney in Fact
☐ Trustee
☐ Guardian or Conservator
☐ Other: _____

Signer Is Representing: _____

RIGHT THUMBPRINT OF SIGNER
Top of thumb here

© 2006 National Notary Association • 9350 De Soto Ave., P.O. Box 2402 • Chatsworth, CA 91313-2402    Item No. 5907 v609    Reorder: Call Toll-Free 1-800-876-6827