# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**George M. Lewis, M.D.**
George M. Lewis, M.D., Pro Se
7095 Hollywood Blvd.
# 1245
Hollywood, Ca. 90028
323-512-0198

# RECEIVED

DEC - 3 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

*Plaintiff*

**CASE No. 1:07-CV-0939 (RMU)**

**Memorandum to Defendant's
Motion to Dismiss Pursuant to
Fed. Rules Civil Proc. Rule 56 (f)**

**vs.**

**Senator Evan Bayh, United States
Senator from Indiana**
*Defendant*

_____/

    **COMES NOW** George M. Lewis, M.D., appearing Pro Se, who asks this honor-

able court to accept these two affidavits (Haines v. Kener 1972 401US 519, 30L. Ed. 2d

652 92 S.Ct. 594), that were submitted in opposition to defendant's motion to dismiss

pursuant to Fed. R.Civ Proc. Rule 12 (b).

    In these two affidavits are descriptions of real events and experiences that Plain-

tiff makes under oath about the ongoing misconduct (the continuous tort actions) by de-

fendant Senator Evan Bayh and/or the agents working for, with, or on behalf of defen-

dant.

Respectfully submitted

George M. Lewis, M.D.
Pro Se

11/29/07

## AFFIDAVIT

I swear under the penalty of perjury that the following events are a true, accurate, and faithful account of what took place on Monday, November 26, 2007 while driving to the Seattle-Tacoma airport with Dianne Curran. I am a Verizon cell phone customer and I am using the Call Log from my cellular telephone to document the exact times used in this affidavit. While Ms Curran was behind the wheel, I followed up on our agreement to phone Verizon and request a local dial-up number for her to use in Bellevue, Washington.

I placed the call at 3:34 pm. The way I chose to do this was by calling Verizon from my cellular telephone to obtain my minutes of usage for the billing cycle. After I received those figures, I pressed pound to speak with an attendant. When the attendant came on the line, I explained that I did not need any additional services on my own behalf. I asked for a local dial-up connection that was to be used by someone else with a Verizon account on her computer, using a landline.

The attendant told me to speak with someone in Verizon's Internet Connections Department. She offered to transfer me. I accepted and waited to be connected. A computerized voice answered and asked if I wished to report a problem on number 480-705-8512. I was shocked. My cellular phone number is 310-595-5640. I got the Verizon computer to repeat the question and the same number was identified. I realized <u>the Verizon computer was referencing the cellular number it had determined I was calling from.</u>

I live in Hollywood, California. The Verizon computer identified a number in area code (480). The (480) area code is in Casa Grande, AZ, 373 miles away from my home in California. The call lasted 8 minutes and 53 seconds. I have called this number back sev-

eral times. I have asked friends to call this number as well. The result? I get an immediate request to enter MY Verizon number. Then the line went dead.

I have raised the issue of illegal electronic monitoring of my cellular telephone in the past (See CV-02-3249 FMC; CV-04-2950 AHS; CV-07-0939 RMU). I am not a terrorist, a criminal, a spy, or a fool. I am not a threat to anybody. I have been exercising my constitutional rights to petition the court, unfretted by the unnecessary and unwarranted intrusions of my government into a lawful court proceeding. Since my initial F.O.I.A. request in April 2002, asking for information about the alleged illegal conduct of attorney Kenneth Kern, Steven Siedel, the Hamilton County Sheriff's Department, the Clerk of the Indiana Supreme Court, and Atlantic Relocations Moving and Storage, among others, Senator Evan Bayh and other agents of the government have done everything they possibly could to prevent me from exercising my Constitutional rights to protect my fourth and fourteenth amendment rights.

I am a physician. My patients deserve the same degree of confidentiality that any American citizen should expect when talking to their doctor about personal health care matters. I believe this electronic monitoring has continued-on my cellular telephone-through the use of a mechanism known as a "switching device". This is one of a variety of different technologies used to electronically monitor telephones. This particular method allows the government to place an electronic monitoring device, or wiretap on a line and actually switch all the calls to a separate phone number, unknown by the customer. The government can then retrieve and monitor all of the conversations and record data from a remote location. In rare circumstances, I have found glitches in their attempts

2

to illegally monitor my calls. Each of the past two times I intercepted the switching number on my cellular telephone, I passed the information along to the Department of Justice.

This particular method of monitoring has been in place for several years and its usage is clearly spelled out on the Internet, in publications produced by EPIC. (Washington, D.C.), and other public policy organizations. This is a very complicated and technical subject and I allege that because Senator Bayh, who sits on the Senate Intelligence Committee, has had the opportunity, the motive, and the ability to thwart my efforts, personally, in exactly this way, by ordering the use of this type of sophisticated monitoring device to hinder my ability to prosecute CV:-07-0939 (RMU).

I have alleged that my life has been placed in danger because I have complained publicly about the illegal wiretaps on my cellular telephone. This has had a very chilling effect on my ability to represent myself in this case. It is hard to even imagine the freedom that the government steals from me whenever it surreptitiously monitors my conversations. It thereby derived the ability to use my personal thoughts, feelings, hopes, and plans in ways that might were antithetical to my best interests. I have acted lawfully. I have reported other previous illegal monitoring events to Inspector General Glen Fine in November 2002, and to the courts (See CV-2950 AHS) but I have only been made to feel like I do not matter and the laws (18 USC 2510-2521) did not apply to me.

In *Katz v. United States, 389 US 347 (1967)* the Supreme Court held that the gateway for Fourth Amendment purposes stood at the point where an individual citizen should be able to expect that his or her privacy would not be subject to unwarranted governmental intrusion, *389 U.S. at 353.* Even if temporary legislation permits electronic

3

monitoring under certain well-defined conditions, the ongoing violations of my privacy rights, while I am in this District Court, is unethical, if not unconstitutional.

The government's intrusion into the private lives of its citizens and into their lawful activities is a giant step away from a government based on the Constitution we are supposed to have now. Is this the prelude to the suspension of our Constitution, one civil liberty at a time? I grew up in Colorado where no man or women was larger than the Constitution or the laws. Now, I realize how wrenching those congressional hearings of the 1970's were, but Congress somehow found the fortitude to stop the reckless and capricious abuses of power that threatened everyone's freedom. After the abuse was uncovered, it courageously passed legislation to insure our civil liberties would be protected.

The harsh autocratic spirit of those times goes on. Although, those excesses are a dim memory for many of us, I remember them vividly. I am a link in the chain. I have alleged a conspiracy to violate my rights by men, in particular Senator Evan Bayh, who have used their power to take away my rights. This compels me to fight to hold on to the liberties that were secured for each citizen long before any of us came into this world.

When the District Court weighs these serious matters, hopefully it will appreciate the sobering impact these abuses have had on my sense of justice and fairness. Yet, nothing of value lasts unless it is backed by the will to do what is right. I continue to believe we can preserve the same liberties that were handed down to us to our children, and our children's children, long after we are gone.

Respectfully Submitted,

George M. Lewis, M.D.

11/29/07

Subscribed and sworn to before me this
29 day of NOV. 2007

_____ Notary Public
in and for the County of Los Angeles, State of California

4



MAYRA JULIE SOSSA
COMM. # 1765082
NOTARY PUBLIC - CALIFORNIA
LOS ANGELES COUNTY
MY COMM. EXP. SEPT. 28, 2011

George M. Lewis, M.D.
7095 Hollywood Blvd.
#1245
Hollywood, California 90028
323-512-0198

## **AFFIDAVIT**

I am an African American who has alleged that officials in Hamilton County,
Indiana, motivated by racial animus towards me, violated my fourteenth amendment
rights in 1998. The abuse of my civil rights has led to a cover-up of the official
misconduct that has continued for the past nine years. This cover-up now involves the
recent actions taken by the Carmel City Court and the Hamilton County Prosecutor's
Office to punish me for having the temerity to speak out. I have alleged the Hamilton
County Sheriff's Department (and others in Indianapolis, Indiana) was involved in a
conspiracy to steal my household belongings, and the subsequent conversion of property
that belonged to me.

I believe the motive was avarice, greed, and racial prejudice which were stirred up
against me in this predominately white Indiana community. This happened not only
because I am African American, but because I was also engaged to, and living with a
white woman named Tricia DeMott. I believe that racial animus led to the irrational,
jealous, vindictive, envious, and greedy misconduct of the Hamilton County Deputy
Sheriff's Department, Steven Siedel, attorney Kenneth Kern, those associated with the
Atlantic Relocations Moving and Storage, and the Clerk, Indiana Supreme Court, leading
them to take advantage of my vulnerable financial position. And, at least in the case of
Atlantic Relocations, the misconduct also included criminal wrongdoing, violating 18
U.S.C. 1346.

It is only because I have exhausted all other available means of resolving these issues, and because 1.) This <u>ongoing conspiracy against my rights</u> involves 2.) <u>Public officials in high political office</u>, <u>acting in concert to protect one another</u> [1]by 3.) <u>Retaliating against me</u> for speaking out, have left me with no other choice than to ask the Civil Rights Division to conduct a thorough investigation into these allegations.

### Background

On July 3, 1998, just before the long holiday weekend, the Noblesville Superior Court issued an eviction order in Hamilton County, Indiana. The court's order gave me essentially one day, July 7, 1998, to appeal the decision. My attorney, Kenneth Kern proposed filing a Writ of Habeas Mandamus with the Clerk of the Indiana Supreme Court on July 7, 1998, asking Chief Justice Randal Sheppard to stay the decision. Kern did this to create the verisimilitude of justice when in fact both he and the Clerk, knew the effort was futile. Yet, I paid the filing fee on July 7th and Mr. Kern <u>swore to me</u> that he went back the next morning and filed an appeal, a Writ of Habeas Mandamus to avert eviction.

However, there were <u>two reasons</u> why Kern did not have any possibility of timely filing honorable appeal before the Wednesday, July 8 eviction deadline at 0900.

1.) <u>We</u> arrived at the Indiana Supreme Court late that day. It was around 1600, just before the court closed. In the Clerk's Office, the docket numbers were assigned sequentially, after the fees were paid. However, after inspecting our documents more closely, we were turned away by the Clerk because Kern did not have the appropriate paperwork to file an appeal, i.e. he did not have a signed copy of the transcript signed by Judge James Sturdyvant, the presiding judge. I observed a court staff member blacken out my docket number from the ledger and

---

[1] See letter from Hamilton County Prosecutor

then continue entering a few more cases with sequential docket numbers until the court closed for business that day.

2.) And, when we finally left, it was after the 4:30 pm closing time for the Indiana Supreme Court. Business was done for that day. Although Kern argued otherwise, that left us with no possibility that a Writ of Habeas Mandamus could have been filed and acted upon before the 0900 eviction deadline on the following morning of July 8, 1998. Yet when I later requested a copy of the Indiana Supreme Court's decision, the Clerk mailed me an official looking court document, purportedly signed by Chief Justice Randall Sheppard that was ambiguously time-stamped 7:00, without indicating weather it was a.m. or p.m. And, it had **NO DATE!**

The eviction went forward as planned while Mr. Kern failed to answer my telephone calls until mid-afternoon, at which time he told me that he had filed the Writ that day, shortly after the court opened, but he had not heard anything from Chief Justice Randall Sheppard. He said I needed to focus on getting my belongings off the premises. Steven Siedel owned the house. Siedel made the arrangements for Atlantic Relocations Moving and Storage to arrive at 0900, with approximately ten to fifteen workers, accompanied by the Hamilton County Deputy Sheriff's Department, to proceed with the task of removing our personal and household goods from the 5000 sq ft. house.

The Sheriff's Department advised me that they were authorized to oversee the eviction and removal of our belongings from the house. My fiancée was allowed to remove important personal items and things we needed immediately. My son Neil and daughter Gabrielle were also present from time to time, helping to move items that were important to them, but I stayed on the premises and watched the movers and the process continue.

At around 3:30 pm or 4:00 pm on the afternoon of July 8th, the Deputy Sheriff ordered me to leave the house. This was hours before the

3

packing was completed. I protested because I wanted to be sure all of my belongings were <u>actually packed</u>. The Deputy Sheriff said that Mr. Siedel wanted to come to the house and did not want me there. I protested again because I felt even more strongly that there was a possibility that something would be stolen after I left. The Deputy Sheriff threatened me with arrest again, if I did not leave immediately. But he acknowledged that he was aware of the potential for theft and said he would remain until all the items were packed, loaded and shipped to the Atlantic Relocations warehouse for storage. His attitude and recognition of my concerns were offered, presumably to allay my fears, reassured me that in my absence, [he] the Sheriff's Department had the responsibility to oversee an orderly transition between occupant and owner. And, he was in the position [in my absence] to prevent a theft from occurring.

After I left the premises, my paths of Mr. Siedel and my own did cross, in a driveway across the street from the house. He said to me, "Well, George! I guess this is where we separate the men from the boys." I believed this was a racial taunt for two reasons. 1.) I was probably little older than he in age at the time, and 2.) His tone of voice carried a derogating emphasis on the word "boys". Siedel returned to the house and I have alleged that [he], with the complicity and cooperation of the other conspirators, would be the final arbiters of which household belongings would go into storage at Atlantic Relocations and which things would remain in the house.

I do not believe this violation of my fourteenth amendment property rights to have been the responsibility of one or two people. It required a tacit agreement between several people (public officials, private citizens, and the employees of a Hamilton County business) for this to have occurred. The theft required a deliberate manipulation of the circumstances surrounding my eviction in which the Sheriff's department played a critical role. I believe they knew that I would be concerned about my belongings and would not want to leave the premises until I was cer-

4

tain that a safe transfer of all my property had taken place. A successful theft could only occur if I was not present during the final stages of the move. I allege this is why the Deputy Sheriff forced me to leave the house under threat of arrest, using the authority vested in him by the law and by virtue of the court's order for eviction.

After the Deputy Sheriff got me off the property, I allege that the Atlantic Relocations movers facilitated the theft by intentionally failing to pack, load, and transport many of my personal and household goods. Then AR and its designees took deliberate steps to deceive, manipulate, and defraud me after the fact.

First, I did not hire Atlantic Relocations. Steve Siedel employed them. In fact, I didn't have an opportunity between the time the court's eviction order was delivered to me at 1630 on Friday, July 3, 1998, before the long holiday weekend, and the date set for the eviction, Wednesday, July 8, 1998. Saturday was July 4th. I had one business day, Tuesday, July 7, 1998 to appeal the decision and/or arrange to move the contents of a 5000 sq. ft. house.

In addition, I found out the June and July are the busiest months for the moving industry and I was told later that residential bookings had to be made well in advance of the moving date. I do not know when Siedel hired Atlantic Relocations. Without my being present, they packed, loaded, and moved my household belongings into storage at the AR warehouse in Hamilton County. Finally, the name on the storage account at AR's warehouse was that of Mr. Steven Siedel.

Second, on July 8th, I observed an Atlantic Relocations supervisory person (white male, mid-thirties) on site during the initial stages of the move. He compiled an inventory of the items that were packed and loaded onto the truck, an inventory AR would later claim to have lost. However, from 07/98 through 05/99 AR billed me monthly storage fees based on that inventory. This fee was based on *their* estimate of the overall weight, the *container size*, and the *number of containers* AR had

5

used to store my property. At the AR warehouse, *they* had filled each one of the *thirteen containers I was billed for.* [2] *They* had estimated the charges based on *their calculations* of the *weight* and *size of containers* needed by *the household contents they put into each container.*

I moved to California in September 1998, but from 07/98 until 05/99 *I received a monthly bill from Atlantic Relocations via USPS for storage charges* based on their estimates of the weight of my household goods, the container size, and the number of containers required to store my belongings.

However, their calculations turned out to be grossly inflated. Their estimates would have been accurate, if all my household contents should had been in storage. The fees billed to me via USPS each month reflected what I should have paid, if all of my belongings had been stored in the AR warehouse. That was not the case. For example, many items were missing, [only a partial listing] a seven-foot slate topped Pool Table, pool cues, racks and balls, a twelve-foot Sectional Sofa, lawn mowers, a wood storage rack, a bicycle, indoor and outdoor Christmas decorations, a gas burning outdoor grill, two floor dehumidifiers, and a waterbed.

I received inflated charges for eleven months. The bills were made to appear as though all of my household belongings had been removed from the house and stored in the AR warehouse. The fees I paid were based on perimeters that would have been accurate if everything had been transferred directly from the house into to storage. I allege that I was manipulated into paying inflated monthly storage fees for eleven months.

The violation of my rights did not stop there. When my household goods were finally shipped to me in May 1999, I made the personal discovery that many items were missing and the charges had not reflected the actual costs of storing all of my belongings.[3] This is when AR Vice President named John Schroeder got involved and conned me into ac-

---

[2] See billing statement from Atlantic Relocations.
[3] Atlantic Relocations

cepting the shipment "as is" with the promise he made that I could submit claims for the missing property to their New Hampshire insurer, requesting compensation for my losses. When my household goods were finally delivered in California, items valued at more than $ 20,000.00 were either missing or damaged.

### Current Situation

I filed civil complaints in the Los Angeles Federal District Court, and the Federal District Court of the District of Columbia [CV: 07-0939 RMU] alleging that these events had occurred just as I presented them here. Because I have asserted my rights, I have been the target of official retaliation by Hamilton County 's Carmel City Court and the Hamilton County Prosecutor's Office, as part of the ongoing official abuse of my civil and constitutional rights.

In 1998, I had two outstanding traffic tickets at the time I left Indiana for California. These outstanding tickets resulted in warrants for my arrest being issued by the Brownsburg County Court [**32102-9711-CM-4216**][4] and by the Carmel City Court [**29H01 9806-CM-000336**]. [5] In November 1998, I went to the Indianapolis F.B.I. office and filed my allegations about the Hamilton County Deputy Sheriff's [Department's] violations of my rights.

Hamilton County's Carmel City Court re-issued a warrant for my arrest that stipulated that I was supposed to turn myself in to the Sheriff at the jail. This decision was supposedly based on a technical issue involving Indiana law. To the best of my ability to articulate the situation, in that state, persons charged with two Class C misdemeanor infractions were subject of an additional, and more serious, Class A penalty that may involve jail time. I was told that I had no option other than reporting to the Hamilton County jail to resolve the traffic ticket [Driving while suspended].

---

[4] See Detainer Action Letter
[5] See Detainer Action Letter

The U.S. Attorney for the Southern District of Indiana indicted me for failure to pay child support in July 2002. I was sentenced to five years of probation and given a $ 20,000.00 fine in September 2003. My probation was violated in December 2003 and I served 10 months in federal custody. Prior to being released, I was made aware of the Interstate Agreement Drivers License Agreement, Article V paragraphs c-h, which sets forth the basis for this law: "permitting prosecution on the charge or charges contained in one or more untried indictments, informations, or complaints which form the basis of the detainer or detainers or for prosecution on any other charge or charges arising out of the same transaction." [6]

Although I wrote both jurisdictions in 2004, Brownsburg County and Hamilton County, prior to my release in 2004, [7] only the traffic violation Brownsburg County Court had been dismissed per the Interstate Agreement. [8] Hamilton County adopted a different interpretation of this law and refused to drop the charges. [9] The complicated formula that would have made me subject to the sanctions of an additional Class A misdemeanor was removed by Brownsburg's decision to dismiss. However, the Hamilton County Carmel City Court will not discuss the restoration of my license until I have reported to the Hamilton County Jail.

I have very real reasons to fear for my life. While I was incarcerated in FCI Victorville, I filed a 2004 civil complaint naming Senator Evan Bayh and others from Indiana. Shortly after that case was docketed, an attempt to take my life was made by Michelle Tempke, an Infirmary temporary employee who dispensed to me capsules that contained poison. I believe this was in retaliation for filing that complaint in July 2004.

This was not the first attempt to kill me. That initial civil complaint contained an allegation about an attempt that was made on my life in

---

[6] See Interstate Agreement
[7] See letters to Hamilton County and Brownsburg County.
[8] See Brownsburg County Court decision.
[9] See Letter from Carmel City Judge.

8

2002 and resulted in my being hospitalized in USC/LAC Medical Center's Cardiac Intensive Care Unit with a diagnosis of congestive heart failure. I have alleged that Ricin was used in a liquid soap compound and had a nearly lethal effect on me, during a time when I was writing DOJ Inspector General Glen Fine about possible illegal wiretaps on my cellular telephone, and other acts violating my civil and constitutional rights.

## Summary

I believe the parties who conspired to steal my household belongings have held a vendetta against me since I revealed their illegal conduct and they were forced to take extraordinary measures to cover-up the truth. Their racism has involved others in the effort to protect them from culpability for their own egregious misconduct. To force my return to Indiana from California, they illegally removed me as guardian of my now deceased father in September 1999. Additionally, through a well coordinated political network in Indianapolis I was required to come there for a hearing to challenge the decision to remove me as guardian. I believed the change in guardianship was manufactured from very weak allegations and that their real intent was to have me incarcerated, silenced, and possibly killed for speaking out about what happened in Hamilton County in 1998.

After that failed attempt to lure me back to Indiana by using my ailing father as bait, the Indiana Medical Board asked the California Medical Board to suspend my license to practice medicine in California on September 29, 1999. I was forced to abandon my medical practice and referred all of my patients to other physicians. The California Medical Board ordered me to go back to Indiana to have my Indiana medical license reinstated before my California medical license would be restored. I questioned the legality of California's suspension on two grounds. 1.) I did not hold an active Indiana medical

license in September 1999 because I had allowed it to expire in June 1999, three months earlier. Therefore, Indiana could not ask another state to suspend a non-existent medical license based on reciprocity between the two states. 2.) And, the California Business Code statutes clearly indicated that suspension was only appropriate when the practitioner was accused of malpractice, incompetence, or was considered to be a danger to the public. None of these applied to me. The California Medical Board agreed and restored my license within a week of the suspension.

However, a closer inspection of the paperwork revealed that the Indiana Medical Board may have acted unethically. I moved to California in September 1998. I applied for and received my California medical license in January 1999. I let my Indiana medical license expire in June 1999. I received word about the suspension of my California license in September 1999, more than ninety days after my Indiana license had expired. However, the Indiana Medical Board changed the dates of their suspension to make it appear that its suspension order was issued in March 1999, nearly six months before the suspension order was delivered in California.

Although I practiced in the same location during that time, was active continuously throughout the time between March and October 1999, they claim that this six month lapse is within the standards governing the administrative practices of both medical boards. I believe otherwise. I believe it represents the irrational anger fueled a racial animus that wanted to punish me at any costs. I refused to go back to attend a mock hearing in my father's name. I challenged the suspension of my California medical license as illegal because it was illegal. But the Indiana Medical Board's fraudulent post dating of

the suspension of my Indiana medical license has hampered me from obtaining malpractice insurance, and has limited my ability to earn a living in my chosen profession.

These events are part of a nine year catalogue of abuses I have experienced because the people I accused of wrongdoing had power, protection, and an intense desire to punish me for telling the truth about the official misconduct that took place in Hamilton County during July 1998, and thereafter. The nexus between the private citizens I have named and the state officials is extremely close. In fact, they are close enough to establish their connections to the conspiracy to protect the Hamilton County Sheriff's Department, Kenneth Kern, Steve Siedel, and Atlantic Relocations employees who stole my property. Later, the effort changed to protect Senator Evan Bayh from any revelation that he had knowledge of the wrongdoing and was actively involved in protecting those whom I had identified.

I have alleged there were many, many cover-up attempts during this time, including attempted murder by Michelle Tempke, a contract employee in the Infirmary's Pharmacy, who handed me toxic capsules, while I was in federal custody in FCI Victorville, California in July 2004. Ms Tempke's attempt to kill me took place shortly after I filed a civil complaint naming Senator Bayh and the others co-conspirators in Indiana in a Civil Rights action. I believe this extraordinary step was taken because Senator Evan Bayh had ambitions on the Presidency of the United States. He had formed and exploratory committee and was actively raising funds for a political race. However, because of my truthful accounts of what happened in Hamilton County, and more importantly, his knowledge of and involvement in the cover-up, I became the bane of his political aspirations and the target of those who supported his presidential ambitions.

I have no driver's license, although I believe that I am legally entitled to have it restored under the Driver's Compact. However, those who have protected the racist in Hamilton County are still holding out for another chance to punish me for telling the truth about their misconduct by forcing me to turn myself into the same group of lawless law enforcement officers that stole my property, covered up the wrongdoing of others, and now thirsts for revenge for having been exposed. What they have done is unethical, immoral, remorseless, and criminal.

I swear the above to be a true and accurate description of the facts, times, and circumstances surrounding the issues raised during these pre-trial hearings, pertaining to CV: 07-0939 (RMU).

Respectfully submitted,

George M. Lewis, M.D.

11/29/07

Subscribed and sworn to before me this
29 day of NOV. 2007
_____ Notary Public
in and for the County of Los Angeles, State of California

MAYRA JULIE SOSSA
COMM. # 1765082
NOTARY PUBLIC-CALIFORNIA
LOS ANGELES COUNTY
MY COMM. EXP. SEPT. 28, 2011

12

2



**ATLANTIC RELOCATION SYSTEMS**

9967 Westpoint Drive
Indianapolis, Indiana 46256

# ATLANTIC RELOCATION SYSTEMS
**9967 WESTPOINT DRIVE**
**INDIANAPOLIS, IN 46256**

317/594-1333
800/333-0058

**FAX NO. - 317/594-1330**

**PLEASE DELIVER THE FOLLOWING PAGE(S) TO:**

NAME: *Mr George Lewis*

COMPANY: _____

PHONE NO. _____

FAX NO. *317-377-5310*

NUMBER OF PAGES FAXED INCLUDING THIS COVER LETTER: *2*

•••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••

FROM: **MARK WHITAKER, V.P. OFFICE & INDUSTRIAL RELOCATIONS**

NOTES: *If you have any other questions,*
*please feel free to call*
*thanks —*
*Mark*

**Atlas Van Lines Agent**

World-Class Moving™        Telephone 317/594-1333 • 800/333-0058 • Fax 317/594-1330

Other Locations: Phoenix, AZ; Irvine, CA; Denver, CO; Sarasota & Tampa, FL; Atlanta & Tucker, GA; Chicago, IL; Houston & Dallas, TX

118

ATLANTIC Relocation Systems

# GEORGE LEWIS' STORAGE BREAKDOWN

**TOTAL CRATES:**          **11**
**TOTAL WEIGHT:**          **13,200LBS.**

**PICK UP CHARGES:**            **$ 891.00**
**STORAGE CHARGES:**(1ST MONTH)  **$ 330.00**
**STORAGE CHARGES:**(2ND MONTH)  **$ 330.00**
**WAREHOUSE HANDLING:**         **$ 363.00**
**CONT. & PACKING:**            **$ 905.31**

**TOTAL DUE BEFORE DELIVERY**      **$2819.31\***

**LOCAL DELIVERY:**              **$ 891.00**
**SANFRANCISCO DELIVERY:** **$7500.00**

**\* THE CHARGES OF $2819.31 MUST BE PAID IN FULL PRIOR TO
FURNITURE BEING RELEASED FROM ATLANTIC RELOCATION SYSTEMS
WAREHOUSE. PAYMENT MUST BE RECEIVED IN THE FORM OF A
CASHIERS CHECK, MONEY ORDER OR CERTIFIED CHECK.**

Agent for ATLAS VAN LINES

Telephone 317/594-1333 • 800/333-0058 • Fax 317/594-1330
Other Locations: Phoenix, AZ; Irvine, CA; Denver, CO; Sarasota & Tampa, FL; Atlanta & Tucker, GA; Chicago, IL; Houston & Dallas, TX

119

# George M. Lewis, M.D.

Neuropsychiatrist
350 Chadbourne Rd.
Fairfield, CA 94585
707.429.7181

August 9, 1999

To Whom It May Concern:

That were apparently lost or stolen. The court order evicting me from my residence was served
by the Hamilton County Sheriff's Office. The Sheriff's Office oversaw the packing of my
household goods as they were packed in boxes identified by the location from which the contents
were collected and with the name "Seidel" on the outside of each box. They moved everything in
the house into storage on the day of the eviction. These items were either lost or stolen while in
your possession. I will list them and their replacement costs:

| Item | Cost |
|---|---|
| Pool Table | 1,100.00 |
| One-third rick of wood | 30.00 |
| Metal wood stand, Leather Tote | 250.00 |
| Two lamps (end table) | 350.00 |
| Two lawnmowers | 250.00 |
| Floor dehumidifier | 300.00 |
| Large computer desk | 250.00 |
| Television with VCR | 290.00 |
| Television 19" with remote | 340.00 |
| Large heavy based brass arched lamp | 375.00 |
| Military sword | 250.00 |
| Pool cue | 100.00 |
| Sectional couch | 400.00 |
| Large wicker chair | 50.00 |
| Propane Gas grill and tank | 500.00 |
| Three cellular telephones | 375.00 |
| Two basketballs, three bats, four gloves | 200.00 |
| Lawn tools (6-8) including racks, hoses, sprinkler heads, hoes, spades | 225.00 |
| Set of venetian blinds | 100.00 |

121

| | |
|---|---|
| Automatic car starter | 375.00 |
| Fan (two floor fans) | 95.00 |
| Camping gear (sleeping bags, tent, sticks, butane lamp, butane stove, ice chest) | 475.00 |

| | |
|---|---|
| TOTAL THIS PAGE | 6,580.00 |
| FROM PREVIOUS PAGE | 8,475.00 |
| TOTAL | $15,055.00 |

Please contact me if you have any further questions.

George M. Lewis, M.D.
Physician

122



**Atlas Van Lines**

*World-Class Moving*®

October 13, 1999
Reg. No. HZ-19948-0

George M. Lewis
2753 Kaanapali Dr.
Fairfield, CA 94533

Dear Mr. Lewis,

In follow up to our recent phone conversation, this correspondence is to serve as our formal denial of your claim filed with Atlas Van Lines, Inc.. As discussed, our investigation has not found, that the loss and damage claim you presented to have occurred while your goods were in the possession of Atlas Van Lines, Inc., for the interstate move.

We direct you and your claim to Atlantic Relocation Systems of Indianapolis, Indiana. This agency handled your goods both at origin and destination under local coverage, separate from your interstate relocation. Your claims would apply to these elements of your move.

We do apologize for any delay this may cause, but your claim does need to be handled by the appropriate party. We are forwarding a copy of your claim and correspondence to you and Atlantic Relocation Systems for your convenience. Their address and phone number are provided below.

Sincerely,

ATLAS VAN LINES, INC.

Alan R. Jobe, Ext. 2247
Director, Special Assignments & Training
'Certified Claims Analyst'
Claims Department

ARJ:aj

cc:    Atlantic Relocation Systems
       9967 Westpoint Drive
       Indianapolis, IN 46256
       PH: 317-594-1333

/123

4

BP-S394.058 **DETAINER ACTION LETTER**
U.S. DEPARTMENT OF JUSTICE

ᶜEP 03
**FEDERAL BUREAU OF PRISONS**

| To:<br><br>**CARMEL POLICE DEPARTMENT**<br>**3 CIVIC SQUARE**<br>**CARMEL, INDIANA    46032**<br><br>**ATTENTION: WARRANTS** | Institution:<br>Federal  Correctional Institution Victorville<br>P.O.  Box  5400<br>Adelanto, CA  92301<br>(760)  246-2532 |
|---|---|
| | Date:  **February 27, 2004** |

| Case/Dkt #:<br>**29H01 9806-CM-000336** | Inmate's Name:<br>**LEWIS MD,**<br>**George  M.** | Fed Reg No:<br>**21304-112** | DOB/SEX/RACE:<br>05-05-1947/MALE/BLACK |
|---|---|---|---|
| Aliases:  George Lewis; George E. Lewis; George<br>Edwin Lewis; George Milton Lewis | | Other No.:   FBI - 204484DC0 | |

The below checked paragraph relates to the above-named inmate:

☒    This office is in receipt of the following report:   A BENCH WARRANT WAS ISSUED FROM YOUR COURT ON 06-07-1999 FOR FAILURE TO APPEAR. HE  WAS CITED FOR DRIVING WITH A SUSPENDED LICENSE.

Will you please investigate this report and advise what disposition, if any, has been made of the case.

**If subject is wanted by your department and you wish a detainer placed, it will be necessary for you to forward a certified copy of your warrant to us along with a cover letter stating your desire to have it lodged as a detainer. If you have no further interest in the subject, please forward a letter indicating so.**

☒    Other:
He was sentenced in Federal Court on 12-15-2003 to 6 months, 136 days with one year(s) supervision to follow for PROBATION VIOLATION. His current Projected Release Date is 10-08-2004.

Sincerely,    **MARIE PEDRO, LIE**

Alan K. Ray, Inmate Systems Manager

Original - Addressee, Copy - Judgement and Commitment File; Copy - Inmate; Copy - Central File (Section 1); Copy - Correctional Services Department
(Replace BP-394(58) dtd Mar 2003)

5

BP-S394.058 **DETAINER ACTION LETTER**
**U.S. DEPARTMENT OF JUSTICE**

SFP 03
**FEDERAL BUREAU OF PRISONS**

| To: <br> **BROWNSBURG POLICE DEPARTMENT** <br> **55 E MAIN STREET** <br> **BROWNSBURG, INDIANA   46112** <br> <br> **ATTENTION: WARRANTS** | Institution: <br> Federal  Correctional Institution Victorville <br> P.O.  Box  5400 <br> Adelanto, CA  92301 <br> (760) 246-2532 |
|---|---|
| | Date:  **February 27, 2004** |

| Case/Dkt #: <br> **32I02-9711-CM-4216** | Inmate's Name: <br> **LEWIS MD,** <br> **George M.** | Fed Reg No: <br> **21304-112** | DOB/SEX/RACE: <br> 05-05-1947/MALE/BLACK |
|---|---|---|---|
| Aliases:  George Lewis; George E. Lewis; George Edwin Lewis; George Milton Lewis | | Other No.:   **FBI - 204484DC0** | |

The below checked paragraph relates to the above-named inmate:

☒     This office is in receipt of the following report:   A BENCH WARRANT WAS ISSUED FROM YOUR COURT ON 07-22-1999 FOR PROBATION REVOCATION. HE WAS CITED FOR MISDEMEANOR DRIVING WITH A SUSPENDED LICENSE AFTER PRIOR CONVICTION.

Will you please investigate this report and advise what disposition, if any, has been made of the case.

**If subject is wanted by your department and you wish a detainer placed, it will be necessary for you to forward a certified copy of your warrant to us along with a cover letter stating your desire to have it lodged as a detainer. If you have no further interest in the subject, please forward a letter indicating so.**

☒     Other:
He was sentenced in Federal Court on 12-15-2003 to 6 months, 136 days with one year(s) supervision to follow for PROBATION VIOLATION. His current Projected Release Date is 10-08-2004.

Sincerely,     **MARIE PEDRO, LIE**

Alan K. Ray, Inmate Systems Manager

Original - Addressee, Copy - Judgement and Commitment File; Copy - Inmate; Copy - Central File (Section 1); Copy - Correctional Services Department
(Replace BP-394(58) dtd Mar 2003)

4

purpose of permitting prosecution on the charge or charges contained in one or more untried indictments, informations, or complaints which form the basis of the detainer or detainers or for prosecution on any other charge or charges arising out of the same transaction. Except for his attendance at court and while being transported to or from any place at which his presence may be required, the prisoner shall be held in a suitable jail or other facility regularly used for persons awaiting prosecution.

"(e) At the earliest practicable time consonant with the purposes of this agreement, the prisoner shall be returned to the sending State.

"(f) During the continuance of temporary custody or while the prisoner is otherwise being made available for trial as required by this agreement, time being served on the sentence shall continue to run but good time shall be earned by the prisoner only if, and to the extent that, the law and practice of the jurisdiction which imposed the sentence may allow.

"(g) For all purposes other than that for which temporary custody as provided in this agreement is exercised, the prisoner shall be deemed to remain in the custody of and subject to the jurisdiction of the sending State and any escape from temporary custody may be dealt with in the same manner as an escape from the original place of imprisonment or in any other manner permitted by law.

"(h) From the time that a party State receives custody of a prisoner pursuant to this agreement until such prisoner is returned to the territory and custody of the sending State, the State in which the one or more untried indictments, informations, or complaints are pending or in which trial is being had shall be responsible for the prisoner and shall also pay all costs of transporting, caring for, keeping, and returning the prisoner. The provisions of this paragraph shall govern unless the States concerned shall have entered into a supplementary agreement providing for a different allocation of costs and responsibilities as between or among themselves. Nothing herein contained shall be construed to alter or affect any internal relationship among the departments, agencies, and officers of and in the government of a party State, or between a party State and its subdivisions, as to the payment of costs, or responsibilities therefor.

"Article VI

"(a) In determining the duration and expiration dates of the time periods provided in articles III and IV of this agreement, the running of said time periods shall be tolled whenever and for as long as the prisoner is unable to stand trial, as determined by the court having jurisdiction of the matter.

"(b) No provision of this agreement, and no remedy made available by this agreement shall apply to any person who is adjudged to be mentally ill.

"Article VII

"Each State party to this agreement shall designate an officer who, acting jointly with like officers of other party States, shall promulgate rules and regulations to carry out more effectively the terms and provisions of this agreement, and who shall provide, within and without the State, information necessary to the effective operation of this agreement.

"Article VIII

"This agreement shall enter into full force and effect as to a party State when such State has enacted the same into law. A State party to this agreement may withdraw herefrom by enacting a statute repealing the same. However, the withdrawal of any State shall not affect the status of any proceedings already initiated by inmates or by State officers at the time such withdrawal takes effect, nor shall it affect their rights in respect thereof.

"Article IX

"This agreement shall be liberally construed so as to effectuate its purposes. The provisions of this agreement shall be severable and if any phrase, clause,

12

Case 1:07-cv-00939-RMU    Document 18-2    Filed 12/03/2007    Page 26 of 33

sentence, or provision of this agreement is declared to be contrary to the constitution of any party State or of the United States or the applicability thereof to any government, agency, person, or circumstance is held invalid, the validity of the remainder of this agreement and the applicability thereof to any government, agency, person, or circumstance shall not be affected thereby. If this agreement shall be held contrary to the constitution of any State party hereto, the agreement shall remain in full force and effect as to the remaining States and in full force and effect as to the State affected as to all severable matters."

Prev | Next

*LII has no control over and does not endorse any external Internet site that contains links to or references LII.*

credits        about us        send email

February 19, 2004,

Case No. <u>32I02 9711 CM 04216</u>

Dear Judge,

I am writing to ask if you would consider dismissing my arrest warrant for the charge of"Failure to Appear". The fine has been paid in this matter. I would also ask if you would dismiss my probation or in alternative run the probation together along with my federal sentence. I cannot make an court appearance because I am serving time in the State of California. I would like to thank you in advance in this matter, and will wait your reply to this matter

Respectfully submitted,

George M.Lewis
#21330-112
Federal Correctional Institution
P.O.Box 5300
Adelanto, CA 92301

6

February 19, 2004,

Case No. <u>29H01 980bCM 0336</u>

Dear Judge,

    I am writing to ask if you dismiss the arrest warrant concerning the charge of "Failure to Appear". I have paid the fine as requested. If you are planning to impose a sentence in this matter, could you run the sentence together with my federal sentence that I am presently serving in the State of California. I would like to thank you in advance in this matter and will wait your reply to this matter.

Respectfully submitted,

George M. Lewis
#21304-112
Federal Correctional Institution
P.O.Box 5300
Adelanto, CA 92301

STATE OF INDIANA )
COUNTY OF HENDRICKS )SS:
)
IN THE MATTER OF: )
STATE OF INDIANA )
)
    VS
GEORGE M LEWIS
OLN 8937-75-1473

BROWNSBURG TOWN COURT
2007 TERM

**32I02-9711-CM-04216**

FILED
MAY 1 1 2007
Brownsburg Town Court
Brownsburg, Indiana

# ORDER

    Comes now the Brownsburg Town Court and Orders the Bureau of Motor Vehicles to expunge the Failure to Appear from the defendant's driving record.

    So Ordered this 11th day of May, 2007

_Charles E. Hostetter_
Charles E. Hostetter, Judge

State of Indiana
Defendant/ Counsel
File



# HAMILTON COUNTY PROSECUTOR'S OFFICE

### SONIA J. LEERKAMP • PROSECUTING ATTORNEY

BARBARA J. TRATHEN
CHIEF TRIAL DEPUTY
•
JEFFREY D. WEHMUELLER
ADMINISTRATIVE CHIEF DEPUTY
•
D. LEE BUCKINGHAM, II
JENNIFER L. FREEMAN
GRETCHEN S. PENNINGTON
DAVID K. NAJJAR
STEPHANIE M. SMITH
WENDY C. PETERSEN
JAMIE T. CAMPBELL
LAWRENCE D. NEWMAN
J. ERIC BLANKENSHIP
BRADLEY L. BANKS
MATTHEW A. GERNAND
DORI E. WOOD
MARIETTO V. MASSILLAMANY
•
GARY C. LAMEY
ROBIN HODAPP-GILLMAN
JUVENILE DIVISION
•
ROGER W. KUBA
INVESTIGATOR

May 20, 2005

George M. Lewis, M.D.
636 N. Spaulding Ave.
Los Angeles, CA 90036

RE:  State v. George M. Lewis, 29H01-9806-CM-336

Dear Mr. Lewis:

Your letter was received by this office and directed to me as I am the prosecutor assigned to the Carmel
City Court. After having reviewed this file, the state is not inclined to enter into any negotiations with
you, as you still have at least one active warrant in the State of Indiana. Until you return to this
jurisdiction to resolve this matter, which will involve surrendering yourself to the authorities at the
Hamilton County Jail, then our office will be unable to assist you in any regards to your case.

Until you have resolved the matter of the outstanding warrant, you should know that this charge will
continue to pend against you.

Govern yourself accordingly.

Respectfully,

Jennifer L. Freeman
Deputy Prosecuting Attorney

ONE HAMILTON COUNTY SQUARE, SUITE 134
NOBLESVILLE, INDIANA 46060
(317) 776-8595 • FAX (317) 776-8469

BAD CHECK PROGRAM 774-2513

PRE-TRIAL DIVERSION 776-8415
DEFERRAL 770-8860

**Proof of Service**

**Defendant**

Senator Evan Bayh
United States Senate
131 Hart Building
Washington, D.C.

George M. Lewis, M.D.
7135 Hollywood Blvd. PH 3-West
Los Angeles, California 90046

11/29/03
DATE: